1  H. CHRISTIAN L'ORANGE (State Bar No. 71730)
   S. FEY EPLING (State Bar No. 190025)
2  DRINKER BIDDLE & REATH LLP
   50 Fremont Street, 20th Floor
3  San Francisco, California 94105-2235
   Telephone: (415) 591-7500
4  Facsimile: (415) 591-7510
   E-mail: christian.lorange@dbr.com
5  E-mail: fey.epling@dbr.com

6  Attorneys for Defendant
   AXA EQUITABLE LIFE INSURANCE COMPANY



FILED

MAR 17 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

7

8              UNITED STATES DISTRICT COURT OF CALIFORNIA

9                          SOUTHERN DISTRICT

FAXED

10                                        '08 CV 498    H  LSP

11  AXA EQUITABLE LIFE INSURANCE       Case No.
    COMPANY,
12                                     **COMPLAINT FOR DECLARATORY
                     Plaintiff,        JUDGMENT AND OTHER RELIEF**
13
                                       **DEMAND FOR JURY TRIAL**
14        v.

15  H. THOMAS MORAN, II, Court-
    Appointed Receiver of LYDIA CAPITAL,
16  LLC and GEORGE WILLIAMSON as
    Trustee of RW AXA, LLC,
17
                     Defendants.
18

19        Plaintiff, AXA Equitable Life Insurance Company ("AXA Equitable"), by its

20  attorneys, hereby files this Complaint for Declaratory Judgment and other relief, and in

21  support thereof, avers as follows:

22        1.    This is an action for Declaratory Judgment under 28 U.S.C. § 2201, in

23  which AXA Equitable seeks a declaration establishing its rights and obligations pursuant

24  to a policy of life insurance issued to RW AXA, LLC ("RW AXA") on the life of Ruth L.

25  Williamson in justifiable reliance upon information provided in the application for that

26  policy. That application was compromised by two material misrepresentations and a

27  material concealment. Moreover, upon information and belief, the policy in question was

28  procured in order to be sold to disinterested investors, and as such, lacked the required

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105



insurable interest. Upon information and belief, Lydia Capital, LLC ("Lydia"), an entity formerly engaged in investing in life insurance policies issued on the lives of strangers, surreptitiously acquired a beneficial interest in RW AXA after the policy was issued. Lydia is in receivership following the initiation by the United States Securities and Exchange Commission (the "SEC") of an enforcement action alleging Lydia and its principals committed, among other purported illegalities, securities fraud.

## PARTIES

2.      Plaintiff AXA Equitable is a life insurance company organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.

3.      Defendant H. Thomas Moran, II ("Mr. Moran" or the "Receiver") is a natural person with an address of 521 W. Wilshire Boulevard, Suite 200, Oklahoma City, Oklahoma 73116. By order of court, Mr. Moran was appointed Receiver of Lydia, a limited liability company organized and existing, upon information and belief, under the laws of the State of Delaware, with its principal place of business in Boston, Massachusetts.

4.      Upon information and belief, Defendant George Williamson ("Mr. Williamson"), an officer of RW AXA, is an individual located in Utah. However, RW AXA's address is listed as 12 Corporate Plaza, Suite 105 Newport Beach, CA 92660.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), insofar as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between AXA Equitable and all defendants.

6.      In addition, this action may be brought in this Court pursuant to 28 U.S.C. §§ 754 and 959(a), inasmuch as AXA Equitable brings this action with respect to the

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1:397004/1

COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF

CASE NO.

1   Receiver's acts and transactions in carrying on business connected with property which,

2   upon information and belief, is within the Lydia receivership. Furthermore, on May 11,

3   2008, the United States District Court for the District of Massachusetts, the court that

4   appointed Mr. Moran, granted AXA Equitable leave to file an action concerning the

5   validity of the policy issued to RW AXA.

6        7.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(a), because a

7   substantial part of the events giving rise to the claim occurred herein.

8

9                   **INVESTOR-ORIGINATED LIFE INSURANCE BACKGROUND**

10       8.    Over the last decade, a secondary market has emerged in which speculative

11  investors have sought to obtain, and in many cases have succeeded in obtaining, a

12  pecuniary interest in life insurance policies. Although there are other varieties of

13  secondary market transactions, in the most problematic scenario, the insured and/or

14  policy owner intend at inception for the policy or a beneficial interest in the entity that

15  owns the policy to be sold and the speculators acquire or agree to acquire an interest in

16  the life insurance policy.

17       9.    These speculators do not acquire an interest in life insurance policies

18  insuring the lives of persons with whom they have a familial relationship, or in whose

19  longevity they possess a legally recognized interest; instead, these speculators purchase

20  policies that insure the lives of strangers – or, in many cases, purchase beneficial interests

21  in insurance trusts or ownership in shell corporations that own those policies – in the

22  expectation that they will profit by the death of the insured.

23       10.   Such arrangements are commonly referred to as IOLI, which stands for

24  "investor-originated life insurance," or STOLI, which stands for "stranger-originated life

25  insurance." (These transactions are referred to as "STOLI" herein.)

26       11.   STOLI transactions often run afoul of state insurable interest laws, which

27  protect the integrity of life insurance by requiring that a policy owner have a cognizable

28  interest in the longevity of the insured at the time the policy is issued.

12.    Speculators, who are the true intended owners of STOLI policies, attempt to circumvent these laws by carefully constructing their transactions in order to hide these impermissible investments.

13.    The speculators must first find a relatively older and high-net worth individual willing to participate in the investment transactions.  Logically, the STOLI investors seek out the highest anticipated rates of return when choosing the life insurance policies on which they will speculate.  This means the typical life insurance policy to which speculators gravitate insures the life of an individual aged seventy or older, with a net worth of over one million dollars.  These individuals can obtain large value policies, and, actuarially speaking, are expected to have a relatively limited lifespan.  For these and other reasons, these individuals are targeted by STOLI speculators.

14.    The speculators must also determine the resale value of the policy in the secondary market; this value is based largely upon the life expectancy of the prospective insured.  The shorter the expected lifetime of the prospective insured, the more valuable the policy is to those who would gamble on his or her life.  Prior to the resale of a policy, the prospective insured often submits to a life expectancy analysis, the results of which are provided to putative investors.

15.    Once the speculators locate an individual who meets their investment profile, and, more importantly, will agree to collaborate in the STOLI arrangement, an application is submitted for one or more insurance policies.  The speculators typically pay most or all of the prospective insured's costs, including premium payments.  Some speculators even agree to pay the prospective insured a fee upon the issuance of the policy.

16.    In many cases, the policy application indicates that a third-party entity, such as a trust, a shell corporation or a limited partnership, will be the owner and beneficiary of the life insurance proceeds.  This permits the speculators to acquire an interest in this holding entity – and, most importantly, in the death benefit that later will be disbursed by the insurer – without disclosing the fact of their ownership to the insurer.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SFI:397004-1

4

COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF

CASE NO.

17.    Another way the investors obtain ownership of the policy is to loan the insured the funds to pay the premium for a finite period of time, usually for the two-year contestability period. Once this contestability period has expired, the insured can either repay the loan or assign the policy to the investors, thus completing the transaction. The loan is structured in a way to encourage the insured to assign the policy to the investors by, among other things, loaning the funds at a high interest rate.

18.    While there are many other variations, all STOLI programs have one thing in common: their objective is to give investors who have no insurable interest in the life of the insured a stake in the life insurance policy of a complete stranger.

## FACTUAL BACKGROUND

### Issuance of the Policy

19.    On July 31, 2006, a formal application (the "First Application") was submitted to AXA Equitable for a $10 million life insurance policy on the life of Ruth L. Williamson, with Brad Ferney identified as the agent.

20.    On the First Application, Ms. Williamson provided, among other information, her date of birth, social security number, and information concerning her net worth.[1] The First Application designated the beneficiary and owner of this prospective policy as Morningside Developers, LLC ("Morningside"). The First Application designated Morningside, as a "trust" with Ms. Williamson's sons, Thomas and George Williamson, indicated as the "trustees."

21.    The First Application contained a question aimed at discovering whether the intended owner of the policy planned to sell the policy. Morningside, as the proposed owner, answered "No" to this question, which states

---

[1] A true and correct copy of the First Application, with redactions, is attached hereto as Exhibit "A." The date of birth, social security number, and approximate net worth of Mr. Williamson were each indicated on the First Application. That information, along with other financial and medical data, has been redacted to protect Ms. Williamson's confidentiality.

1     •    Do you, the owner intend to use or transfer the policy for any type of pre-
death financial settlement, such as viatical settlement, senior settlement, life
2           settlement, or any other secondary market?

3

   22.     Ms. Williamson, as the proposed insured, and Morningside, as the proposed

4

owner, also answered "No" to the following question:

5

     •    Have you, the owner, or any Proposed Insured if other than the owner, in
6           the past 5 years sold a policy to a life settlement, viatical or other secondary
           market provider?

7

8     23.    Also, Ms. Williamson, as the proposed insured, and Morningside, as

9  proposed owner, answered "Yes" to the following question:

10      •    Any other life insurance now in effect or application now pending?

11

12     24.    In further response to this affirmative answer, Ms. Williamson stated

United of Omaha and ING each issued a life insurance policy on her life. Upon
13

information and belief, an additional $10 million life insurance policy was issued by AIG
14

American General on the life of Ms. Williamson (the "AIG Policy"), and remained in
15

effect at the time the First Application was submitted to AXA Equitable. Ms. Williamson
16

did not disclose the existence of the AIG Policy in the First Application.
17

18     25.    As part of this application process, Ms. Williamson also submitted a

financial supplement (the "First Financial Supplement").
19

20     26.    Based upon the First Application, First Financial Supplement, and the

representations contained therein, on August 11, 2006, AXA Equitable issued life
21

insurance policy number 156 218 633 with a death benefit of $10 million on the life of
22

Ms. Williamson (the "First Policy"). A true and correct copy of the First Policy, with
23

redactions of personal identifiers, health information and financial information is attached
24

hereto as Exhibit "B." The First Policy was issued with a copy of the First Application
25

(including the First Financial Supplement) attached. *See* Exhibit "B."
26

27     27.    Upon receipt of the First Policy on August 11, 2006, Morningside indicated

on the delivery receipt "[a]ll persons proposed for insurance under this Policy are living
28

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

6

COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF                    CASE NO.

1    and insurable as described in each part of the application for this Policy."

2        28.    On November 15, 2006, AXA Equitable received a request to split the First

3    Policy into two policies from Brad Ferney. The First Policy was requested to be reduced

4    to a $6 million death benefit, while a second policy was requested to be issued with a $4

5    million death benefit. Along with this request came a formal application for the new $4

6    million policy (the "Second Application"), with Brad Ferney again identified as the

7    agent.[2]

8        29.    Unlike the First Application, the Second Application indicated no other

9    insurance policies were in-force on the life of Ms. Williamson.

10        30.    Upon information and belief, at the time the Second Application was

11    submitted to AXA Equitable, life insurance policies issued by AIG American General,

12    United of Omaha, and ING were in effect on the life of Ms. Williamson.

13        31.    The Second Application designated the beneficiary and owner of the

14    prospective policy as RW AXA. The Second Application did not designate a contact or

15    address for RW AXA; however, a subsequent amendment to application (the

16    "Amendment") designated George B. Williamson as an officer of RW AXA, with an

17    address at 12 Corporate Plaza Suite 105, Newport Beach, California 92660. A copy of

18    the Amendment is attached hereto as Exhibit "D."

19        32.    The Second Application contained the same questions as the First

20    Application focusing on the potential intent to apply for the Second Policy merely to

21    engage in a stranger originated life insurance transaction. RW AXA, as the proposed

22    owner, answered "No" to the following question:

23        •    Do you, the owner, intend to use or transfer the policy for any type of pre-
24             death financial settlement, such as viatical settlement, senior settlement, life
             settlement, or for any other secondary market?

25

26        [2] A true and correct copy of the Second Application, with redactions, is attached hereto as Exhibit
27    "C." The date of birth, social security number, and approximate net worth of Mr. Williamson were each
    indicated on the Second Application. That information, along with other financial and medical data, has
28    been redacted to protect Ms. Williamson's confidentiality.

33.    RW AXA, as the proposed owner, and Ms. Williamson, as the proposed insured, answered "No" to the following question:

- Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical or other secondary market provider?

34.    As part of this application process, Ms. Williamson also submitted a financial supplement (the "Second Financial Supplement").

35.    Based upon the Second Application, the Second Financial Supplement, and the representations contained therein, on or about November 28, 2006, AXA Equitable issued life insurance policy number 156 229 495 with a death benefit of $4 million on the life of Ms. Williamson (the "Second Policy").[3]  A true and correct copy of the Second Policy, with redactions of personal identifiers, health information and financial information is attached hereto as Exhibit "E."  The Second Policy was issued with a copy of the Second Application attached.  *See* Exhibit "E."

36.    The Second Policy was issued with a copy of the Second Application (including the Second Financial Supplement) attached.  Importantly, upon receipt of the Second Policy on December 1, 2006, Mr. Williamson, by and on behalf of RW AXA, indicated on the delivery receipt "[a]ll persons proposed for insurance under this Policy are living and insurable as described in each part of the application for this Policy."

37.    Based upon the request to split the First Policy, AXA reissued the First Policy on November 30, 2006, with a death benefit of $6 million.

38.    Upon information and belief, despite answering "no" to questions in the First Application and Second Application asking whether, in the past 5 years, the owner or any proposed insured sold a life insurance policy to a life settlement, viatical or other secondary market provider, policies insuring the life of Ms. Williamson were sold within the 5 years prior to submission of the First Application and within the 5 years prior to

_____

[3] AXA Equitable in the near future will also imitate an action in the United States District Court for the Southern District of California related to the Second Policy.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA  94105

SF1.397604.1

COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF                                    CASE NO.

1    submission of the Second Application.

2        39.    Upon information and belief, within weeks of re-issuance of the Second

3    Policy, as was intended at or prior to inception, Ms. Williamson and/or Mr. Williamson,

4    by and on behalf of RW AXA, and/or others acting on their behalf, completed the sale

5    and/or assignment of a beneficial interest in the RW AXA to Lydia.

6

7                  **The SEC's Enforcement Action Against Lydia Capital**

8        40.    Shortly after the re-issuance of the First Policy, on or about April 12, 2007,

9    the SEC initiated an enforcement action in the United States District Court for the District

10    of Massachusetts against Lydia and its principals, alleging Lydia carried out a "fraudulent

11    investment scheme" through its sale of "limited partnership interests" in the Lydia

12    Capital Alternative Investment Fund (the "Fund"). A true and correct copy of the SEC's

13    Complaint in that action, *SEC v. Lydia Capital, LLC, et al.*, Civ. Action No. 1:07-10712-

14    RGS, is attached hereto as Exhibit "F."

15        41.    The SEC alleged Lydia, through the sale of the partnership interests in the

16    Fund, failed to disclose "that the Fund's principal underlying assets – i.e., life insurance

17    policies – may be either worthless or virtually worthless." *See* Exhibit "F" at ¶ 2.

18        42.    The SEC alleged the life insurance policies may be worthless because the

19    policy applicants "falsely claimed that they had no intention to sell their policies" at the

20    time they applied for insurance. *See* Exhibit "F" at ¶ 13.

21        43.    According to the SEC, as a result of these false claims, the "[l]ife insurance

22    companies have a right to rescind the [fraudulent] policies based on false representations

23    in the application." *See* Exhibit "F" at ¶ 14.

24        44.    On or about May 1, 2007, the SEC filed an Amended Complaint which

25    further detailed the violations of securities laws allegedly committed by Lydia. A true

26    and correct copy of the SEC's Amended Complaint is attached hereto as Exhibit "G."

27

28                       **Indicia of a STOLI Transaction**

DREIER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1 397004.1        COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF        CASE NO.

45.    Upon information and belief, the Second Policy was purchased for the purpose of selling it on the secondary market, as stated in the SEC's Complaint. *See* Exhibit "F" ¶ 13.

46.    In addition to those allegations set forth by the SEC, four additional grounds exist to support that the Second Policy was purchased for the purpose of selling it on the secondary market: first, Ms. Williamson admitted to previously selling one other life insurance policy; second, Ms. Williamson may have sold at least two other life insurance policies; third, Ms. Williamson gave statements inconsistent with her denial of having purchased the Second Policy with an intent to sell the Second Policy; and fourth, Ms. Williamson gave statements inconsistent with her intended purpose for purchasing the Second Policy. These grounds provide strong evidence of the First Policy and Second Policy being the subject of a secondary market transaction.

47.    Ms. Williamson admitted to previously selling an insurance policy. Ms Williamson spoke with two AXA Equitable employees in regard to the circumstances surrounding the purchase of the First Policy and the Second Policy. During these conversations, Ms. Williamson admitted to the existence of the AIG Policy and to having previously sold the AIG Policy. Ms. Williamson noted she had sold the AIG Policy and used the proceeds to purchase new insurance, which she believed was the United of Omaha policy referenced as part of her First Financial Supplement.

48.    Upon information and belief, Ms. Williamson may have sold two life insurance policies other than the AIG Policy. Ms. Williamson informed AXA Equitable employees that she was unaware of the status of two other policies issued by ING and United of Omaha, which were disclosed in her First Application. Thus, upon information and belief, Ms. Williamson may have sold more than one policy prior to submitting the First Application and the Second Application.

49.    Third, Ms. Williamson made inconsistent statements to AXA Equitable employees which indicated the Second Policy was likely purchased with an intent to sell it. Ms. Williamson informed the AXA Equitable employees:

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1 397684 1

COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF                                    CASE NO.

- She had no knowledge of the policies beyond the application stage and that her sons controlled anything to do with the policies.

- Ms. Williamson noted the agent on the policies, Brad Ferney, had the idea to sell the First Policy and the Second Policy. Mr. Ferney then worked with her sons, as the owners of Morningside and RW AXA, to arrange the sale.

50. Fourth, Ms. Williamson gave AXA Equitable employees seemingly inconsistent statements about the purpose of the First Policy and the Second Policy. On the First Financial Supplement, Ms. Williamson and the trustees indicated they sought to purchase the First Policy for "estate planning + estate liquidity." Ms. Williamson later admitted the purpose of the First Policy and the Second Policy was to provide funds for "death taxes" for the benefit of her family. When asked about the details of the First Policy and the Second Policy, Ms. Williamson was uncertain of the details: Ms. Williamson was not sure of the death benefits and thought the First Policy and Second Policy had death benefits of $3,000,000.00 and $4,000,000.00, not $6,000,000.00 and $4,000,000.00; she was unaware of the owners or beneficiaries for the First Policy and the Second Policy; and she was unaware of any of the premium details for the First Policy and the Second Policy.

51. Upon information and belief, Mr. Williamson's comments, as referenced above, indicate the Second Policy was purchased in order to sell it on the secondary market.

## COUNT I

## DECLARATORY JUDGMENT – FRAUD

52. AXA Equitable hereby incorporates by reference each and every averment of fact contained in the preceding paragraphs as if set forth herein at length.

53. Upon information and belief, the Mr. Williamson, by and on behalf of RW AXA, made a misrepresentation to AXA Equitable on the Second Application concerning their intent to use the Second Policy for a life settlement, viatical or other secondary market transaction. Specifically, RW AXA, as the owner of the Second Policy, answered "No" to the following question:

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1 39700-1-1

COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF                                            CASE NO.

1      • Do you, the owner intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or any other secondary market?

3      *See* Exhibit "C."

4      54.    Upon information and belief, RW AXA knew of the falsity of this representation concerning intent to use the Second Policy for a life settlement, viatical or other secondary market transaction, or of the possible sale of a beneficial interest in a trust, LLC, or other entity created, or to be created, on Ms. Williamson's behalf. Thus, the misrepresentation of RW AXA in the Second Application was intentional.

9      55.    Further, AXA Equitable justifiably relied on the misrepresentation and had it known of the misrepresentation, it would not have issued the Second Policy. Thus, the misrepresentation was material.

12     56.    Upon information and belief, Ms. Williamson made another misrepresentation to AXA Equitable on the Second Application concerning whether Ms. Williamson had ever previously sold life insurance. Specifically, Ms. Williamson answered "No" to this question, which states:

16     • Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical or other secondary market provider?

18     *See* Exhibit "C."

19     57.    Upon information and belief, Ms. Williamson had sold one to three life insurance policies prior to the submission of the Second Application.

21     58.    Upon information and belief, Ms. Williamson knew of the falsity of this representation. Thus, this misrepresentation of the Ms. Williamson in the Second Application was intentional.

24     59.    Further, AXA Equitable justifiably relied on the misrepresentation and had it known of the misrepresentation, it would not have issued the Second Policy. Thus, the misrepresentation was material.

27     60.    An intentional material concealment also occurred when the Mrs. Williamson and Mr. Williamson, by and on behalf of RW AXA, failed to inform AXA

DREKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

12

1    Equitable of the existence of the AIG Policy.

2        61.    Upon information and belief, the AIG Policy was in force at the time Ms.

3    Williamson submitted the Second Application.

4        62.    Had AXA Equitable known of the existence of the AIG Policy, AXA

5    Equitable would not have issued the Second Policy.  Therefore, the existence of the AIG

6    Policy issued on the life of Ms. Williamson application for insurance was material

7    information to AXA Equitable.

8        63.    Thus, Ms. Williamson, with the intent to defraud AXA Equitable,

9    concealed material information which would have probably and reasonably changed

10   AXA Equitable's decision to issue the Second Policy.

11       64.    AXA Equitable is entitled to a judicial declaration that the Second Policy is

12   void ab initio, as it was issued by AXA Equitable based upon fraudulent

13   misrepresentations and a fraudulent concealment.

14                              **COUNT II**

15   **DECLARATORY JUDGMENT - MATERIAL MISREPRESENTATIONS AND**
16   **MATERIAL CONCEALMENT**

17       65.    AXA Equitable hereby incorporates by reference each and every averment

18   of fact contained in the preceding paragraphs as if set forth herein at length.

19       66.    AXA Equitable is entitled to a judicial declaration that the Second Policy is

20   void *ab initio*, as it was issued by AXA Equitable in reliance upon two material

21   misrepresentations made by the Second Policy applicants and a concealment of material

22   information by the Second Policy applicants.

23                              **COUNT III**

24   **DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST**

25
26       67.    AXA Equitable hereby incorporates by reference each and every averment
     of fact contained in the preceding paragraphs as if set forth herein at length.
27
28       68.    Upon information and belief, the Second Policy was issued to, at the behest

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

                              13

1   of, and/or under the direction of, a party or parties possessing no insurable interest

2   recognized under the law of California.

3        69.    Upon information and belief, Mr. Williamson, by and on behalf of RW

4   AXA, or others acting on his behalf agreed to or completed the sale and/or assignment of

5   a beneficial interest in the RW AXA prior to or at the time of issuance of the Second

6   Policy to Lydia. The purpose of the series of transactions was to cloak the agreements

7   whereby Lydia engaged in a gamble upon the life of Ms. Williamson

8        70.    AXA Equitable is entitled to a judicial declaration that, pursuant to Cal. Ins.

9   Code §§ 252, 286, and 10110.1(d)-(e), the Second Policy is void *ab initio*.

10

11   <center>**RELIEF REQUESTED**</center>

12       WHEREFORE, AXA Equitable respectfully requests the entry of an Order by this

13   Court declaring:

14       A.    Whether the Second Policy is void *ab initio* due to the fraud of Ms.

15   Williamson and Mr. Williamson, by and on behalf of RW AXA, on the application

16   materials and relied upon by AXA Equitable in issuing the Second Policy;

17       B.    Whether the Second Policy is void *ab initio* due to the two material

18   misrepresentations and material concealment by Ms. Williamson and Mr. Williamson, by

19   and on behalf of RW AXA, on the Second Application materials and relied upon by AXA

20   Equitable in issuing the Second Policy;

21       C.    Whether the Second Policy was unsupported at the time of issuance by any

22   legally cognizable insurable interest under California law and, as such, is void *ab initio*;

23       D.    Whether AXA Equitable may retain some or all of the premiums paid

24   pursuant to the Second Policy, or, alternatively, may recover its costs and expenses

25   associated with the issuance of the Second Policy and its aftermath;

26       F.    Whether AXA Equitable is awarded attorneys' fees and costs associated

27   with seeking this judgment; and

28   / / /

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

<center>14</center>

G.    Whether AXA Equitable is granted such further relief as this Court deems appropriate.

Dated: March 17, 2008

H. CHRISTIAN L'ORANGE (SBN 71730)
S. FEY EPLING (SBN 190025)
Drinker Biddle & Reath LLP
50 Fremont Street, 20th Floor
San Francisco, California  94105-2235
Telephone: (415) 591-7500
Facsimile: (415) 591-7510
E-mail: christian.lorange@dbr.com
E-mail: fey.epling@dbr.com

Attorneys for Plaintiff
AXA EQUITABLE LIFE INSURANCE
COMPANY

*Of Counsel*

STEPHEN C. BAKER
STEPHEN A. SERFASS
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA  19103-6996
Telephone: (215) 988-2700

15

COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF                    CASE NO.

## DEMAND FOR JURY TRIAL

AXA Equitable Life Insurance Company demands trial by jury of all issues triable by a jury pursuant to Federal Rule of Civil Procedure 38 and Civil Local Rule 38.1.

Dated: March 17, 2008

H. CHRISTIAN L'ORANGE (SBN 71730)
S. FEY EPLING (SBN 190025)
Drinker Biddle & Reath LLP
50 Fremont Street, 20th Floor
San Francisco, California 94105-2235
Telephone: (415) 591-7500
Facsimile: (415) 591-7510
E-mail: christian.lorange@dbr.com
E-mail: fey.epling@dbr.com

Attorneys for Plaintiff
AXA EQUITABLE LIFE INSURANCE
COMPANY

*Of Counsel*

STEPHEN C. BAKER
STEPHEN A. SERFASS
DRINKER BIDDLE & REATH LLP
One Logan Square
18th & Cherry Streets
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

16

SF1\3970004\1    COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF    CASE NO.

# EXHIBIT A

(Page 1 of 12).

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance**
**Part I**
Form No. LIFEAPP-UT
(2005)

**① PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink.

Proposed Insured

Proposed Insured

A. Full Name: First _Rudy_ MI _L_ Last _Williamson_    B. Gender: ☐ Male ☑ Female

C. Home Address: _Palos Verdes_ No. and Street _____
(if address is a P.O. Box or rural residence, proof of residence required)
City/Municipality _____ County/Parish _____ State _CA_ Zip + 4 Code _90274_

D. Home Phone No _____    Best time to Call: _____    Best phone no. to be contacted: _____

E. Date of Birth: _____ (Month/Day/Year)    F. Place of Birth: _Utah_ (State/Country)

G. Marital Status: ☐ Single ☑ Married ☐ Widowed ☐ Divorced ☐ Separated    H. Soc. Sec. No. _____

I. Driver's Lic. No.: _____    State: _CA_

J. U.S. Citizen? ☑ Yes ☐ No If No, Country _____    U.S. Visa type _____    Passport # or U.S. Visa # _____    # of years in U.S. _____

K. Currently employed? ☐ Yes ☐ No ☑ Retired

L. Current Occupation(s): (1) Title: _Homemaker_    (2) Duties _____    (3) How Long? _____
(if less than 1 year at current occupation, give previous in Remarks.)

M. Employer Name: _____

N. Employer Address: _____ No.& Street _____ City _____ State _____ Zip + 4 Code _____

O. Annual Earned Income (Income from occupation) $ _____    P. Net Worth $ _____

* If the Proposed Insured and/or policy payor is not a U.S. Person (U.S. Citizen/U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**② COVERAGE INFORMATION**

A. Plan of Insurance _Athena UL II_    Amount of Insurance $ _____    [if face amount is $2 million or larger complete Financial Supplement.]
(If survivorship policy, complete an application for each Proposed Insured.
If VUL, must also complete VUL Supplement.
To select dividend options on BIA, or Riders on all Non-VUL Plans complete Optional Benefits Supplement.)

B. Complete for UL or VUL only  (1) Death Benefit Option ☑ Option A ☐ Option B
(2) Planned Periodic Premium $ _____

C. Definition of Life Insurance Test: Complete for AUL II, TL, II, CCU '04    ☐ Guideline Premium Test ☑ Cash Value Accumulation Test

D. Premium Mode: ☑ Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly
Or
System-Matic (Complete S-M form and check applicable box)    ☐ Quarterly (only available for UL and VUL) ☐ Monthly

E. Salary Allotment (1) Unit Name _____ (2) Unit/Sub Unit No. _____ (3) Unit Register Date _____
(Specify Alpha- need, if other than Insured, in Remarks.)

F. Date Policy to save insured Age? ☑ Yes ☐ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as Viatical settlement, senior settlement, life settlement, or for any other secondary market? ☐ Yes ☑ No
2. Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider? ☐ Yes ☑ No

H. Any other life insurance now in effect or application now pending? ☑ Yes ☐ No
(Give companies, amounts and policy number in Remarks.)

I. Do you have existing life insurance or annuity contracts? ☐ Yes ☐ No

J. Will the coverage applied for replace or change any life insurance or annuities? ☐ Yes ☑ No Is this a 1035 Exchange? ☐ Yes ☐ No
If "Yes", complete: (If additional room is needed, please use Remarks Section.)
Amount $ _____ Company _____ Issue Year _____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity
Amount $ _____ Company _____ Issue Year _____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity

K. Is there a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☐ No If "Yes", complete Term Policy/Rider or Purchase Option Supplement.

L. Complete if Proposed Insured is under age 16:
a) State total amount of insurance in force on the life of applicant or child's parent, if greater $ _____
b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No

If "Yes" give details _____

AUX3V-2005 UT    CAT# 135031    EB1773_25  1

**EXHIBIT A**
**PAGE 00001**

(Page 2 of 12)

**③ BENEFICIARY/OWNER**

A. Beneficiary (Total designation must be 100%. Use Remarks Section for additional Beneficiary information.)

| Beneficiary Full Name | Relationship to Insured | Percentage |
|---|---|---|
| Primary: Morningside Developers LLC | Trust | 100% |
| Thomas & George Williamson | Sons | |
| Contingent: | | |

B. Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)
Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.
If the Owner is the Trust provide the name of the Trust.

Owner's Name ___ Same ___

Address Street 3451 E. 7300 S. Suite 102 City Slc State UT Zip Code 84121

U.S. Citizen? ☒ Yes ☐ No* If No, Country ___ U.S. Visa type ___ Passport # or U.S. Visa # ___ # of years in U.S. ___

Relationship to Insured Trust ___ Date of Birth ___

Name of Trustee ___ Date of Trust Agreement ___

* If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**④ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

A. Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs?
(If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.)   ☐ Yes ☒ No

B. Any plans to travel or reside outside the United States?
(If "Yes", complete Foreign Residence and Travel Supplement.)   ☒ Yes ☐ No

C. Have you been disabled for 2 or more weeks within the last 2 years?   ☐ Yes ☒ No

D. In the last year flown otherwise as a passenger or plan to do to?
(If "Yes", complete Aviation Supplement.)   ☐ Yes ☒ No

E. Engaged within the last year or any plan to engage in scuba racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies?
(If "Yes", complete Avocation Supplement.):   ☐ Yes ☒ No

F. Ever had an application for life or health insurance that was declined, required an extra premium or other modification?
(If "Yes", state companies and provide full details in Remarks.)   ☐ Yes ☒ No

G. In the last 10 years, have you been convicted of, or pled "no contest" to a felony ".
(If "Yes" in "Remarks", state full details of offense and penalty, with dates.)   ☐ Yes ☒ No

H. Do you currently use any form of tobacco or nicotine product?   ☐ Yes ☐ No   Type ___ Avg. Quantity # packs ___ Frequency ___

I. Have you ever used any form of tobacco or nicotine product?   ☐ Yes ☐ No   Type ___ Date Ceased ___

**⑤ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered.**

A. Height 4 ft 11 in Weight 110 lbs

B. Personal Physician Name ___

C. Address ___

D. Date and Reason for Last Visit in the Last 5 Years ___

E. What treatment was given or recommended? (If none, so state) ___

Has Proposed Insured:

F. Ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder?   Yes ☒ No

G. In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility?   Yes ☐ No
(Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.)

H. In the last 10 years:
   1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substance?
(If "Yes", complete Substance Usage Supplement.)   Yes ☐ No
   2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous?
(If "Yes", complete Substance Usage Supplement.)   Yes ☐ No

I. In the last 10 years, been:
Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession?   Yes ☐ No

J.

| Family History | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | | |
| Mother | | | |
| Sibling | | | |

AWGV-2005 UT

2

EXHIBIT A
PAGE 00002

(Page 3 of 12)

**❷ DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION** (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| No. | *(please specify diagnosis and medication)* | *Onset Date* | *Date* | *How long?* | *see Phone Number* |
|  |  |  |  |  |  |
|  | *See AIDS from Doctors* |  |  |  |  |
|  |  |  |  |  |  |

**REMARKS.** Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here. (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

---

**❸ COMPLETE IF MONEY IS PAID WITH THE POLICY.**

Amount paid with this Application: $ _____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including:

(i) the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii) the $1,000,000 insurance amount limitations, and

(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?    ☐ Yes   ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession while the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.

**AGREEMENT. Each signer of this application agrees that:**

(1) The statements and answers in all parts of the application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application.

(2) The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered. Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

(3) Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application; and (c) unless to the best of any (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid.

(4) No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).

(5) I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable.

AUSV-2005 UT                                                                      3

EXHIBIT A
PAGE 00003

(Page 4 of 12)

☐ AXA Equitable Life Insurance Company.        ☐ MONY Life Insurance Company of America

☐ MLS Equitable Life Insurance Company         ☐ Mony Life Insurance Company of America

**ACKNOWLEDGMENT OF UNDERWRITING PRACTICES.**

**AUTHORIZATIONS**

**TO OBTAIN HEALTH INFORMATION**

**TO OBTAIN NON-HEALTH INFORMATION**

**PURPOSE OF AUTHORIZATIONS**

**CONSEQUENCES OF REVOCATION**

**ADDITIONAL AUTHORIZATIONS**

**DURATION**

**COPY OF AUTHORIZATIONS**

Dated at City  Salt Lake City                            — Trustee

State  UTAH

7/31/06.

EXHIBIT A
PAGE 00004

# EXHIBIT B

*INSURED PERSON*   RUTH L WILLIAMSON



*POLICY OWNER*     MORNINGSIDE DEVELOPERS LLC

# UNIVERSAL LIFE INSURANCE POLICY

*POLICY NUMBER*    156 218 633

**AXA EQUITABLE LIFE INSURANCE COMPANY**
**HOME OFFICE: 1290 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK**

**We agree** to pay the Insurance Benefit of this policy and to provide its other benefits and rights in accordance with its provisions.

### Flexible Premium Universal Life Insurance Policy

This is a flexible premium universal life insurance policy. You can, within limits:
- make premium payments at any time and in any amount;
- change the Death Benefit Option; and
- reduce the face amount of insurance

These rights and benefits are subject to the terms and conditions of this policy. All requests for policy changes are subject to our approval and may require evidence of insurability.

We put your net premiums into your Policy Account. Your Policy Account will accumulate, after deductions, at rates of interest we determine. Such rates will not be less than 3% per year.

This is a non-participating policy.

**Right to Examine Policy.** You may examine this policy and if for any reason you are not satisfied with it, you may cancel it by returning this policy with a written request for cancellation to our Administrative Office by the 10th day after you receive it. If you do this, we will refund the premiums that were paid minus any outstanding loan and accrued loan interest.

**Read Your Policy Carefully.** It is a legal contract between you and AXA Equitable Life Insurance Company.

*Karen Field Hazin*

Karen Field Hazin, Vice President,
Secretary and Associate General Counsel

*Christopher M. Condron*

Christopher M. Condron,
Chairman and Chief Executive Officer

04-100

## *Contents*

*Policy Information  3*

*Table of Maximum Monthly Charges for Benefits  4*

*Those Who Benefit from this Policy  5*

*The Insurance Benefit We Pay  5*

*Reducing the Face Amount of the Base Policy or Changing the Death Benefit Option  6*

*The Premiums You Pay  7*

*Your Policy Account and How it Works  8*

*The Cash Surrender Value of this Policy  9*

*How a Loan Can Be Made  10*

*Our Annual Report to You  11*

*How Benefits are Paid  11*

*Other Important Information  11*

**In this policy:**

"We," "our," and "us" mean AXA Equitable Life Insurance Company.

"You" and "your" mean the owner of this policy at the time an owner's right is exercised.

Unless otherwise stated, all references to interest in this policy are effective annual rates of interest.

Attained age means age on the birthday nearest to the beginning of the current policy year.

**Administrative Office**

The address of our Administrative Office is shown on Page 3. You should send correspondence to that office. Premium payments should be sent to the address listed on your billing notice.

*Copies of the application for this policy and any additional benefit riders are attached to the policy.*

## INTRODUCTION

The premiums you pay, after deductions are made in accordance with the Table of Expense Charges in the Policy Information sectio n, are put into your Policy Account. Amounts in your Policy Account earn interest at rates we declare periodically; these rates will not be less than 3% on an effective annual basis.

If Death Benefit Option A is in effect, the Death Benefit is the base policy face amount. If Death Benefit Option B is in effect, the Death Benefit is the base policy face amount *plus* the amount in your Policy Account. Under either option, the Death Benefit will never be less than a percentage of your Policy Account as stated in the "Death Benefit" provision.

The Insurance Benefit of this policy is payable upon the death of the insured person while the policy is in force.

We make monthly deductions from your Policy Account to cover the cost of the benefits provided by this policy and the cost of any benefits provided by riders to this policy. If you give up this policy for its Net Cash Surrender Value or reduce the base policy face amount, we may deduct a surrender charge from your Policy Account.

This is only a summary of what this policy provides. You should read all of it carefully. Its terms govern your rights and our obligations.

**EXHIBIT B**
**PAGE 00006**

04-100

Page 2

## POLICY INFORMATION

INSURED PERSON    RUTH L WILLIAMSON

POLICY OWNER    MORNINGSIDE DEVELOPERS LLC

FACE AMOUNT
OF BASE POLICY    $6,000,000

DEATH BENEFIT    OPTION A (SEE PAGE 6)

POLICY NUMBER    156 218 633                          ISSUE AGE
                                                     SEX FEMALE

BENEFICIARY    MORNINGSIDE DEVELOPERS LLC

REGISTER DATE    MAR 5, 2006

DATE OF ISSUE    NOV 30, 2006             RATING CLASS:  STANDARD
                                                        NON-TOBACCO USER
                                                        (WITH FLAT EXTRA)

A MINIMUM INITIAL PREMIUM PAYMENT OF $84,195.65 IS DUE ON OR BEFORE DELIVERY OF THE POLICY.

THE PLANNED PERIODIC PREMIUM OF $446,544.00 IS PAYABLE ANNUALLY.

THE ADDITIONAL BENEFIT RIDERS LISTED BELOW, IF ANY, ARE INCLUDED IN THIS POLICY:

THE PLANNED PERIODIC PREMIUMS SHOWN ABOVE MAY NOT BE SUFFICIENT TO CONTINUE THE POLICY AND LIFE INSURANCE COVERAGE IN FORCE. THE PERIOD FOR WHICH THE POLICY AND COVERAGE WILL CONTINUE IN FORCE WILL DEPEND ON: (1) THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS; (2) CHANGES IN THE FACE AMOUNT AND THE DEATH BENEFIT OPTIONS; (3) CHANGES IN THE INTEREST RATES CREDITED TO THIS POLICY; (4) CHANGES IN THE MONTHLY DEDUCTIONS FROM THE POLICY ACCOUNT FOR THIS POLICY AND ANY BENEFITS PROVIDED BY RIDERS TO THIS POLICY; AND (5) LOAN AND PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL ACTIVITY.

04-100-3                           PAGE 3
                           (CONTINUED ON NEXT PAGE)

EXHIBIT B
PAGE 00007

POLICY INFORMATION CONTINUED—POLICY NUMBER    156 218 633

——————    TABLE OF EXPENSE CHARGES    ——————

DEDUCTION FROM PREMIUM PAYMENTS:

PREMIUM CHARGE:

WE DEDUCT AN AMOUNT NOT TO EXCEED 8% FROM EACH PREMIUM PAYMENT. WE RESERVE THE RIGHT TO INCREASE THIS PERCENTAGE LIMIT AS A RESULT OF CHANGES IN THE TAX LAWS WHICH INCREASE OUR EXPENSES. IF WE MUST INCREASE THIS PERCENTAGE, WE WILL DO SO ONLY TO THE EXTENT THAT OUR EXPENSES ARE INCREASED AS A RESULT OF THE TAX LAW CHANGE.

DEDUCTIONS FROM YOUR POLICY ACCOUNT:

ADMINISTRATIVE CHARGE:

FIRST POLICY YEAR: WE DEDUCT $20.00 AT THE BEGINNING OF EACH POLICY MONTH.

SECOND AND SUBSEQUENT POLICY YEARS (BUT NOT BEYOND THE POLICY ANNIVERSARY WHEN THE INSURED PERSON IS ATTAINED AGE 100): WE DEDUCT AN AMOUNT NOT TO EXCEED $10.00 AT THE BEGINNING OF EACH POLICY MONTH.

**EXHIBIT B**
**PAGE 00008**

POLICY INFORMATION CONTINUED—POLICY NUMBER  156 218 633

——————— TABLE OF SURRENDER CHARGES ———————
FOR THE INITIAL BASE POLICY FACE AMOUNT

| BEGINNING OF POLICY YEAR | CHARGE | BEGINNING OF POLICY YEAR | CHARGE |
|---|---|---|---|
| 01 | $278,646.05 | 09 | $141,514.64 |
| 02 | $263,584.63 | 10 | $121,056.75 |
| 03 | $248,526.01 | 11 | $100,593.26 |
| 04 | $233,467.39 | 12 | $80,135.37 |
| 05 | $218,403.17 | 13 | $59,674.68 |
| 06 | $202,896.71 | 14 | $39,216.79 |
| 07 | $182,436.02 | 15 | $18,756.10 |
| 08 | $161,975.33 | 16 AND LATER | $0.00 |

A SURRENDER CHARGE WILL BE SUBTRACTED FROM YOUR POLICY ACCOUNT IF THIS
POLICY IS GIVEN UP FOR ITS NET CASH SURRENDER VALUE WITHIN THE FIRST
FIFTEEN POLICY YEARS. THE SURRENDER CHARGE IN THE FIRST POLICY MONTH
OF EACH POLICY YEAR IS SHOWN IN THE TABLE ABOVE. DURING THE FIRST FIVE
POLICY YEARS THE SURRENDER CHARGE DECLINES UNIFORMLY IN EQUAL MONTHLY
AMOUNTS UNTIL IT REACHES $204,601.30 IN THE TWELFTH MONTH OF POLICY
YEAR FIVE. STARTING IN POLICY YEAR SIX, THE SURRENDER CHARGE DECLINES
UNIFORMLY IN EQUAL MONTHLY AMOUNTS UNTIL IT REACHES ZERO IN THE TWELFTH
MONTH OF POLICY YEAR FIFTEEN.

IF THE BASE POLICY FACE AMOUNT IS REDUCED WITHIN THE FIRST FIFTEEN
POLICY YEARS, A PROPORTIONATE SHARE OF THE APPLICABLE SURRENDER CHARGE AT
THAT TIME WILL BE DEDUCTED FROM YOUR POLICY ACCOUNT. SEE SURRENDER
CHARGES PROVISION FOR A DESCRIPTION OF THE PROPORTIONATE SURRENDER CHARGE.

ADMINISTRATIVE OFFICE:

AXA EQUITABLE LIFE INSURANCE COMPANY

AXA EQUITABLE NATIONAL OPERATIONS CENTER
10840 BALLANTYNE COMMONS PARKWAY
CHARLOTTE, NC 28277
(800) 373-6542

04-100-3                    PAGE 3—CONTINUED

**EXHIBIT B**
**PAGE 00009**

POLICY INFORMATION CONTINUED - POLICY NUMBER 156 218 633

———— TABLE OF MAXIMUM MONTHLY CHARGES FOR BENEFITS ————

| BENEFITS | MONTHLY DEDUCTION FROM POLICY ACCOUNT | PERIOD |
|---|---|---|
| BASE POLICY LIFE INSURANCE | MAXIMUM MONTHLY COST OF INSURANCE RATE FOR THE BASE POLICY (SEE PAGE 4 - CONTINUED) TIMES THOUSANDS OF NET AMOUNT AT RISK. NO DEDUCTION IS MADE AFTER AGE 100 OF THE INSURED PERSON. | 20 YEARS |
| FLAT EXTRA CHARGE FOR BASIC LIFE INSURANCE | $13,750.00<br>$10,000.00 | FIRST 5 YEARS<br>NEXT 10 YEARS |

EXHIBIT B
PAGE 00010

POLICY INFORMATION CONTINUED—POLICY NUMBER  156 218 633

TABLE OF MAXIMUM MONTHLY COST OF INSURANCE RATES
PER $1,000 OF NET AMOUNT AT RISK FOR THE BASE POLICY

| INSURED PERSON'S ATTAINED AGE | RATE |
|---|---|
| 80 | 5.59500 |
| 81 | 6.27500 |
| 82 | 7.06750 |
| 83 | 7.98833 |
| 84 | 9.02000 |
| 85 | 10.16417 |
| 86 | 11.40333 |
| 87 | 12.74917 |
| 88 | 14.19083 |
| 89 | 15.75500 |
| 90 | 17.44583 |
| 91 | 19.30500 |
| 92 | 21.39667 |
| 93 | 23.84000 |
| 94 | 26.92583 |
| 95 | 31.31000 |
| 96 | 38.50417 |
| 97 | 52.27500 |
| 98 | 83.33250 |
| 99 | 83.33250 |
| 100 AND OVER | 0.00000 |

EXHIBIT B
PAGE 00011

POLICY INFORMATION CONTINUED — POLICY NUMBER  156 218 633

——————    TABLE OF PERCENTAGES    ——————



| INSURED PERSON'S ATTAINED AGE | PERCENTAGE |
|---|---|
| 80 | 132.0% |
| 81 | 129.6% |
| 82 | 127.3% |
| 83 | 125.2% |
| 84 | 123.2% |
| 85 | 121.4% |
| 86 | 119.7% |
| 87 | 118.1% |
| 88 | 116.7% |
| 89 | 115.3% |
| 90 | 114.0% |
| 91 | 112.7% |
| 92 | 111.5% |
| 93 | 110.2% |
| 94 | 108.9% |
| 95 | 107.6% |
| 96 | 106.2% |
| 97 | 104.8% |
| 98 | 103.4% |
| 99 | 102.5% |
| 100 AND ABOVE | 101.0% |

This policy is designed to satisfy the definition of life insurance for Federal income tax purposes under Section 7702 of the Internal Revenue Code of 1986, as amended (i.e., the "Code"). Accordingly, even if this policy states otherwise, at no time will the death benefits under the policy be less than the Cash Surrender Value of the policy, divided by the net single premium per dollar of insurance which would have to be paid at such time to fund such benefits consistent with the definition of such terms in the Code. At no time will the "death benefit" under the policy be less than the applicable percentage of the "cash surrender value" of the policy. In addition, we may take certain actions, described here and elsewhere in the policy, to meet the definitions and limitations in the Code, based on our interpretation of the Code. Please see "Policy Changes - Applicable Tax Law" for more information.

04-100-4CVAT                    PAGE 4 — CONTINUED

EXHIBIT B
PAGE 00012

## Those Who Benefit from this Policy

**Owner.** The owner of this policy is the insured person unless otherwise stated in the application, or later changed.

As the owner, you are entitled to exercise all the rights of this policy while the insured person is living. To exercise a right, you do not need the consent of anyone who has only a conditional or future ownership interest in this policy.

**Beneficiary.** The beneficiary is as stated in the application, unless later changed. The beneficiary is entitled to the Insurance Benefit of this policy. One or more beneficiaries for the Insurance Benefit can be named in the application. If more than one beneficiary is named, they can be classed as primary or contingent. If two or more persons are named in a class, their shares in the benefit can be stated. The stated shares in the Insurance Benefit will be paid to any primary beneficiaries who survive the insured person. If no primary beneficiaries survive, payment will be made to any surviving contingent beneficiaries. Beneficiaries who survive in the same class will share the Insurance Benefit equally, unless you have made another arrangement with us.

If there is no designated beneficiary living at the death of the insured person, we will pay the Insurance Benefit to the insured person's surviving children in equal shares. If none survive, we will pay the insured person's estate.

**Changing the Owner or Beneficiary.** While the insured person is living, you may change the owner or beneficiary by written notice in a form satisfactory to us. You can get such a form from your financial professional or by writing to us at our Administrative Office. The change will take effect on the date you sign the notice; however, it will not apply to any payment we make or other action we take before we receive the notice.

**Assignment.** You may assign this policy, if we agree; however, we will not be bound by an assignment unless we have received it in writing at our Administrative Office. Your rights and those of any other person referred to in this policy will be subject to the assignment. We assume no responsibility for the validity of an assignment. An absolute assignment will be considered as a change of ownership to the assignee.

## The Insurance Benefit We Pay

We will pay the Insurance Benefit of this policy to the beneficiary upon the death of the insured person when we receive at our Administrative Office (1) proof that the insured person died while this policy was in force; and (2) all other requirements we deem necessary. The Insurance Benefit includes the following amounts, which we will determine as of the date of death of the insured person:

- the Death Benefit described in the "Death Benefit" provision;

- plus any other benefits then due from riders to this policy;

- minus any policy loan and accrued interest, or liens;

- minus any overdue deductions from your Policy Account if the insured person dies during a grace period.

We will add interest to the resulting amount in accordance with applicable law. We will compute the interest at a rate we determine, but not less than the rate required by any applicable law. Payment of the Insurance Benefit may also be affected by other provisions of this policy. See the "Other Important Information" section of this policy, where we specify our right to contest the policy, the suicide exclusion, and what happens if age or sex has been misstated. Additional exclusions or limitations (if any) are listed in the Policy Information section.

**EXHIBIT B**
**PAGE 00013**

**Death Benefit.** The Death Benefit of this policy will be determined under either Option A or Option B, whichever you have chosen and is in effect on the date of death of the insured person.

Under Option A, the Death Benefit is the greater of (a) the base policy face amount; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

Under Option B, the Death Benefit is the greater of (a) the base policy face amount *plus* the amount in your Policy Account on the date of death of the insured person; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

The percentages referred to above are the percentages from the "Table of Percentages" shown on Page 4-Continued of this policy for the insured person's age (nearest birthday) at the beginning of the policy year of determination.

**Coverage After Age 100.** If the policy is in force on the policy anniversary when the insured person reaches age 100, it will remain in force subject to the policy loan provision. However, no premium payments, partial withdrawals, changes in face amount or changes in Death Benefit Option will be permitted after age 100 of the insured person; policy loans and loan repayments may continue to be made, subject to our normal rules as stated in other provisions of the policy pertaining to these items. No deductions for cost of insurance or administrative charges will be made after age 100 of the insured person.

## Reducing the Face Amount of the Base Policy or Changing the Death Benefit Option

You may reduce the face amount of the base policy or change the death benefit option by written request to us at our Administrative Office, subject to the following conditions:

1.  After the second policy year while this policy is in force, you may ask us to reduce the base policy face amount but not to less than $50,000. Any such reduction in the face amount may not be less than $10,000. If you reduce the base policy face amount before the end of the twentieth policy year, we will deduct a proportionate amount of any applicable surrender charge from your Policy Account.

2.  After the second policy year while this policy is in force, you can change your death benefit option. Any requested change to death benefit Option B must be made while the insured person is not more than attained age 90. If you ask us to change from Option A to Option B, we will decrease the base policy face amount by the amount in your Policy Account on the date the change takes effect. However, we will decline to make such change if it would reduce the base policy face amount to less than $50,000. If you ask us to change from Option B to Option A, we will increase the base policy face amount by the amount in your Policy Account on the date the change takes effect. Such decreases and increases in the base policy face amount are made so that the death benefit remains the same on the date the change takes effect.

3.  The change will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request.

4.  We reserve the right to decline to make any change that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

5.  You may ask for a change by completing an application for change, which you can get from your financial professional or by writing to us at our Administrative Office. A copy of your application for change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become a part of this policy. We may require you to return this policy to our Administrative Office to make a policy change.

EXHIBIT B
PAGE 00014

04-100-5

## *The Premiums You Pay*

The minimum initial premium payment shown in the Policy Information section is due on or before delivery of this policy. No insurance will take effect before a premium at least equal to the minimum initial premium is paid. Other premiums may be paid at our Administrative Office at any time prior to attained age 100 of the insured person while this policy is in force. We will furnish you with a premium receipt, signed by one of our officers, upon request.

We will send premium notices to you for the planned periodic premium shown in the Policy Information section. You may skip planned periodic premium payments. However, this may adversely affect the duration of the Death Benefit and your policy's values. We will assume that any payment you make to us is a premium payment, unless you tell us in writing that it is a loan repayment.

If you stop paying premiums, insurance coverage will continue for as long as the Net Policy Account Value is sufficient to cover the monthly deductions described in the "Monthly Deductions" provision, with a further extension of coverage as described in the "Grace Period" provision.

**Limits.** Each premium payment after the initial one must be at least $100. We may increase this minimum limit 90 days after we send you written notice of such increase. We reserve the right to limit the amount of any premium payments you may make if they would immediately result in more than a dollar for dollar increase in the Death Benefit (which would happen if the Death Benefit is determined as a percentage of the Policy Account, as described in the "Death Benefit" provision), unless you provide satisfactory evidence of insurability of the insured person.

We also reserve the right not to accept premium payments or to return excess amounts that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

**Grace Period.** At the beginning of each policy month, we compare the Net Policy Account Value (this is equal to the amount in your Policy Account minus any policy loan and accrued loan interest) to the total monthly deductions described in the "Monthly Deductions" provision. If the Net Policy Account Value is sufficient to cover the total monthly deductions, this policy is not in default.

If the Net Policy Account Value at the beginning of any policy month is not sufficient to cover the total monthly deductions, the policy is in default as of the first day of such policy month.

If the policy is in default, we will send you and any assignee on our records at last known addresses written notice stating that a grace period of 31 days will begin starting with the next monthly policy anniversary. The notice will also state the amount of payment that is due.

The payment required will not be more than an amount sufficient to increase the Net Policy Account Value to cover all monthly deductions for 3 months, calculated assuming no interest was credited to the Policy Account and no policy changes were made.

If we do not receive such amount at our Administrative Office before the end of the grace period, we will then (1) withdraw and retain any amount in your Policy Account; and (2) send a written notice to you and any assignee on our records at last known addresses stating that this policy has ended without value.

If we receive the requested amount before the end of the grace period, but the Net Policy Account Value is still insufficient to cover total monthly deductions, we will send a written notice that a new 31 day grace period will begin starting with the next monthly policy anniversary and request an additional payment.

If the insured person dies during a grace period, we will pay the Insurance Benefit as described on Page 5.

**EXHIBIT B**
**PAGE 00015**

**Restoring Your Policy Benefits.** If this policy has ended without value and was not given up for its Net Cash Surrender Value, you may restore policy benefits while the insured person is alive. In order to restore benefits, you must:

1. Ask for restoration of policy benefits within 5 years from the end of the grace period; and

2. Provide evidence of insurability satisfactory to us; and

3. Make a required payment. The required payment will not be more than an amount sufficient to cover (i) total monthly deductions for 3 months, calculated from the effective date of restoration; and (ii) the premium charge. We will determine the amount of this required payment as if no interest was credited to your Policy Account.

We must receive the required payment while the insured person is alive. We will deduct the premium charge from the required payment. The policy account on the date of restoration will be equal to the balance of the required payment.

The effective date of the restoration of policy benefits will be the beginning of the policy month which coincides with or next follows the date we approve your request. We will start to make monthly charges again as of the effective date of restoration. The schedule of surrender charges that was applicable on the date of default will also be applicable to the restored policy.

We reserve the right to decline to restore this policy if in our opinion it would cause this policy to fail to qualify as life insurance under applicable tax law.

## *Your Policy Account and How it Works*

**Premium Payments.** When we receive your premium payments, we subtract the premium charge shown in the table in the "Policy Information" section and any overdue monthly deductions. We put the balance (the net premium) into your Policy Account as of the date we receive the premium payment at our Administrative Office and before any deductions from your Policy Account due on that date are made. However, we will put the initial net premium payment into your Policy Account as of the Register Date if it is later than the date of receipt. No premiums will be applied to your Policy Account until the minimum initial premium payment, as shown in the "Policy Information" section, is received at our Administrative Office.

We credit interest to your Policy Account at effective annual rates we determine periodically. We make deductions from your Policy Account as described in the "Monthly Deductions" provision. We also subtract from your Policy Account any partial Net Cash Surrender Value withdrawals you ask for; more details are given in the Cash Surrender Value section of this policy.

**Monthly Deductions.** At the beginning of each policy month we make a deduction from your Policy Account to cover the charges described below. If you do not submit the full minimum initial premium with your application, and the minimum initial premium is paid upon delivery, your monthly charges commence as of the Register Date. Such deduction for any policy month is the sum of the following amounts determined as of the beginning of that month:

• the monthly administrative charge;

• the monthly cost of insurance for the insured person; and

• the monthly cost of any benefits provided by riders to this policy.

The monthly cost of insurance is the sum of (a) our current monthly cost of insurance rate times the net amount at risk at the beginning of the policy month divided by $1,000; *plus* (b) any flat extra charge shown in the "Policy Information" section. The net amount at risk at any time is the Death Benefit (calculated as of that time) minus the amount in your Policy Account at that time.

**EXHIBIT B**
**PAGE 00016**

We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision. They will never be more than those shown in the Table of Maximum Monthly Cost of Insurance Rates Per $1000 of Net Amount at Risk for the Base Policy on Page 4-Continued.

No monthly deductions are made after age 100 of the insured person.

**Other Deductions.** We also make the following other deductions from your Policy Account as they occur:

- We deduct a surrender charge if, before the end of the fifteenth policy year, you give up this policy for its Net Cash Surrender Value or you reduce the base policy face amount.

**How We Add Interest.** We will credit the amount in your Policy Account with interest at rates we determine. We will determine such interest rates periodically in advance for unloaned and loaned amounts. The rates may be different for unloaned and loaned amounts. Any change in the interest rates we determine will be as described in the "Changes in Policy Cost Factors" provision. Such interest rates will not be less than 3% per year. Interest accrues and is credited on unloaned amounts in your Policy Account daily. However, we will credit interest on the initial net premium from the Register Date if it is later than the date of receipt provided the initial premium is at least equal to the minimum initial premium shown on Page 3 of the policy.

We credit interest on the loaned portion of your Policy Account daily. The interest rate we credit to the loaned portion of your Policy Account will be at an annual rate up to 2% less than the loan interest rate we charge. However, we reserve the right to credit a lower rate than this if in the future tax laws change such that our taxes on policy loans or policy loan interest are increased. In no event will we credit less than 3% per year.

On each policy anniversary and at any time you repay all of a policy loan, we will transfer the interest that has been credited to the loaned portion of your Policy Account to the unloaned portion of your Policy Account.

## The Cash Surrender Value of this Policy

**Cash Surrender Value.** The Cash Surrender Value on any date is equal to the amount in your Policy Account on that date minus any applicable surrender charge.

**Net Cash Surrender Value.** The Net Cash Surrender Value is equal to the Cash Surrender Value minus any policy loan and accrued loan interest. You may give up this policy for its Net Cash Surrender Value at any time while the insured person is living. You may do this by sending us a written request for it and this policy to our Administrative Office. Your written request for cancellation or surrender must include the following:

1. A statement that makes it clear that you intend to surrender the contract;

2. The policy number of the policy to be surrendered;

3. The name of the insured person and your name (if other than the insured person) and address where proceeds should be mailed;

4. Your signature and, if required by the policy or by a legally binding document of which we have an actual notice, the signature of a collateral assignee or other person having an interest in the policy through the legally binding document.

If this policy has a Cash Surrender Value and is being given up for its Net Cash Surrender Value, a completed withholding authorization must also be included with your written request. If this form is not provided to us with your written request for surrender, we will withhold income tax on the taxable portion of your distribution at the mandated federal and state tax rates. We will compute the Net Cash Surrender Value as of the date we receive your request for it and this policy at our Administrative Office. If the policy has been lost, stolen or destroyed, you must include a statement in the written request that the policy was lost, stolen or destroyed with an approximate date of when the policy was lost, stolen or destroyed. All insurance coverage under this policy ends on the date we receive your written request.

**Surrender Charges.** If you give up this policy for its Net Cash Surrender Value before the end of the fifteenth policy year, we will subtract a surrender charge from your Policy Account. A table of surrender charges for the initial base policy face amount is in the "Policy Information" section.

**EXHIBIT B**
**PAGE 00017**

Page 9



If the base policy face amount is reduced before the end of the fifteenth policy year, we will also deduct a proportionate amount of any applicable surrender charge from your Policy Account. We will send you a new Policy Information section in the event of a reduction in the base policy face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

We have filed a detailed statement of the method of computing surrender charges with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**Partial Net Cash Surrender Value Withdrawal.** After the first policy year, and while the insured person is living, you may ask for a partial Net Cash Surrender Value withdrawal by written request to our Administrative Office. Your request will be subject to our approval based on our rules in effect when we receive your request, and to the minimum withdrawal amount of $500.00. We have the right to decline a request for a partial Net Cash Surrender Value withdrawal if this would cause the policy to fail to qualify as life insurance under applicable tax law, as interpreted by us. We will decline a request for a partial Net Cash Surrender Value withdrawal if this would cause a decrease in the base policy face amount to less than $50,000. A partial withdrawal will result in a reduction in the Cash Surrender Value and in your Policy Account equal to the amount withdrawn as well as a reduction in your Death Benefit, If the Death Benefit is Option A, the withdrawal may also result in a decrease in the face amount; there will be no proportionate surrender charge due to such a decrease.

Such withdrawal and resulting reduction in the Death Benefit, in the Cash Surrender Value and in your Policy Account will take effect on the date we receive your written request at our Administrative Office. We will send you a new Policy Information section if a withdrawal results in a reduction in the face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

## How a Loan Can Be Made

**Policy Loans.** You can take a loan on this policy while it has a loan value. This policy will be the only security for the loan. The initial loan and each additional loan must be for at least $500.00. Any amount on loan is part of your Policy Account. We refer to this as the loaned portion of your Policy Account.

**Carry Over Loans.** If this policy was issued based, in whole or part, upon an exchange of another life insurance policy, any transferred existing loan from the exchanged policy as approved by us will be put into the loaned portion of your Policy Account. If a refund is made under the "Right to Examine Policy" provision, we will subtract any policy loan and accrued loan interest from that refund.

**Loan Value.** The loan value on any date is the Cash Surrender Value on that date discounted at the loan interest rate we charge to the next policy anniversary. The amount of any new loan you take may not be more than the loan value, less any existing loan and accrued loan interest. If you request an increase to an existing loan, the additional amount requested will be added to the amount of the existing loan and accrued loan interest.

**Loan Interest.** Interest on a loan accrues daily at an adjustable loan interest rate. We will determine the rate at the beginning of each policy year, subject to the following paragraphs. It will apply to any new or outstanding loan under the policy during the policy year next following the date of determination.

The maximum loan interest rate for a policy year shall be the greater of (1) the "Published Monthly Average," as defined below, for the calendar month that ends two months before the date of determination or (2) 4%. "Published Monthly Average" means the Moody's Corporate Bond Yield Average - Monthly Average Corporates published by Moody's Investors Service, Inc., or any successor thereto. If such averages are no longer published, we will use such other averages as may be established by regulation by the insurance supervisory official of the jurisdiction in which this policy is delivered. In no event will the interest rate for a policy year be greater than 15%. We reserve the right to establish a rate lower than the maximum.

No change in the rate shall be less than ½ of 1% per year. We may increase the rate whenever the maximum rate as determined by clause (1) of the preceding paragraph exceeds the rate being charged by ½ of 1% or more. We will reduce the rate to or below the maximum rate as determined by clause (1) of the preceding paragraph if such maximum is lower than the rate being charged by ½ of 1% or more.

We will notify you of the initial loan interest rate when you take out a loan. We will also give you advance written notice of any increase in the interest rate of any outstanding loan.

Loan interest is due on each policy anniversary. If the interest is not paid when due, it will be added to your outstanding loan and bear interest at the loan rate then in effect.

**EXHIBIT B**
**PAGE 00018**

**Loan Repayment.** You may repay all or part of a policy loan at any time while the insured person is alive and this policy is in force.

Failure to repay a policy loan or to pay loan interest will not terminate this policy unless at the beginning of a policy month the Net Policy Account Value is less than the total monthly deduction then due. In that case, the "Grace Period" provision will apply.

A policy loan will have a permanent effect on your benefits under this policy even if it is repaid.

## Our Annual Report to You

For each policy year we will send you without charge a report for this policy that shows the current Death Benefit, the value of your Policy Account, the Cash Surrender Value and any policy loan with the current loan interest rate. It will also show the premiums paid and any other information as may be required by the insurance supervisory official of the jurisdiction in which this policy is delivered.

## How Benefits Are Paid

The Insurance Benefit or your Net Cash Surrender Value withdrawals are paid immediately in one sum. Amounts paid will not be subject to the claims of creditors or to legal process, to the extent permitted by law.

## Other Important Information

**Your Contract with Us.** This policy is issued in consideration of payment of a premium at least equal to the minimum initial premium payment shown in the "Policy Information" section. This policy, any riders or endorsements, and the attached copy of the initial application and all subsequent applications to change this policy, and all additional Policy Information sections added to this policy, make up the entire contract. The rights conferred by this policy are in addition to those provided by applicable Federal and State laws and regulations.

Only our Chairman of the Board, our President or one of our Vice Presidents can modify this contract or waive any of our rights or requirements under it. The person making these changes must put them in writing and sign them.

**Policy Changes — Applicable Tax Law.** For you and the beneficiary to receive the tax treatment accorded to life insurance under Federal law, this policy must qualify initially and continue to qualify as life insurance under the Code or successor law. Therefore, we have reserved earlier in this policy the right to decline to accept premium payments, to decline to change Death Benefit Options, to decline to change the face amount, or to decline to make partial withdrawals that, in our opinion, would cause this policy to fail to qualify as life insurance under applicable tax law. Further, we reserve the right to make changes in this policy or its riders (for example, in the percentages in the "Death Benefit" provision) or to require additional premium payments, or to make distributions from this policy or to change the face amount to the extent we deem it necessary to continue to qualify this policy as life insurance. Any such changes will apply uniformly to all policies that are affected. You will be given advance written notice of such changes.

**Changes in Policy Cost Factors.** Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses. Any change in policy cost factors will never result in an interest crediting rate that is lower than that guaranteed in the policy, or policy charges that exceed the maximum policy charges guaranteed in the policy. Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**When the Policy Is Incontestable.** We have the right to contest the validity of this policy based on material misstatements made in the initial application for this policy. However, we will not contest the validity of this policy after it has been in effect during the lifetime of the insured person for two years from the earlier of the Register Date or date of issue shown in the Policy Information section.

04-100-11                                                                              Page 11

EXHIBIT B
PAGE 00019

We also have the right to contest the validity of any policy change or restoration based on material misstatements made in any application for that change or restoration. We will not contest any policy change that requires evidence of insurability, or any restoration of this policy, after the change or restoration has been in effect for two years during the lifetime of the insured person.

No statement shall be used to contest a claim unless contained in an application.

All statements made in an application are representations and not warranties.

See any additional benefit riders for modifications of this provision that apply to them.

**What if Age or Sex has Been Misstated?** If the insured person's age or sex has been misstated on any application, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at the correct age and sex.

**How the Suicide Exclusion Affects Benefits.** If the insured person commits suicide (while sane or insane) within two years after the earlier of the Register Date or the date of issue shown in the Policy Information section, our liability will be limited to the payment of a single sum. This sum will be equal to the premiums paid, minus any loan and accrued loan interest and minus any partial withdrawal of the Net Cash Surrender Value. If the insured person commits suicide (while sane or insane) within two years after the effective date of a change that you asked for that increases the Death Benefit, then our liability as to the increase in amount will be limited to the payment of a single sum equal to the monthly cost of insurance deductions made for such increase.

**How We Measure Policy Periods and Anniversaries.** We measure policy years, policy months, and policy anniversaries from the Register Date shown in the Policy Information section. Each policy month begins on the same day in each calendar month as the day of the month in the Register Date.

**When We May Defer Payment.** We may defer payment of any Net Cash Surrender Value withdrawal or loan amount (except when used to pay premiums to us) for up to six months after we receive a request for it. We will allow interest, at a rate of at least 3% per year, on any Net Cash Surrender Value payment that we defer for 30 days or more.

**The Basis We Use for Computation.** We provide Cash Surrender Values that are at least equal to those required by law. If required to do so, we have filed with the insurance supervisory official of the jurisdiction in which this policy is delivered a detailed statement of our method of computing such values. We compute reserves under this policy by the Commissioners' Reserve Valuation Method.

We use the 1980 Commissioners' Standard Ordinary Male or Female Mortality Tables at attained ages 0-17, and the 1980 Commissioners' Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables at attained ages 18 and over, as the basis for determining maximum insurance costs and minimum cash surrender values. We take account of the sex, attained age, and class of risk of the insured person. For attained ages 18 and over, we also take account of the tobacco user status of the insured person. We use a minimum effective annual interest rate of 3%.

For policies issued at attained ages 0-17, an insured person's cost of insurance rate is not based on that person's status as a tobacco user or non-tobacco user. Effective with the policy anniversary when that insured person reaches attained age 18, non-tobacco user cost of insurance rates will be charged for that person. For policies issued at attained ages 18 or over, an insured person's cost of insurance rate takes account of that person's status as a tobacco user or non-tobacco user.

**Change from Tobacco User Rates to Non-Tobacco User Rates.** Any insured person attained age 18 or over being charged tobacco user rates may be eligible for non-tobacco user rates. The change, if approved, may result in lower future cost of insurance rates beginning on the effective date of change to non-tobacco user rates.

Upon request made to our Administrative Office, we will provide forms and instructions as to how you may apply for non-tobacco user rates. The change will be based upon our general underwriting rules in effect at the time of application, and may include criteria other than tobacco use status as well as a definition of tobacco use different from that applicable at the time this policy was issued.

**EXHIBIT B**
**PAGE 00020**

The change to non-tobacco user rates, if approved, will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request. A copy of your application for the change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become part of this policy. We may require you to return this policy to our Administrative Office to make the change. This change may have adverse tax consequences.

The change to non-tobacco rates will be contestable; however, we will not contest the change after it has been in effect for two years during the lifetime of the insured person. In the event of a successful contest, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at tobacco user rates.

**Policy Illustrations.** Upon request we will give you an illustration of the potential future benefits under this policy, based upon both guaranteed and current cost factor assumptions.

**Policy Changes.** You may add additional benefit riders or make other changes, subject to our rules at the time of change.

**Conversion Privilege.** You may, with the written consent of the insured person, request that we convert this policy to a variable life insurance policy we are then offering. You may request this at any time after the first policy year but not later than the fifth policy year after the register date of this policy. The new policy will be subject to its own issue age and face amount limits. If the insured person is less than attained age 65 at the time of the request, we will not require any evidence of insurability except as specifically noted below. If the insured person is attained age 65 or over at the time of the request, we will require evidence of insurability satisfactory to us. In all cases, this request is also subject to all of the following conditions:

1. This policy must be in force on the date of conversion. The insured person may not then be disabled under the terms of any disability waiver rider in effect under this policy.

2. The new policy will have a face amount of insurance equal to the face amount of insurance under this policy on the date of conversion. In order for the new policy to qualify as life insurance under the Internal Revenue Code or successor legislation, as interpreted by us, it may be necessary to increase the face amount of the new policy. If so, any increase in the face amount of the new policy to assure that the new policy meets the definition of life insurance will be subject to evidence of insurability satisfactory to us.

3. The register date and issue date of the new policy will be the same as the date of conversion. Premiums and charges for the new policy will be based on the company's rates in effect for the new policy for the then current issue age of the insured person and the same class of risk or the closest comparable class as under this policy. You may request a more favorable risk classification for the insured person; however, this will be subject to evidence of insurability satisfactory to us.

4. Any additional benefit riders in effect under this policy will be included with the new policy only if they are then available with the new policy as of its issue date. You may request to add new additional benefit riders to the new policy; however, this will be subject to evidence of insurability satisfactory to us.

5. Any policy loan and accrued loan interest under this policy must be repaid prior to conversion.

The suicide exclusion and contestable periods of the new policy will be determined from the date of issue of this policy rather than the date of issue of the new policy, except to the extent evidence of insurability was required as noted in the first paragraph of this provision and in items 2, 3, and 4.

**EXHIBIT B**
**PAGE 00021**

We will waive the surrender charge applicable to this policy on the date of conversion up to, but not to exceed, the amount of the first year surrender charge for the new policy. We will retain the excess, if any, over this amount and deduct it from this policy's Policy Account on the date of conversion. We will transfer the balance of your Policy Account Value to the new policy. Your Policy Account Value for the new policy will be allocated to the investment options under the new policy as directed by you on the application completed for the conversion, and in accordance with the terms of the new policy. The initial premium and deduction allocation percentages that you specify on the application will continue to apply unless later changed by you. Monthly deductions for the new policy, including any additional benefit riders, will start on the register date of the new policy. The new policy will be subject to all charges according to its terms. Coverage under this policy will terminate on the conversion date.

You may examine the new policy and cancel it if you are not satisfied with it; you will have as many days after the conversion date to do this as you had to cancel this policy after it was delivered to you originally. You must send a written request for cancellation within this time period to our Administrative Office. If you do this, we will (1) reinstate this policy and the same additional benefit riders, if any, that you had originally and (2) refund any premium payments made under the new policy.

**EXHIBIT B**
**PAGE 00022**

04-100-13                                                                 Page 14

# Accelerated Death Benefit Rider

**Disclosure.** The receipt of the Accelerated Death Benefit Amount may be taxable. You should seek assistance from your personal tax advisor prior to electing the benefit.

*In this rider "we", "our" and "us" mean AXA Equitable Life Insurance Company. "You" means the Owner of the policy at the time an Owner's right is exercised. "This Policy" means the policy to which this rider is attached.*

**Policy Number:**

**This Rider's Benefit.** We will pay an accelerated death benefit in the amount requested by the Owner, if the Insured is terminally ill, subject to the provisions of this rider. We will pay an accelerated death benefit under this policy only once and in one lump sum.

The maximum accelerated death benefit you may receive is the lesser of:

1. 75% of the death benefit payable under this policy, less any policy loan and loan interest, and

2. $500,000.

The maximum aggregate amount of Accelerated Death Benefit payments that will be paid under all policies issued by us on the life of the Insured is $500,000.

For purposes of this benefit, the death benefit does not include any accidental death benefits, non-convertible term riders or convertible term riders not in their conversion period or any benefits payable because of the death of any person other than the Insured.

There is no premium or cost of insurance charge for this rider.

We reserve the right to deduct a processing charge of up to $250.00 per policy from the accelerated death benefit payment.

We reserve the right to set a minimum of $5,000 on the amount you may receive under this rider.

To be eligible for this benefit you must provide satisfactory evidence to us that the Insured's life expectancy is six months or less. This evidence must include, but is not limited to, certification by a physician licensed to practice medicine in the United States or Canada and who is acting within the scope of such license. A physician does not include the Owner, the Insured or a member of either's family.

**How This Rider Relates To The Policy.** This rider is a part of the policy. Its benefits are subject to all the terms of this rider and the policy. This rider has no cash or loan value. This rider is non-participating.

**Interest.** Interest will be charged on the amount of the Accelerated Death Benefit and on any unpaid premium we advance after the payment of an Accelerated Death Benefit. The interest rate at the time the Accelerated Death Benefit payment is made will not exceed the greater of the following on such date:

1. the yield on a 90-day treasury bill; or

2. the maximum adjustable policy loan interest rate permitted in the state in which this policy is delivered.

**Effect Of Accelerated Death Benefit Payment On The Policy.** The Accelerated Death Benefit payment, plus any accrued interest will be treated as a lien against the policy values. The amount of the lien will be pro-rated against the policy's net cash surrender value, if any, and the net amount at risk. (The net amount at risk is defined as the death benefit of the policy minus the cash surrender value, if any.)

For variable life policies, the portion of the cash surrender value that is on lien and is allocated to investment divisions of the Separate Account will be transferred to and maintained as a part of the unloaned Guaranteed Investment Division (GID). You may tell us how much of the accelerated payment is to be transferred from each investment division. Units will be redeemed from each investment division sufficient to cover the amount that is on lien and transferred to the unloaned portion of the GID. If you do not tell us how to allocate the payment, we will allocate it based on our rules then in effect. For variable life policies that do not have a GID, the portion of the cash surrender value that is on lien will be transferred to and maintained in the Money Market Division of our Separate Account. Such transfers will occur as of the date we approve an Accelerated Death Benefit payment. The amount payable at death under the policy will be reduced by the full amount of the lien and any other indebtedness outstanding under the policy. The Owner's access to the policy's cash surrender value will be limited to the excess of the policy's cash surrender value over the amount of the lien secured against the cash surrender value and any other outstanding policy loans and loan interest.

EXHIBIT B
PAGE 00023

If premiums are required to be paid under the policy, they will continue to be due after the payment of the accelerated payment. If any premium is not paid when due, the amount of the unpaid premium will be added to the lien.

If the policy is a flexible premium life policy, and the net cash surrender value is not large enough to cover a monthly deduction, AXA Equitable will advance a premium sufficient enough to keep the policy in force for up to six months following the date we approve an Accelerated Death Benefit payment. This premium advance will be added to the lien.

If a Disability Premium Waiver Rider is in effect under the policy, this policy's premiums or monthly deductions will be waived as of the date we approve an Accelerated Death Benefit payment.

Rider Limitations. Your right to be paid under the Accelerated Death Benefit Rider is subject to the following conditions:

1.  The policy must be in force other than as extended term insurance.
2.  For term insurance policies, there must be at least one year left before the final term expiry date.
3.  For adjustable life policies (Equitable Life Account), if policy is term insurance or paid-up extended term insurance, there must be at least one year left before the final term expiry date.
4.  You must make a claim in writing in a form that is satisfactory to us.
5.  If the policy is collaterally assigned, except to us as security for a policy loan or an Accelerated Death Benefit lien, we must receive a full release of this assignment for the election of this benefit.
6.  An Accelerated Death Benefit payment must be approved in writing by any irrevocable beneficiary.
7.  For joint last to die policies, a claim may be made under the rider only after the death of the first of the Insureds to die.
8.  You may not be eligible for the Accelerated Death Benefit if we are notified that:
    a)  you are required by law to elect this rider's benefit in order to meet the claims of creditors, whether in bankruptcy or otherwise; or
    b)  you are required by a government agency to elect this rider's benefit in order to apply for, obtain, or keep a government benefit or entitlement.
9.  You may request only one Accelerated Death Benefit Amount to be paid per policy.
10. We may require examination of the Insured by our medical representatives at our expense as part of any proof to establish eligibility for benefits under this rider.

When This Rider Will Terminate. You may terminate this rider by asking us in writing in a form satisfactory to us and by sending the rider to our Administrative Office. The effective date of the termination will be the beginning of the policy month which coincides with or next follows the date we receive your request. Once this rider has been terminated, another Accelerated Death Benefit Rider cannot be attached to the policy.

This rider will terminate when the policy terminates. If at any time the amount of the lien equals the total death benefit the policy will terminate. Termination will occur 31 days after we have mailed notice to the last known address of the Owner, unless the full amount of the lien is repaid within 31 days of the notice.

## AXA Equitable Life Insurance Company

Karen Field Hazin, Vice President,
Secretary and Associate General Counsel

Christopher M. Condron,
Chairman and Chief Executive Officer

# AMENDMENT TO APPLICATION

Name of Proposed
Insured:              RUTH L WILLIAMSON                    Application Dated: JUL 24, 2006
                      First  Middle Initial  Last

Policy or Contract No: 156 118 633

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

Your application is hereby amended by the undersigned in the following particulars:

MY AGENT HAS PROVIDED A PROPOSAL ILLUSTRATING THE VALUES OF THE CONTRACT
AS ISSUED.


ISSUE WITH FACE AMOUNT TO BE $6,000,000.

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said application and this
amendment thus taken as a whole are to be considered as the basis for and as a part of the policy or contract.  To the best of my (our)
knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and
complete as of the date of this amendment.

Dated at  Salt Lake City     Utah          on  12 /         20 06
              (City)            (State)

_____         _____
Signature of Purchaser if other than Applicant      Signature of Applicant

AGENT:
AGENCY:

# AMENDMENT TO APPLICATION

Name of Proposed
Insured:    RUTH L WILLIAMSON    Application Date: JUL 24, 2006
    First  Middle Initial  Last

Policy or Contract No.: 156 718 633

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

Your application is hereby amended by the undersigned in the following particulars:

ISSUE TEMPORARY EXTRA PREMIUM CLASS POLICY.

ISSUE WITH CASH VALUE ACCUMULATION TEST.

THE PART 2 OF THIS APPLICATION REFERRED TO HEREIN IS THE MEDICAL
EXAMINATION OF THE MASS MUTUAL INSURANCE CO., A COPY OF WHICH
EXAMINATION DATED 5/26/2006 IS MADE A PART OF THE APPLICATION TO THE
AXA-EQUITABLE LIFE INSURANCE COMPANY.

ISSUE WITH PLAN TO BE ATHENA UNIVERSAL LIFE II.

ISSUE WITH ANSWER TO QUESTIONS 3A AND B ON APPLICATION TO BE MORNINGSIDE
DEVELOPERS LLC, 1434 EAST 7800 SOUTH, SUITE 109, SALT LAKE CITY, UT 84121 AND
TAX IDENTIFICATION NUMBER TO BE 20-3784809.

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said application and this
amendment then taken as a whole are to be considered as the basis for and as a part of the policy or contract. To the best of my (our)
knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and
complete as of the date of this amendment.

Dated at _____Salt Lake_____ _____Ut._____ on __8/1__ __2006__
    (City)      (State)

_____  _____
Signature of Purchaser if other than Applicant    Signature of Applicant

AGENT:
AGENCY:

BV 232-109 Am. Amendment   09

# o n e    r e s o u r c e    g r o u p

Date:  November 15, 2006

To:    Barb McCall – AXA Equitable

From:  Linda Bunn – ORG Operations

C:     Todd Stewart – ORG President

RE:    RUTH L WILLIAMSON – REQUEST FOR POLICY REISSUE 156218633

The client has decided that the best manner to handle their insurance needs is to take the original $10,000,000 policy that was issued by AXA with an August 2006 issue date and issue 2 policies as follows:

1.  Reduce the existing policy to $6million keeping the same policy number 156218633, same plan, same bene & owner.
2.  Apply $196,126.80 to the reissued policy 156218633.
3.  Use the enclosed application to issue the new $4million policy with the RWAXA LLC as the owner and beneficiary and keep the same issue date as policy 156218633.
4.  Apply $130,751.12 to the $4million policy

What I am enclosing in this package is:

1.  This cover letter
2.  The new application for the $4million policy
3.  Illustration for the $4million policy
4.  Illustration for the $6million policy (reissued)

Please advise what else AXA is in need of to accomplish this split.

Thank you in advance for your sense of urgency in getting this reissue performed.

You may reach me personally as follows:

Linda.bunn@orgcorp.com
260-918-2081 direct line
260-423-6161 ext 341 (through the ORG Corp switchboard)

**EXHIBIT B
PAGE 00027**

(Page 1 of 12.)

| ☐ AXA Equitable Life Insurance Company | ☐ MONY Life Insurance Company of America | Application For Life Insurance |
|---|---|---|
| 1290 Avenue of the Americas | 1290 Avenue of the Americas | Part 1 |
| New York, NY 10104 | New York, NY 10104 | Form No. LIFEAPP-UT |
| | | (2006) |

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink.

**Proposed Insured**

A. Full Name: First _Ruth_ M. I. _L._ Last _Williamson_   B. Gender: ☐ Male ☐ Female

C. Home Address:

CityMunicipality: _____  County/Parish: _____  State _CA_  Zip + 4 Code _90874_

D. Home Phone No. _____  Best time to Call: _____  Best phone no. to be contacted:

E. Date of Birth: _____  F. Place of Birth: _Utah_

G. Marital Status: ☐ Single ☐ Married ☐ Widowed ☐ Divorced ☐ Separated  H. Soc. Sec. No. _____

I. Driver's Lic. No.: _____  State: _CA_

J. U.S. Citizen? ☐ Yes ☐ No  If Yes, Country _____  U.S. Visa type _____  Passport # or U.S. Visa # _____  # of years in U.S.

K. Currently employed? ☐ Yes ☐ No  If Retired

L. Current Occupation(s): (1) Type _Homemaker_  (2) Duties _____  (3) How Long?

M. Employer Name:

N. Employer Address: _____  City _____  State _____  Zip + 4 Code

O. Annual Earned Income (income from occupation) $ _____  P. Net Worth $ _____

* If the Proposed Insured and/or policy owner is not a U.S. Person (U.S. Citizen or U.S. corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _Athena UL II_  Amount of Insurance $ _____
(If survivorship policy, complete an application for each Proposed Insured.  (If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement.  Supplement.)
To select G-Mand options on UL or Riders on all Non-VUL Plans
complete Optional Benefits Supplement.)

B. Complete for UL or VUL only (1) Death Benefit Option ☐ Option A ☐ Option B
(2) Planned Periodic Premium $

C. Deletion of Life Insurance Test: Complete for A/B, A, FL, B, CCII '04  ☐ Guideline Premium Test  ☐ Cash Value Accumulation Test

D. Premium Mode: ☐ Annual  ☐ Semi-Annual  ☐ Quarterly  ☐ Monthly
System-Limits (Complete S-M lines and check applicable box)  ☐ Quarterly (only available for UL and VUL)  ☐ Monthly
Or

E. Salary Allotment (1) Unit Name _____  (2) Unit/Sub Unit. No. _____  (3) Draft Register Date
(Salary Allotee areas, if user has been put in Remarks.)

F. Date Policy to take Issued Age? ☐ Yes ☐ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or for any other secondary market? ☐ Yes ☐ No
   2. Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market provider? ☐ Yes ☐ No

H. Any other life insurance now in effect or application now pending? ☐ Yes ☐ No
(Use companies, amount and policy numbers in Remarks.)

I. Do you have existing life insurance or annuity contracts?  ☐ Yes ☐ No

J. Will the coverage applied for replace or change any life insurance or annuities?  ☐ Yes ☐ No  Is this a 1035 Exchange? ☐ Yes ☐ No
If "Yes", complete: (If additional room is needed, please use Remarks Section.)

| Amount $ | Company | Issue Year | Policy Number | ☐ Life | ☐ Group | ☐ Annuity |
| Amount $ | Company | Issue Year | Policy Number | ☐ Life | ☐ Group | ☐ Annuity |

K. Is this a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☐ No  If "Yes", complete Term Policy/Rider or Purchase Option Supplement.

L. Complete if Proposed Insured is under age 15:
   a) State total amount of insurance in force on the life of applicant or child's parent, if greater $
   b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No

If "Yes" give details

AUNGV-2006 UT                     CAT# 135931                     E6179_25   1

**EXHIBIT B
PAGE 00028**

[Page 2 of 12]

**⑤ BENEFICIARY/OWNER**

A. Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary Information.)

| Beneficiary Full Name | Relationship to Insured | Percentage |
|---|---|---|
| Primary: _Morningside Developers LLC_ | _Trust_ | _100%_ |
| _Thomas & George Williamson_ | _cons_ | |
| Contingent: | | |

B. Owner [The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.]
Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.
If the Owner is the Trust provide the name of the Trust.

Owner's Name _same_                          Social Security # or TIN _____

Address: Street _8691 E. 2600 S. Suite 109_  City _SLC_  State _UT_  Zip Code _84121_
(Being relied upon to write to Owner at this address unless otherwise specified in a separate section)

U.S. Citizen? ☑ Yes ☐ No* If No, Country _____  Passport # or U.S. Visa # _____  # of years in US _____
*If Yes, complete Foreign Residence and Travel Supplement.

Relationship to Insured _Trust_                Date of Birth _____

Name of Trustee _____                          Date of Trust Agreement _____

* If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**③ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

| | | |
|---|---|---|
| A. | Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.) | ☐ Yes ☑ No |
| B. | Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement.) | ☐ Yes ☑ No |
| C. | Have you been disabled for 2 or more weeks within the last 2 years? | ☐ Yes ☑ No |
| D. | In the last year have other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement.) | ☐ Yes ☑ No |
| E. | Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement.) | ☐ Yes ☑ No |
| F. | Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks.) | ☐ Yes ☑ No |
| G. | In the last 10 years, have you been convicted of, or pled "no contest" to a felony? (If "Yes" in "Remarks", state full details of offense and penalty, with dates.) | ☐ Yes ☑ No |
| H. | Do you currently use any form of tobacco or nicotine product? ☐ Yes ☑ No  Type _____  Avg. Quantity # packs _____  Frequency _____ | |
| I. | Have you ever used any form of tobacco or nicotine product? ☐ Yes ☑ No  Type _____  Date Quit _____ | |

**⑤ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered.**

| | | |
|---|---|---|
| A. | Height _5_ ft. _11_ in. Weight _110_ lbs. | |
| B. | Personal Physician Name | |
| C. | Address | |
| D. | Date and Reason for Last Visit in the Last 5 Years | |
| E. | What treatment was given or recommended? (If none, so state) | |
| | Has Proposed Insured: | |
| F. | Ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder? | ☐ ☐ |
| G. | In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years. Do not include colds, other injuries or normal pregnancy) | ☐ ☐ |
| H. | In the last 10 years: | |
| | 1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.) | ☐ ☐ |
| | 2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement.) | ☐ ☐ |
| I. | In the last 10 years, been: Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession? | ☐ ☐ |
| J. | | |

| Family History | Age If Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | | |
| Mother | | | |
| Sibling | | | |

AI4GV-2005 UT                                                                        2

EXHIBIT B
PAGE 00029

(Page 3 of 12)

**DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION**    (Attach additional sheet of paper if necessary; and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS:**
Provide details for any of the questions, and any other additional remarks. If the owner is a Qualified Plan, please indicate the qualified plan and type here.    (Attach additional sheet of paper if necessary and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

_____
_____
_____
_____
_____
_____
_____

**COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application: $ _____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary Insurance Agreement, including:
(i)  the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and
(ii) the $1,000,000 insurance amount limitations, and
(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?    ☐ Yes  ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.

**AGREEMENT. Each signer of this application agrees that:**
(1) The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in acting on this application.
(2) The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered. Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.
(3) Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Requested Date specified in this application; and (c) unless to the best of any (our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the full initial premium is paid.
(4) No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).
(5) I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable.

AA8GV-2005 UT                                                                                    3

EXHIBIT B
PAGE 00030

(Page 4 of 12)

**ACKNOWLEDGMENT OF UNDERWRITING PRACTICES**

**AUTHORIZATIONS**

**TO OBTAIN HEALTH INFORMATION**

**TO OBTAIN NON-HEALTH INFORMATION**

**PURPOSE OF AUTHORIZATIONS**

**COVERAGE CONDITIONS**

**ADDITIONAL AUTHORIZATIONS**

**DURATION**

**COPY OF AUTHORIZATIONS**

Dated at City _Salt Lake City_

State _UTAH_

Date _7/31/06_

AMGN-302S UT

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Financial Supplement**
Form No. FIN-CV (2005)

---

**Financial Supplement Forming Part of the Application for Life Insurance**

Name: _Ruth L. Williamson_

☒ Proposed Insured
☐ Additional/Joint Insured

**Personal Financial Statement (For Personal Insurance)**

**1. Balance Sheet**

| Current Assets | Amount | Current Liabilities | Amount |
|---|---|---|---|
| Liquid | $ | Mortgages | $ |
| Other (specify) _Real Estate_ | $ | Other (specify) | $ |
| Total | $ | Total | $ |
| | | Net Worth | $ |

**2. Income**

| | Earned Income | Unearned Income | | | | Total |
|---|---|---|---|---|---|---|
| | | Dividend | Rental Income | Pension/Soc Sec | Other-specify | |
| Current Year | $ | $ | | | | $ |
| Last Year | $ | $ | | | | $ |

**3.** How was face amount determined?
State what formula was used (e.g., estimated fair market value, capitalization of earnings, etc.) If none, state none.

**4.** Do you expect any changes greater than 15% in income or net worth in the next 12 months?    YES ☐  NO ☒
If "yes", explain

**5.** Have you filed for bankruptcy in the past 5 years?    YES ☐  NO ☒
If "yes", chapter _____ Date Open _____ Date Closed _____

**Business Information (For Business Insurance)**

**6.** Type of business:  ☐ Sole Proprietorship  ☐ Partnership  ☐ Corporation  ☐ Limited Liability Corporation
**7.** Name of business _____ Nature of business _____
**8.** How long has business been in operation? _____ years
**9.** % of business owned _____ %
Are all members of firm being similarly insured?    ☐ Yes  ☐ No
   a. If "yes", provide details of business coverage issued or applied for on other members (Use Separate Sheet If Necessary)

| Name | Position/Title | % Owned | Business Insurance in force/applied for |
|---|---|---|---|
| | | | |
| | | | |

   b. If "No", explain reason

**10.** Business finances for past 2 years:

| Year | Assets | Liabilities | Retained Earnings | Gross Sales | Net Profit |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |
| | $ | $ | $ | $ | $ |

**11.** Has the business filed for bankruptcy under reorganization in the past 5 years?    YES ☐  NO ☐
If "yes", explain

**Other Information (For Personal and/or Business)**

**12.** Do you intend to finance any of the premium required to pay for this policy through a financing or loan agreement? (If Yes, submit a copy of the financing or loan agreement)    ☐ Yes  ☐ No

Check all of the following that apply and complete requested information:

☐ Loan _____ (% of premium) Identify Source of Loan _____
   Loan Repayment Schedule _____
   Describe the collateral used _____
☐ Cash _____ (% of premium)
☐ Existing life insurance policy or contract _____ (% of premium)
☐ Existing investments _____ (% of premium) Identify Investment
   Source _____

**13.** Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If Yes, describe the inducement) _____    ☐ Yes  ☒ No

**14.** Please state the reason you are purchasing this policy (e.g. estate planning, business insurance, etc.)
_Estate planning & estate liquidity_

---

145-6604 (2006)    Cat. # 134003    ES810_core

| References (Personal and/or Business) | | | |
|---|---|---|---|
| Attorney: | | | |
| | Name | Business Address | Telephone No. |
| Accountant: | | | |
| | Name | Business Address | Telephone No. |
| Other: | | | |
| | Name | Branch | Title of Account |
| | Name | Branch | Title of Account |
| Have bankers, attorney and accountant been authorized to release information? | | ☐ Yes  ☐ No | |
| If "no", explain | | | |

I represent that the statements and answers in this Supplement are true and complete.

Date: 7/25/06

— Morningside Developer, LLC

Signature of Licensed Financial Professional/Introducing Broker

**EXHIBIT B**
**PAGE 00033**

(Page 1 of 4)

## APPLICATION (PART 2)

APPLICATION NO.

To: ☐ Massachusetts Mutual Life Insurance Co.   ☐ MML Bay State Life Insurance Co.   ☐ C.M. Life Insurance Co.
Springfield, Massachusetts 01111-0001                          100 Bright Meadow Blvd., Enfield, CT 06082

To: ☐ Massachusetts Mutual Life Insurance Co.   ☐ MML Bay State Life Insurance Co.   ☐ C.M. Life Insurance Co.
Springfield, Massachusetts 01111-0001                          100 Bright Meadow Blvd., Enfield, CT 06082

### Personal Information

In all cases, the terms "you" and "your" refer to the Proposed Insured.

1. a. Full name of Proposed Insured
First Name
R U T H

Middle Name
L

Last Name
C H U T T A R B U

Suffix
(e.g. Jr., III)

b. Date of Birth

c. Client ID (if known)

d. Social Security No.

Do not complete 2 if being medically examined.

2. a. Height in shoes ___ ft. _11_ in.
b. Weight (clothed) _1 1 0_ lbs.
c. Loss in weight in the past year?
If "Yes," Amount ___ lbs. Re-

| 3. Family History | Age if Living | Age at Death | Cause of Death |
|---|---|---|---|
| a. Father | | | |
| b. Mother | | | |

### General Health

If "Yes" to any question, please explain in 11 below.   Yes   No

4. Have any of your parents, brothers or sisters:
a. had cardiovascular disease prior to age 60?
b. ever had diabetes, kidney disease, or other familial disorder?

5. a. Have you smoked cigarettes in the past 12 months?
b. If "No," have you used tobacco or nicotine in any other form during the past 12 months?
c. Have you used tobacco or nicotine in any form during the past 3 years?

6. Have you ever received any treatment in relation to alcoholism or use of alcohol?

7. Have you ever used barbiturates, narcotics, cocaine or other controlled substances not prescribed by a physician?

8. Have you applied for life or health insurance and been declined, postponed, rated or restricted in the last ten years?

9. Have you ever requested or received a pension, benefits, or payment because of an injury, sickness or disability?

10. Have you been treated for, or been diagnosed by a member of the medical profession as having, acquired immune deficiency syndrome (AIDS)?

### 11.   COMPLETE 11 FOR EACH "YES" ANSWER IN 4 - 10 ABOVE

| Question Number | Explanatory Details and Remarks |
|---|---|
| | |

A50CA197

EXHIBIT B
PAGE 00034

(Page 2 of 4)

05/31/2006  13:29   7148923781          PSCHLOTTERBECK ENSI          PAGE  03/06

| APPLICATION NO. | | Page 2 |
|---|---|---|
| Medical History | | |
| Medical History | Complete 20 Below For Each Medical History Checked In 12 - 22 | |
| | Complete 20 Below For Each Medical History Checked In 12 - 22 | |

REDACTED

REDACTED

A50CA197

EXHIBIT B
PAGE 00035

(Page 3 of 4)

APPLICATION NO.                                                                    Page 3

COMPLETE 29 FOR EACH APPROPRIATE ITEM CHECKED IN 12~28 ABOVE

REDACTED

REDACTED

**EXHIBIT B
PAGE 00036**

# AXA EQUITABLE
## LIFE INSURANCE COMPANY

A Stock Life Insurance Company.
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable upon the death of the insured person while this policy is in force. You may pay premiums while the insured person is living and is not yet attained age 100. The values provided by this policy are based on declared interest rates. This is a non-participating policy.

No. 04-100

EXHIBIT B
PAGE 00037

# EXHIBIT C

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance**
Part I
Form No. LIFEAPP-GV
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink.

Proposed Insured

A. Full Name: First _Ruth_    M.I. _L_    Last _Williamson_    B. Gender: ☐ Male ☒ Female

C. Home Address: _____ No. and Street _____ Bldg/Apt/Suite

City/Municipality _____ city/Parish _____ _CA_ Zip + 4 Code _90274_
(if address is a P.O. Box or rural residence, proof of residence required.)

D. Home Phone No. _____ Best time to Call: _____ Best phone no. to be contacted: _____

E. Date of Birth: _____ (Month/Day/Year)    F. Place of Birth: _Utah / Salt Lake_ (State/County)

G. Marital Status: ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated    H. Soc. Sec. No. _____

I. Driver's Lic. No. _____ State: _California_

J. U.S. Citizen? ☒ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S. _____

K. Currently employed? ☐ Yes ☐ No ☒ Retired

L. Current Occupation: (1) Title: _Homemaker_    (2) Duties _____ (3) How Long? _____
(if less than 1 year of current occupation, give previous in Remarks)

M. Employer Name: _____

N. Employer Address: _____ No.& Street _____ City _____ State _____ Zip + 4 Code

O. Annual Earned Income (income from occupation) $ _____    P. Net Worth $ _____

* If the Proposed Insured and/or policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a
state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❷ COVERAGE INFORMATION**

A. Plan of Insurance _Athena UL_    Amount of Insurance $ _4 million_
(If survivorship policy, complete an application for each Proposed Insured.    (If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement.)    Supplement.)
To select dividend options on EWL or Riders on all Non-VUL Plans
complete Optional Benefits Supplement.

B. Complete for UL or VUL only (1) Death Benefit Option ☒ Option A ☐ Option B
(2) Planned Periodic Premium $ _297,696.00_

C. Definition of Life Insurance Test: Complete for AUL II, IL, IL COLI '04 ☐ Guideline Premium Test ☒ Cash Value Accumulation Test

D. Premium Mode: ☒ Annual ☐ Semi-Annual ☐ Quarterly ☐ Monthly
Or
System-Matic (Complete S-M form and check applicable box) ☐ Quarterly (only available for UL and VUL) ☐ Monthly

E. Salary Allotment (1) Unit Name _____ (2) Unit/Sub Unit. No. _____ (3) Unit Register Date _____
(Salary Allotter name, if other than insured, in Remarks)

F. Does Policy to save insured Age? ☒ Yes ☐ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or
for any other secondary market? ☐ Yes ☒ No
2. Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy to a life settlement, viatical, or other secondary market
provider? ☐ Yes ☒ No

H. Any other life insurance now in effect or application now pending? ☐ Yes ☒ No
(Give companies, amounts and policy numbers in Remarks.)

I. Will the coverage applied for replace or change any life insurance or annuities? ☐ Yes ☒ No Is this a 1035 Exchange? ☐ Yes ☒ No
If "Yes", complete: (if additional room is needed, please use Remarks Section.)
Amount $ _____ Company _____ Issue Year _____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity
Amount $ _____ Company _____ Issue Year _____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option? ☐ Yes ☒ No If "Yes", complete Term Policy/Rider or Purchase Option Supplement.

K. Complete if Proposed Insured is under age 15:
a) State total amount of insurance in force on the life of applicant or child's
parent, if greater $ _____
b) Are any other children in the family insured for a lesser amount? ☐ Yes ☐ No

If "Yes" give details _____

AHAGV-2005    CAT# 133941    E6173_core (4/06)  1

**EXHIBIT C
PAGE 00038**

**③ BENEFICIARY/OWNER**

A. Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

Beneficiary Full Name _____ Relationship to Insured _____ Percentage _____

Primary: **RWAXA LLC** _____ %

Contingent: _____

B. Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks Section.

If the Owner is the Trust provide the name of the Trust.

Owner's Name: **RWAXA LLC** _____ Social Security # or TIN #____

Address: Street _____ City _____ State _____ Zip Code ____

U.S. Citizen? ☐ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S.___

Relationship to Insured _____ Date of Birth ____

Name of Trustee _____ Date of Trust Agreement ____

* If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**④ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

A. Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs? (If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.)

B. Any plans to travel or reside outside the United States? (If "Yes", complete Foreign Residence and Travel Supplement.)

C. Have you been disabled for 2 or more weeks within the last 2 years?

D. In the last year flown other than as a passenger or plan to do so? (If "Yes", complete Aviation Supplement.)

E. Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies? (If "Yes", complete Avocation Supplement.)

F. Ever had an application for life or health insurance that was declined, required an extra premium or other modification? (If "Yes", state companies and provide full details in Remarks.)

G. In the last 10 years, have you been convicted of, or pled "no contest" to ____

H. Do you currently use any form of tobacco or nicotine product? ____ Yes ____ No Type____ Avg. Quantity # packs____ Frequency____

I. Have you ever used any form of tobacco or nicotine product? ____ Yes ____ No Type____ Date Ceased ____

**⑤ MEDICAL INFORMATION (Proposed Insured)** Please Note: Complete this section even if a paramedical or medical exam is being ordered.

A. Height **4** Ft **11** In Weight **110** lbs.

B. Personal Physician Name _Nena Pillay_

C. Address ____

D. Date and Reason for Last Visit in the Last 5 Years ____

E. What treatment was given or recommended? (If none, so state) ____

Has Proposed Insured:

F. Ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder?

G. In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.)

H. In the last 10 years:

1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances? (If "Yes", complete Substance Usage Supplement.)

2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous? (If "Yes", complete Substance Usage Supplement.)

I. In the last 10 years, been: Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession?

| Family History | Age If Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | | |
| Mother | | | |
| Sibling | | | |

ANRGV-2005                                      (4/06)  2

**EXHIBIT C**
**PAGE 00039**

**DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION**    (Attach additional sheet of paper if necessary;
and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (Include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address and Phone Number |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**REMARKS**
Provide details for any of the questions, and any other additional remarks.    (Attach additional sheet of paper if necessary; and it must be
If the owner is a Qualified Plan, please indicate the qualified plan and type    signed and dated by the Proposed Insured, Owner, and financial
here.    professional.)

_____

**COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application: $_____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary
Insurance Agreement, including:

(i) the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii) the $1,000,000 insurance amount limitations, and

(iii) that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?    ☐ Yes  ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome
(AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or
had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.

**AGREEMENT.** Each signer of this application agrees that:

(1)  The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in
acting on this application.

(2)  The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered.
Temporary insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

(3)  Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium
for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application; and (c) unless to the best of my
(our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the
full initial premium is paid.

(4)  No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or
requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).

(5)  I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable.

AM05 2005    (4/06)  3

**EXHIBIT C
PAGE 00040**

☑ AXA Equitable Life Insurance Company          ☐ MONY Life Insurance Company of America

**ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES**
I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

**AUTHORIZATIONS**
**TO OBTAIN HEALTH INFORMATION**
I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our Company, with respect to other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

**TO OBTAIN NON-HEALTH INFORMATION**
I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Institution Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

**PURPOSE OF AUTHORIZATIONS**
I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted; when requested by a government agency; in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

**COVERAGE CONDITIONS**
I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

**ADDITIONAL AUTHORIZATIONS**
You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy. I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

**DURATION**
Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke any (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

**COPY OF AUTHORIZATIONS**
I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.
FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).
CERTIFICATION INSTRUCTIONS: You must cross out item (II) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) accepting to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City _____ Los Angeles _____

State _____ CA _____

OR _____ 11/15/06 _____

Signature of Proposed Insured, Applicant (if parent or guardian,
if Proposed Insured is a child, state Applicant.)

Signature of Owner (or Applicant if not Proposed Insured
(if corporation, print firm's name and signature of authorized officer.)
(If trust, signature of trustee.)

**Financial Professional to complete this section:**
Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued?   ☐ Yes   ☑ No
(If "yes", give details _____)
I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and know of nothing affecting the risk that has not been recorded herein.
☐ I have witnessed the signature required on fully completed Part 1   ☐ I have not witnessed the signature required on fully completed Part 1, (Explain below)

Signature of Licensed Financial Professional/Insurance Broker _____
Print Licensed Financial Professional's Name _____

AXAGV-2005                                                                                      (4/06)

**EXHIBIT C**
**PAGE 00041**

# EXHIBIT D

# AMENDMENT TO APPLICATION

Name of
Proposed Insured  RUTH L WILLIAMSON _____  Application Dated  NOV 15, 2006
                          First        Middle Initial      Last

Policy No _____  156 229 495 _____

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

The application is hereby amended by the undersigned in the following particulars:

ISSUE EXTRA PREMIUM CLASS POLICY.

MY ASSOCIATE HAS PROVIDED A PROPOSAL ILLUSTRATING THE VALUES OF THE CONTRACT
AS ISSUED.

ISSUE WITH 3B TO BE OFFICER NAME GEORGE B WILLIAMSON, ADDRESS 12 CORPORATE
PLAZA SUITE 105, NEWPORT BEACH, CA 92660

---

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said
application and this amendment thus taken as a whole are to be considered as the basis for and as a part of the
policy. To the best of my knowledge and belief, in all other respects the statements and answers in the
application continue to be, without material change, true and complete as of the date of this amendment.

Dated at  Salt Lake City , Utah. _____  on  12/1/06 ____
                    (City)              (State)

_____        _____
  Signature of Purchaser if other than Applicant           Signature of Applicant

┌─────────────────────────────────┐
│  Agent: _____ │
│                                  │
│  Agency: _____ │
└─────────────────────────────────┘

EV 237.400 App. Amendment.    (B)

EXHIBIT D
PAGE 00042

# EXHIBIT E

*INSURED PERSON*    RUTH L WILLIAMSON



*POLICY OWNER*    RWAXA LLC

## UNIVERSAL LIFE INSURANCE POLICY

*POLICY NUMBER*    156 229 495

**AXA EQUITABLE LIFE INSURANCE COMPANY**
**HOME OFFICE: 1290 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK**

**We agree** to pay the Insurance Benefit of this policy and to provide its other benefits and rights in accordance with its provisions.

### Flexible Premium Universal Life Insurance Policy

This is a flexible premium universal life insurance policy. You can, within limits:
- make premium payments at any time and in any amount;
- change the Death Benefit Option; and
- reduce the face amount of insurance

These rights and benefits are subject to the terms and conditions of this policy. All requests for policy changes are subject to our approval and may require evidence of insurability.

We put your net premiums into your Policy Account. Your Policy Account will accumulate, after deductions, at rates of interest we determine. Such rates will not be less than 3% per year.

This is a non-participating policy.

**Right to Examine Policy. You may examine this policy and if for any reason you are not satisfied with it, you may cancel it by returning this policy with a written request for cancellation to our Administrative Office or to the financial professional who sold it to you by the 10th day after you receive it. If you do this, we will refund the premiums that were paid minus any outstanding loan and accrued loan interest.**

**Read Your Policy Carefully.** It is a legal contract between you and AXA Equitable Life Insurance Company.

*Pauline Sherman*

Pauline Sherman, Senior Vice President,
Secretary and Associate General Counsel

*Cnle*

Christopher M. Condron
Chairman and Chief Executive Officer

04-100CA

## Contents

*Policy Information*   3

*Table of Maximum Monthly Charges for Benefits*   4

*Those Who Benefit from this Policy*   5

*The Insurance Benefit We Pay*   5

*Reducing the Face Amount of the Base Policy or Changing the Death Benefit Option*   6

*The Premiums You Pay*   7

*Your Policy Account and How it Works*   8

*The Cash Surrender Value of this Policy*   9

*How a Loan Can Be Made*   10

*Our Annual Report to You*   11

*How Benefits are Paid*   11

*Other Important Information*   11

**In this policy:**

"*We,*" "*our,*" and "*us*" mean AXA Equitable Life Insurance Company.

"*You*" and "*your*" mean the owner of this policy at the time an owner's right is exercised.

Unless otherwise stated, all references to interest in this policy are effective annual rates of interest.

Attained age means age on the birthday nearest to the beginning of the current policy year.

**Administrative Office**

The address of our Administrative Office is shown on Page 3. You should send correspondence to that office. Premium payments should be sent to the address listed on your billing notice.

*Copies of the application for this policy and any additional benefit riders are attached to the policy.*

# INTRODUCTION

The premiums you pay, after deductions are made in accordance with the Table of Expense Charges in the Policy Information sectio n, are put into your Policy Account. Amounts in your Policy Account earn interest at rates we declare periodically; these rates will not be less than 3% on an effective annual basis.

If Death Benefit Option A is in effect, the Death Benefit is the base policy face amount. If Death Benefit Option B is in effect, the Death Benefit is the base policy face amount *plus* the amount in your Policy Account. Under either option, the Death Benefit will never be less than a percentage of your Policy Account as stated in the "Death Benefit" provision.

The Insurance Benefit of this policy is payable upon the death of the insured person while the policy is in force.

We make monthly deductions from your Policy Account to cover the cost of the benefits provided by this policy and the cost of any benefits provided by riders to this policy. If you give up this policy for its Net Cash Surrender Value or reduce the base policy face amount, we may deduct a surrender charge from your Policy Account.

This is only a summary of what this policy provides. You should read all of it carefully. Its terms govern your rights and our obligations.

04-100CA

Page 2

**EXHIBIT E**
**PAGE 00044**

## POLICY INFORMATION

| | |
|---|---|
| INSURED PERSON | RUTH L WILLIAMSON |
| POLICY OWNER | RWAXA LLC |
| FACE AMOUNT OF BASE POLICY | $4,000,000 |
| DEATH BENEFIT | OPTION A (SEE PAGE 6) |
| POLICY NUMBER | 156 229 495 |
| BENEFICIARY | RWAXA LLC |
| REGISTER DATE | MAR 5, 2006 |
| DATE OF ISSUE | NOV 28, 2006 |

ISSUE AGE
SEX FEMALE

RATING CLASS:  STANDARD
NON-TOBACCO USER
(WITH FLAT EXTRA)

A MINIMUM INITIAL PREMIUM PAYMENT OF $55,608.68 IS DUE ON OR BEFORE DELIVERY OF THE POLICY.

THE PLANNED PERIODIC PREMIUM OF $297,696.00 IS PAYABLE ANNUALLY.

THE ADDITIONAL BENEFIT RIDERS LISTED BELOW, IF ANY, ARE INCLUDED IN THIS POLICY:

---

THE PLANNED PERIODIC PREMIUMS SHOWN ABOVE MAY NOT BE SUFFICIENT TO CONTINUE THE POLICY AND LIFE INSURANCE COVERAGE IN FORCE. THE PERIOD FOR WHICH THE POLICY AND COVERAGE WILL CONTINUE IN FORCE WILL DEPEND ON: (1) THE AMOUNT, TIMING AND FREQUENCY OF PREMIUM PAYMENTS; (2) CHANGES IN THE FACE AMOUNT AND THE DEATH BENEFIT OPTIONS; (3) CHANGES IN THE INTEREST RATES CREDITED TO THIS POLICY; (4) CHANGES IN THE MONTHLY DEDUCTIONS FROM THE POLICY ACCOUNT FOR THIS POLICY AND ANY BENEFITS PROVIDED BY RIDERS TO THIS POLICY; AND (5) LOAN AND PARTIAL NET CASH SURRENDER VALUE WITHDRAWAL ACTIVITY.

04-100-3

PAGE 3
(CONTINUED ON NEXT PAGE)

EXHIBIT E
PAGE 00045

POLICY INFORMATION CONTINUED—POLICY NUMBER    156 229 495.

———————    TABLE OF EXPENSE CHARGES    ———————

DEDUCTION FROM PREMIUM PAYMENTS:

PREMIUM CHARGE:

WE DEDUCT AN AMOUNT NOT TO EXCEED 15% FROM EACH PREMIUM PAYMENT.

DEDUCTIONS FROM YOUR POLICY ACCOUNT:

ADMINISTRATIVE CHARGE:

FIRST POLICY YEAR: WE DEDUCT $20.00 AT THE BEGINNING OF EACH POLICY MONTH.

SECOND AND SUBSEQUENT POLICY YEARS (BUT NOT BEYOND THE POLICY ANNIVERSARY WHEN THE INSURED PERSON IS ATTAINED AGE 100); WE DEDUCT AN AMOUNT NOT TO EXCEED $10.00 AT THE BEGINNING OF EACH POLICY MONTH.

04-100-3CA              PAGE 3—CONTINUED

EXHIBIT E
PAGE 00046

POLICY INFORMATION CONTINUED—POLICY NUMBER  156 229 495

————— TABLE OF SURRENDER CHARGES —————
FOR THE INITIAL BASE POLICY FACE AMOUNT

| BEGINNING OF POLICY YEAR | CHARGE | BEGINNING OF POLICY YEAR | CHARGE |
|---|---|---|---|
| 01 | $185,764.03 | 09 | $94,343.09 |
| 02 | $175,723.09 | 10 | $80,704.50 |
| 03 | $165,684.01 | 11 | $67,062.17 |
| 04 | $155,644.93 | 12 | $53,423.58 |
| 05 | $145,602.11 | 13 | $39,783.12 |
| 06 | $135,264.47 | 14 | $26,144.53 |
| 07 | $121,624.01 | 15 | $12,504.07 |
| 08 | $107,983.55 | 16 AND LATER | $0.00 |

A SURRENDER CHARGE WILL BE SUBTRACTED FROM YOUR POLICY ACCOUNT IF THIS
POLICY IS GIVEN UP FOR ITS NET CASH SURRENDER VALUE WITHIN THE FIRST
FIFTEEN POLICY YEARS.  THE SURRENDER CHARGE IN THE FIRST POLICY MONTH
OF EACH POLICY YEAR IS SHOWN IN THE TABLE ABOVE.  DURING THE FIRST FIVE
POLICY YEARS THE SURRENDER CHARGE DECLINES UNIFORMLY IN EQUAL MONTHLY
AMOUNTS UNTIL IT REACHES $136,400.87 IN THE TWELFTH MONTH OF POLICY
YEAR FIVE.  STARTING IN POLICY YEAR SIX, THE SURRENDER CHARGE DECLINES
UNIFORMLY IN EQUAL MONTHLY AMOUNTS UNTIL IT REACHES ZERO IN THE TWELFTH
MONTH OF POLICY YEAR FIFTEEN.

IF THE BASE POLICY FACE AMOUNT IS REDUCED WITHIN THE FIRST FIFTEEN
POLICY YEARS, A PROPORTIONATE SHARE OF THE APPLICABLE SURRENDER CHARGE AT
THAT TIME WILL BE DEDUCTED FROM YOUR POLICY ACCOUNT.  SEE SURRENDER
CHARGES PROVISION FOR A DESCRIPTION OF THE PROPORTIONATE SURRENDER CHARGE.

ADMINISTRATIVE OFFICE:

AXA EQUITABLE LIFE INSURANCE COMPANY

AXA EQUITABLE NATIONAL OPERATIONS CENTER
10840 BALLANTYNE COMMONS PARKWAY
CHARLOTTE, NC 28277
(800) 373-6542

EXHIBIT E
PAGE 00047

POLICY INFORMATION CONTINUED - POLICY NUMBER 156 229 495

_____ TABLE OF MAXIMUM MONTHLY CHARGES FOR BENEFITS _____

| BENEFITS | MONTHLY DEDUCTION FROM POLICY ACCOUNT | PERIOD |
|---|---|---|
| BASE POLICY LIFE INSURANCE | MAXIMUM MONTHLY COST OF INSURANCE RATE FOR THE BASE POLICY (SEE PAGE 4 - CONTINUED) TIMES THOUSANDS OF NET AMOUNT AT RISK. NO DEDUCTION IS MADE AFTER AGE 100 OF THE INSURED PERSON. | 20 YEARS |
| FLAT EXTRA CHARGE FOR BASIC LIFE INSURANCE | $9,000.00 | FIRST 5 YEARS |
| | $6,666.67 | NEXT 10 YEARS |

04-100-4

PAGE 4
(CONTINUED ON NEXT PAGE)

EXHIBIT E
PAGE 00048

POLICY INFORMATION CONTINUED—POLICY NUMBER  156 229 495

TABLE OF MAXIMUM MONTHLY COST OF INSURANCE RATES
PER $1,000 OF NET AMOUNT AT RISK FOR THE BASE POLICY

| INSURED PERSON'S ATTAINED AGE | RATE |
|---|---|
| 80 | 5.59500 |
| 81 | 6.27500 |
| 82 | 7.06750 |
| 83 | 7.98833 |
| 84 | 9.02000 |
| 85 | 10.16417 |
| 86 | 11.40333 |
| 87 | 12.74917 |
| 88 | 14.19083 |
| 89 | 15.75500 |
| 90 | 17.44583 |
| 91 | 19.30500 |
| 92 | 21.39667 |
| 93 | 23.84000 |
| 94 | 26.92583 |
| 95 | 31.31000 |
| 96 | 38.50417 |
| 97 | 52.27500 |
| 98 | 83.33250 |
| 99 | 83.33250 |
| 100 AND OVER | 0.00000 |

EXHIBIT E
PAGE 00049

POLICY INFORMATION CONTINUED—POLICY NUMBER  156 229 495

TABLE OF PERCENTAGES

| INSURED PERSON'S ATTAINED AGE | PERCENTAGE |
|---|---|
| 80 | 132.0% |
| 81 | 129.6% |
| 82 | 127.3% |
| 83 | 125.2% |
| 84 | 123.2% |
| 85 | 121.4% |
| 86 | 119.7% |
| 87 | 118.1% |
| 88 | 116.7% |
| 89 | 115.3% |
| 90 | 114.0% |
| 91 | 112.7% |
| 92 | 111.5% |
| 93 | 110.2% |
| 94 | 108.9% |
| 95 | 107.6% |
| 96 | 106.2% |
| 97 | 104.8% |
| 98 | 103.4% |
| 99 | 102.5% |
| 100 AND ABOVE | 101.0% |

This policy is designed to satisfy the definition of life insurance for Federal income tax purposes under Section 7702 of the Internal Revenue Code of 1986, as amended (i.e., the "Code"). Accordingly, even if this policy states otherwise, at no time will the death benefits under the policy be less than the Cash Surrender Value of the policy, divided by the net single premium per dollar of insurance which would have to be paid at such time to fund such benefits consistent with the definition of such terms in the Code. At no time will the "death benefit" under the policy be less than the applicable percentage of the "cash surrender value" of the policy. In addition, we may take certain actions, described here and elsewhere in the policy, to meet the definitions and limitations in the Code, based on our interpretation of the Code. Please see "Policy Changes - Applicable Tax Law" for more information.

04-100-4CVAT                    PAGE 4—CONTINUED

EXHIBIT E
PAGE 00050



## *Those Who Benefit from this Policy*

**Owner.** The owner of this policy is the insured person unless otherwise stated in the application, or later changed.

As the owner, you are entitled to exercise all the rights of this policy while the insured person is living. To exercise a right, you do not need the consent of anyone who has only a conditional or future ownership interest in this policy.

**Beneficiary.** The beneficiary is as stated in the application, unless later changed. The beneficiary is entitled to the Insurance Benefit of this policy. One or more beneficiaries for the Insurance Benefit can be named in the application. If more than one beneficiary is named, they can be classed as primary or contingent. If two or more persons are named in a class, their shares in the benefit can be stated. The stated shares in the Insurance Benefit will be paid to any primary beneficiaries who survive the insured person. If no primary beneficiaries survive, payment will be made to any surviving contingent beneficiaries. Beneficiaries who survive in the same class will share the Insurance Benefit equally, unless you have made another arrangement with us.

If there is no designated beneficiary living at the death of the insured person, we will pay the Insurance Benefit to the insured person's surviving children in equal shares. If none survive, we will pay the insured person's estate.

**Changing the Owner or Beneficiary.** While the insured person is living, you may change the owner or beneficiary by written notice to us. You can get such a form from your financial professional or by writing to us at our Administrative Office. The change will take effect on the date you sign the notice; however, it will not apply to any payment we make or other action we take before we receive the notice.

**Assignment.** You may assign this policy, if we agree; however, we will not be bound by an assignment unless we have received it in writing at our Administrative Office. Your rights and those of any other person referred to in this policy will be subject to the assignment. We assume no responsibility for the validity of an assignment. An absolute assignment will be considered as a change of ownership to the assignee.

## *The Insurance Benefit We Pay*

We will pay the Insurance Benefit of this policy to the beneficiary upon the death of the insured person when we receive at our Administrative Office (1) proof that the insured person died while this policy was in force; and (2) all other requirements we deem necessary. The Insurance Benefit includes the following amounts, which we will determine as of the date of death of the insured person:

* the Death Benefit described in the "Death Benefit" provision;

* plus any other benefits then due from riders to this policy;

* minus any policy loan and accrued interest, or liens;

* minus any overdue deductions from your Policy Account if the insured person dies during a grace period.

We will add interest to the resulting amount in accordance with applicable law. We will compute the interest at a rate we determine, but not less than the rate required by any applicable law. Payment of the Insurance Benefit may also be affected by other provisions of this policy. See the "Other Important Information" section of this policy, where we specify our right to contest the policy, the suicide exclusion, and what happens if age or sex has been misstated. Additional exclusions or limitations (if any) are listed in the Policy Information section.

**EXHIBIT E**
**PAGE 00051**

**Death Benefit.** The Death Benefit of this policy will be determined under either Option A or Option B, whichever you have chosen and is in effect on the date of death of the insured person.

Under Option A, the Death Benefit is the greater of (a) the base policy face amount; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

Under Option B, the Death Benefit is the greater of (a) the base policy face amount *plus* the amount in your Policy Account on the date of death of the insured person; or (b) a percentage of the amount in your Policy Account on the date of death of the insured person.

The percentages referred to above are the percentages from the "Table of Percentages" shown on Page 4-Continued of this policy for the insured person's age (nearest birthday) at the beginning of the policy year of determination.

**Coverage After Age 100.** If the policy is in force on the policy anniversary when the insured person reaches age 100, it will remain in force subject to the policy loan provision. However, no premium payments, partial withdrawals, changes in face amount or changes in Death Benefit Option will be permitted after age 100 of the insured person; policy loans and loan repayments may continue to be made, subject to our normal rules as stated in other provisions of the policy pertaining to these items. No deductions for cost of insurance or administrative charges will be made after age 100 of the insured person.

## *Reducing the Face Amount of the Base Policy or Changing the Death Benefit Option*

You may reduce the face amount of the base policy or change the death benefit option by written request to us at our Administrative Office, subject to the following conditions:

1. After the second policy year while this policy is in force, you may ask us to reduce the base policy face amount but not to less than $50,000. Any such reduction in the face amount may not be less than $10,000. If you reduce the base policy face amount before the end of the twentieth policy year, we will deduct a proportionate amount of any applicable surrender charge from your Policy Account.

2. After the second policy year while this policy is in force, you can change your death benefit option. Any requested change to death benefit Option B must be made while the insured person is not more than attained age 90. If you ask us to change from Option A to Option B, we will decrease the base policy face amount by the amount in your Policy Account on the date the change takes effect. However, we will decline to make such change if it would reduce the base policy face amount to less than $50,000. If you ask us to change from Option B to Option A, we will increase the base policy face amount by the amount in your Policy Account on the date the change takes effect. Such decreases and increases in the base policy face amount are made so that the death benefit remains the same on the date the change takes effect.

3. The change will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request.

4. We reserve the right to decline to make any change that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

5. You may ask for a change by completing an application for change, which you can get from your financial professional or by writing to us at our Administrative Office. A copy of your application for change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become a part of this policy. We may require you to return this policy to our Administrative Office to make a policy change.

**EXHIBIT E**
**PAGE 00052**

## *The Premiums You Pay*

The minimum initial premium payment shown in the Policy Information section is due on or before delivery of this policy. No insurance will take effect before a premium at least equal to the minimum initial premium is paid. Other premiums may be paid at our Administrative Office at any time prior to attained age 100 of the insured person while this policy is in force. We will furnish you with a premium receipt, signed by one of our officers, upon request.

We will send premium notices to you for the planned periodic premium shown in the Policy Information section. You may skip planned periodic premium payments. However, this may adversely affect the duration of the Death Benefit and your policy's values. We will assume that any payment you make to us is a premium payment, unless you tell us in writing that it is a loan repayment.

If you stop paying premiums, insurance coverage will continue for as long as the Net Policy Account Value is sufficient to cover the monthly deductions described in the "Monthly Deductions" provision, with a further extension of coverage as described in the "Grace Period" provision.

**Limits.** Each premium payment after the initial one must be at least $100. We may increase this minimum limit 90 days after we send you written notice of such increase. We reserve the right to limit the amount of any premium payments you may make if they would immediately result in more than a dollar for dollar increase in the Death Benefit (which would happen if the Death Benefit is determined as a percentage of the Policy Account, as described in the "Death Benefit" provision), unless you provide satisfactory evidence of insurability of the insured person.

We also reserve the right not to accept premium payments or to return excess amounts that we determine would cause this policy to fail to qualify as life insurance under applicable tax law as interpreted by us.

**Grace Period.** At the beginning of each policy month, we compare the Net Policy Account Value (this is equal to the amount in your Policy Account minus any policy loan and accrued loan interest) to the total monthly deductions described in the "Monthly Deductions" provision. If the Net Policy Account Value is sufficient to cover the total monthly deductions, this policy is not in default.

If the Net Policy Account Value at the beginning of any policy month is not sufficient to cover the total monthly deductions, the policy is in default as of the first day of such policy month.

If the policy is in default, we will send you and any assignee on our records at last known addresses written notice stating that a grace period of 61 days has begun starting with the date the notice is mailed. The notice will also state the amount of payment that is due.

The payment required will not be more than an amount sufficient to increase the Net Policy Account Value to cover all monthly deductions for 3 months, calculated assuming no interest was credited to the Policy Account and no policy changes were made.

If we do not receive such amount at our Administrative Office before the end of the grace period, we will then (1) withdraw and retain any amount in your Policy Account; and (2) send a written notice to you and any assignee on our records at last known addresses stating that this policy has ended without value.

If we receive the requested amount before the end of the grace period, but the Net Policy Account Value is still insufficient to cover total monthly deductions, we will send a written notice that a new 61 day grace period has begun and request an additional payment.

If the insured person dies during a grace period, we will pay the Insurance Benefit as described on Page 5.

EXHIBIT E
PAGE 00053

04-100-7                                                                                              Page 7

**Restoring Your Policy Benefits.** If this policy has ended without value and was not given up for its Net Cash Surrender Value, you may restore policy benefits while the insured person is alive. In order to restore benefits, you must:

1. Ask for restoration of policy benefits within 5 years from the end of the grace period; and

2. Provide evidence of insurability satisfactory to us; and

3. Make a required payment. The required payment will not be more than an amount sufficient to cover (i) total monthly deductions for 3 months, calculated from the effective date of restoration; and (ii) the premium charge. We will determine the amount of this required payment as if no interest was credited to your Policy Account.

We must receive the required payment while the insured person is alive. We will deduct the premium charge from the required payment. The policy account on the date of restoration will be equal to the balance of the required payment.

The effective date of the restoration of policy benefits will be the beginning of the policy month which coincides with or next follows the date we approve your request. We will start to make monthly charges again as of the effective date of restoration. The schedule of surrender charges that was applicable on the date of default will also be applicable to the restored policy.

We reserve the right to decline to restore this policy if in our opinion it would cause this policy to fail to qualify as life insurance under applicable tax law.

## Your Policy Account and How it Works

**Premium Payments.** When we receive your premium payments, we subtract the premium charge shown in the table in the "Policy Information" section and any overdue monthly deductions. We put the balance (the net premium) into your Policy Account as of the date we receive the premium payment at our Administrative Office and before any deductions from your Policy Account due on that date are made. However, we will put the initial net premium payment into your Policy Account as of the Register Date if it is later than the date of receipt. No premiums will be applied to your Policy Account until the minimum initial premium payment, as shown in the "Policy Information" section, is received at our Administrative Office.

We credit interest to your Policy Account at effective annual rates we determine periodically. We make deductions from your Policy Account as described in the "Monthly Deductions" provision. We also subtract from your Policy Account any partial Net Cash Surrender Value withdrawals you ask for; more details are given in the Cash Surrender Value section of this policy.

**Monthly Deductions.** At the beginning of each policy month, we make a deduction from your Policy Account to cover the charges described below. If you do not submit the full minimum initial premium with your application, and the minimum initial premium is paid upon delivery, your monthly charges commence as of the Register Date. Such deduction for any policy month is the sum of the following amounts determined as of the beginning of that month:

- the monthly administrative charge;

- the monthly cost of insurance for the insured person; and

- the monthly cost of any benefits provided by riders to this policy.

The monthly cost of insurance is the sum of (a) our current monthly cost of insurance rate times the net amount at risk at the beginning of the policy month divided by $1,000; plus (b) any flat extra charge shown in the "Policy Information" section. The net amount at risk at any time is the Death Benefit (calculated as of that time) minus the amount in your Policy Account at that time.

EXHIBIT E
PAGE 00054

We will determine cost of insurance rates from time to time. Any change in the cost of insurance rates we use will be as described in the "Changes in Policy Cost Factors" provision. They will never be more than those shown in the Table of Maximum Monthly Cost of Insurance Rates Per $1000 of Net Amount at Risk for the Base Policy on Page 4-Continued.

No monthly deductions are made after age 100 of the insured person.

**Other Deductions.** We also make the following other deductions from your Policy Account as they occur:

- We deduct a surrender charge if, before the end of the fifteenth policy year, you give up this policy for its Net Cash Surrender Value or you reduce the base policy face amount.

**How We Add Interest.** We will credit the amount in your Policy Account with interest at rates we determine. We will determine such interest rates periodically in advance for unloaned and loaned amounts. The rates may be different for unloaned and loaned amounts. Any change in the interest rates we determine will be as described in the "Changes in Policy Cost Factors" provision. Such interest rates will not be less than 3% per year. Interest accrues and is credited on unloaned amounts in your Policy Account daily. However, we will credit interest on the initial net premium from the Register Date if it is later than the date of receipt provided the initial premium is at least equal to the minimum initial premium shown on Page 3 of the policy.

We credit interest on the loaned portion of your Policy Account daily. The interest rate we credit to the loaned portion of your Policy Account will be at an annual rate up to 2% less than the loan interest rate we charge. However, we reserve the right to credit a lower rate than this if in the future tax laws change such that our taxes on policy loans or policy loan interest are increased. In no event will we credit less than 3% per year.

On each policy anniversary and at any time you repay all of a policy loan, we will transfer the interest that has been credited to the loaned portion of your Policy Account to the unloaned portion of your Policy Account.

## The Cash Surrender Value of this Policy

**Cash Surrender Value.** The Cash Surrender Value on any date is equal to the amount in your Policy Account on that date minus any applicable surrender charge.

**Net Cash Surrender Value.** The Net Cash Surrender Value is equal to the Cash Surrender Value minus any policy loan and accrued loan interest. You may give up this policy for its Net Cash Surrender Value at any time while the insured person is living. You may do this by sending us a written request for it and this policy to our Administrative Office. Your written request for cancellation or surrender must include the following:

1. A statement that makes it clear that you intend to surrender the contract;
2. The policy number of the policy to be surrendered;
3. The name of the insured person and your name (if other than the insured person) and address where proceeds should be mailed;
4. Your signature and, if required by the policy or by a legally binding document of which we have an actual notice, the signature of a collateral assignee or other person having an interest in the policy through the legally binding document.

If this policy has a Cash Surrender Value and is being given up for its Net Cash Surrender Value, a completed withholding authorization must also be included with your written request. If this form is not provided to us with your written request for surrender, we will withhold income tax on the taxable portion of your distribution at the mandated federal and state tax rates. We will compute the Net Cash Surrender Value as of the date we receive your request for it and this policy at our Administrative Office. If the policy has been lost, stolen or destroyed, you must include a statement in the written request that the policy was lost, stolen or destroyed with an approximate date of when the policy was lost, stolen or destroyed. All insurance coverage under this policy ends on the date we receive your written request.

**Surrender Charges.** If you give up this policy for its Net Cash Surrender Value before the end of the fifteenth policy year, we will subtract a surrender charge from your Policy Account. A table of surrender charges for the initial base policy face amount is in the "Policy Information" section.

EXHIBIT E
PAGE 00055

04-100-9                                                                 Page 9



If the base policy face amount is reduced before the end of the fifteenth policy year, we will also deduct a proportionate amount of any applicable surrender charge from your Policy Account. We will send you a new Policy Information section in the event of a reduction in the base policy face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

We have filed a detailed statement of the method of computing surrender charges with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**Partial Net Cash Surrender Value Withdrawal.** After the first policy year, and while the insured person is living, you may ask for a partial Net Cash Surrender Value withdrawal by written request to our Administrative Office. Your request will be subject to our approval based on our rules in effect when we receive your request, and to the minimum withdrawal amount of $500.00. We have the right to decline a request for a partial Net Cash Surrender Value withdrawal if this would cause the policy to fail to qualify as life insurance under applicable tax law, as interpreted by us. We will decline a request for a partial Net Cash Surrender Value withdrawal if this would cause a decrease in the base policy face amount to less than $50,000. A partial withdrawal will result in a reduction in the Cash Surrender Value and in your Policy Account equal to the amount withdrawn as well as a reduction in your Death Benefit. If the Death Benefit is Option A, the withdrawal may also result in a decrease in the face amount; there will be no proportionate surrender charge due to such a decrease.

Such withdrawal and resulting reduction in the Death Benefit, in the Cash Surrender Value and in your Policy Account will take effect on the date we receive your written request at our Administrative Office. We will send you a new Policy Information section if a withdrawal results in a reduction in the face amount. It will become a part of this policy. We may require you to return this policy to our Administrative Office to make a change.

## How a Loan Can Be Made

**Policy Loans.** You can take a loan on this policy while it has a loan value. This policy will be the only security for the loan. The initial loan and each additional loan must be for at least $500.00. Any amount on loan is part of your Policy Account. We refer to this as the loaned portion of your Policy Account.

**Carry Over Loans.** If this policy was issued based, in whole or part, upon an exchange of another life insurance policy, any transferred existing loan from the exchanged policy as approved by us will be put into the loaned portion of your Policy Account. If a refund is made under the "Right to Examine Policy" provision, we will return any policy loan and accrued loan interest from that refund.

**Loan Value.** The loan value on any date is the Cash Surrender Value on that date discounted at the loan interest rate we charge to the next policy anniversary. The amount of any new loan you take may not be more than the loan value, less any existing loan and accrued loan interest. If you request an increase to an existing loan, the additional amount requested will be added to the amount of the existing loan and accrued loan interest.

**Loan Interest.** Interest on a loan accrues daily at an adjustable loan interest rate. We will determine the rate at the beginning of each policy year, subject to the following paragraphs. It will apply to any new or outstanding loan under the policy during the policy year next following the date of determination.

The maximum loan interest rate for a policy year shall be the greater of (1) the "Published Monthly Average," as defined below, for the calendar month that ends two months before the date of determination or (2) 4%. "Published Monthly Average" means the Moody's Corporate Bond Yield Average - Monthly Average Corporates published by Moody's Investors Service, Inc., or any successor thereto. If such averages are no longer published, we will use such other averages as may be established by regulation by the insurance supervisory official of the jurisdiction in which this policy is delivered. In no event will the interest rate for a policy year be greater than 15%. We reserve the right to establish a rate lower than the maximum.

No change in the rate shall be less than $\frac{1}{2}$ of 1% per year. We may increase the rate whenever the maximum rate as determined by clause (1) of the preceding paragraph exceeds the rate being charged by $\frac{1}{2}$ of 1% or more. We will reduce the rate to or below the maximum rate as determined by clause (1) of the preceding paragraph if such maximum is lower than the rate being charged by $\frac{1}{2}$ of 1% or more.

We will notify you of the initial loan interest rate when you take out a loan. We will also give you advance written notice of any increase in the interest rate of any outstanding loan.

Loan interest is due on each policy anniversary. If the interest is not paid when due, it will be added to your outstanding loan and bear interest at the loan rate then in effect.

04-100-9

EXHIBIT E
PAGE 00056



**Loan Repayment.** You may repay all or part of a policy loan at any time while the insured person is alive and this policy is in force.

Failure to repay a policy loan or to pay loan interest will not terminate this policy unless at the beginning of a policy month the Net Policy Account Value is less than the total monthly deduction then due. In that case, the "Grace Period" provision will apply.

A policy loan will have a permanent effect on your benefits under this policy even if it is repaid.

## Our Annual Report to You

For each policy year we will send you without charge a report for this policy that shows the current Death Benefit, the value of your Policy Account, the Cash Surrender Value and any policy loan with the current loan interest rate. It will also show the premiums paid and any other information as may be required by the insurance supervisory official of the jurisdiction in which this policy is delivered.

## How Benefits Are Paid

The Insurance Benefit or your Net Cash Surrender Value withdrawals are paid immediately in one sum. Amounts paid will not be subject to the claims of creditors or to legal process, to the extent permitted by law.

## Other Important Information

**Your Contract with Us.** This policy is issued in consideration of payment of a premium at least equal to the minimum initial premium payment shown in the "Policy Information" section. This policy, any riders or endorsements, and the attached copy of the initial application and all subsequent applications to change this policy, and all additional Policy Information sections added to this policy, make up the entire contract. The rights conferred by this policy are in addition to those provided by applicable Federal and State laws and regulations.

Only our Chairman of the Board, our President or one of our Vice Presidents can modify this contract or waive any of our rights or requirements under it. The person making these changes must put them in writing and sign them.

**Policy Changes — Applicable Tax Law.** For you and the beneficiary to receive the tax treatment accorded to life insurance under Federal law, this policy must qualify initially and continue to qualify as life insurance under the Code or successor law. Therefore, we have reserved earlier in this policy the right to decline to accept premium payments, to decline to change Death Benefit Options, to decline to change the face amount, or to decline to make partial withdrawals that, in our opinion, would cause this policy to fail to qualify as life insurance under applicable tax law. Further, we reserve the right to make changes in this policy or its riders (for example, in the percentages in the "Death Benefit" provision) or to require additional premium payments, or to make distributions from this policy or to change the face amount to the extent we deem it necessary to continue to qualify this policy as life insurance. Any such changes will apply uniformly to all policies that are affected. You will be given advance written notice of such changes.

**Changes in Policy Cost Factors.** Changes in policy cost factors (interest rates we credit, cost of insurance deductions and expense charges) will be on a basis that is equitable to all policyholders of a given class, and will be determined based on reasonable assumptions as to expenses, mortality, policy and contract claims, taxes, investment income, and lapses. Any change in policy cost factors will never result in an interest crediting rate that is lower than that guaranteed in the policy, or policy charges that exceed the maximum policy charges guaranteed in the policy. Any change in policy cost factors will be determined in accordance with procedures and standards on file, if required, with the insurance supervisory official of the jurisdiction in which this policy is delivered.

**When the Policy is Incontestable.** We have the right to contest the validity of this policy based on material misstatements made in the initial application for this policy. However, we will not contest the validity of this policy after it has been in effect during the lifetime of the insured person for two years from the earlier of the Register Date or date of issue shown in the Policy Information section.

**EXHIBIT E**
**PAGE 00057**

We also have the right to contest the validity of any policy change or restoration based on material misstatements made in any application for that change or restoration. We will not contest any policy change that requires evidence of insurability, or any restoration of this policy, after the change or restoration has been in effect for two years during the lifetime of the insured person.

No statement shall be used to contest a claim unless contained in an application.

All statements made in an application are representations and not warranties.

See any additional benefit riders for modifications of this provision that apply to them.

**What If Age or Sex has Been Misstated?** If the insured person's age or sex has been misstated on any application, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at the correct age and sex.

**How the Suicide Exclusion Affects Benefits.** If the insured person commits suicide (while sane or insane) within two years after the earlier of the Register Date or the date of issue shown in the Policy Information section, our liability will be limited to the payment of a single sum. This sum will be equal to the premiums paid, minus any loan and accrued loan interest and minus any partial withdrawal of the Net Cash Surrender Value. If the insured person commits suicide (while sane or insane) within two years after the effective date of a change that you asked for that increases the Death Benefit, then our liability as to the increase in amount will be limited to the payment of a single sum equal to the monthly cost of insurance deductions made for such increase.

**How We Measure Policy Periods and Anniversaries.** We measure policy years, policy months, and policy anniversaries from the Register Date shown in the Policy Information section. Each policy month begins on the same day in each calendar month as the day of the month in the Register Date.

**When We May Defer Payment.** We may defer payment of any Net Cash Surrender Value withdrawal or loan amount (except when used to pay premiums to us) for up to six months after we receive a request for it. We will allow interest, at a rate of at least 3% per year, on any Net Cash Surrender Value payment that we defer for 30 days or more.

**The Basis We Use for Computation.** We provide Cash Surrender Values that are at least equal to those required by law. If required to do so, we have filed with the insurance supervisory official of the jurisdiction in which this policy is delivered a detailed statement of our method of computing such values. A detailed statement of the method of computing values and benefits is available from our Administrative Office upon request. We compute reserves under this policy by the Commissioners' Reserve Valuation Method.

We use the 1980 Commissioners' Standard Ordinary Male or Female Mortality Tables at attained ages 0-17, and the 1980 Commissioners' Standard Ordinary Male or Female, Smoker or Non-Smoker Mortality Tables at attained ages 18 and over, as the basis for determining maximum insurance costs and minimum cash surrender values. We take account of the sex, attained age, and class of risk of the insured person. For attained ages 18 and over, we also take account of the tobacco user status of the insured person. We use a minimum effective annual interest rate of 3%.

For policies issued at attained ages 0-17, an insured person's cost of insurance rate is not based on that person's status as a tobacco user or non-tobacco user. Effective with the policy anniversary when that insured person reaches attained age 18, non-tobacco user cost of insurance rates will be charged for that person. For policies issued at attained ages 18 or over, an insured person's cost of insurance rate takes account of that person's status as a tobacco user or non-tobacco user.

**Change from Tobacco User Rates to Non-Tobacco User Rates.** Any insured person attained age 18 or over being charged tobacco user rates may be eligible for non-tobacco user rates. The change, if approved, may result in lower future cost of insurance rates beginning on the effective date of change to non-tobacco user rates.

Upon request made to our Administrative Office, we will provide forms and instructions as to how you may apply for non-tobacco user rates. The change will be based upon our general underwriting rules in effect at the time of application, and may include criteria other than tobacco use status as well as a definition of tobacco use different from that applicable at the time this policy was issued.

04-100-11CA                                                    Page 12

EXHIBIT E
PAGE 00058

The change to non-tobacco user rates, if approved, will take effect at the beginning of the policy month that coincides with or next follows the date we approve your request. A copy of your application for the change will be attached to the new Policy Information section that we will issue when the change is made. The new section and the application for change will become part of this policy. We may require you to return this policy to our Administrative Office to make the change. This change may have adverse tax consequences.

The change to non-tobacco rates will be contestable; however, we will not contest the change after it has been in effect for two years during the lifetime of the insured person. In the event of a successful contest, the Death Benefit and any benefits provided by riders to this policy shall be those which would be purchased by the most recent deduction for the cost of insurance, and the cost of any benefits provided by riders, at tobacco user rates.

**Policy Illustrations.** Upon request we will give you an illustration of the potential future benefits under this policy, based upon both guaranteed and current cost factor assumptions.

**Policy Changes.** You may add additional benefit riders or make other changes, subject to our rules at the time of change.

**Conversion Privilege.** You may, with the written consent of the insured person, request that we convert this policy to a variable life insurance policy we are then offering. You may request this at any time after the first policy year but not later than the fifth policy year after the register date of this policy. The new policy will be subject to its own issue age and face amount limits. If the insured person is less than attained age 65 at the time of the request, we will not require any evidence of insurability except as specifically noted below. If the insured person is attained age 65 or over at the time of the request, we will require evidence of insurability satisfactory to us. In all cases, this request is also subject to all of the following conditions:

1. This policy must be in force on the date of conversion. The insured person may not then be disabled under the terms of any disability waiver rider in effect under this policy.

2. The new policy will have a face amount of insurance equal to the face amount of insurance under this policy on the date of conversion. In order for the new policy to qualify as life insurance under the Internal Revenue Code or successor legislation, as interpreted by us, it may be necessary to increase the face amount of the new policy. If so, any increase in the face amount of the new policy to assure that the new policy meets the definition of life insurance will be subject to evidence of insurability satisfactory to us.

3. The register date and issue date of the new policy will be the same as the date of conversion. Premiums and charges for the new policy will be based on the company's rates in effect for the new policy for the then current issue age of the insured person and the same class of risk or the closest comparable class as under this policy. You may request a more favorable risk classification for the insured person; however, this will be subject to evidence of insurability satisfactory to us.

4. Any additional benefit riders in effect under this policy will be included with the new policy only if they are then available with the new policy as of its issue date. You may request to add new additional benefit riders to the new policy; however, this will be subject to evidence of insurability satisfactory to us.

5. Any policy loan and accrued loan interest under this policy must be repaid prior to conversion.

The suicide exclusion and contestable periods of the new policy will be determined from the date of issue of this policy rather than the date of issue of the new policy, except to the extent evidence of insurability was required as noted in the first paragraph of this provision and in items 2, 3, and 4.

**EXHIBIT E**
**PAGE 00059**

We will waive the surrender charge applicable to this policy on the date of conversion up to, but not to exceed, the amount of the first year surrender charge for the new policy. We will retain the excess, if any, over this amount and deduct it from this policy's Policy Account on the date of conversion. We will transfer the balance of your Policy Account Value to the new policy. Your Policy Account Value for the new policy will be allocated to the investment options under the new policy as directed by you on the application completed for the conversion, and in accordance with the terms of the new policy. The initial premium and deduction allocation percentages that you specify on the application will continue to apply unless later changed by you. Monthly deductions for the new policy, including any additional benefit riders, will start on the register date of the new policy. The new policy will be subject to all charges according to its terms. Coverage under this policy will terminate on the conversion date.

You may examine the new policy and cancel it if you are not satisfied with it; you will have as many days after the conversion date to do this as you had to cancel this policy after it was delivered to you originally. You must send a written request for cancellation within this time period to our Administrative Office. If you do this, we will (1) reinstate this policy and the same additional benefit riders, if any, that you had originally and (2) refund any premium payments made under the new policy.

**EXHIBIT E**
**PAGE 00060**

# *Accelerated Death Benefit Rider*

**Disclosure.** The receipt of the Accelerated Death Benefit Amount may be taxable. You should seek assistance from your personal tax advisor prior to electing the benefit.

*In this rider "we", "our" and "us" mean AXA Equitable Life Insurance Company. "You" and "your" mean the Owner of the policy at the time an Owner's right is exercised.*

---

**Effective Date of this Rider.** This rider is effective on the Register Date of this policy. If this rider is added after issue of this policy, the effective date of this rider is shown on the Additional Benefits Rider to which it is attached.

**Cost Of This Rider.** There is no premium or cost of insurance charge for this rider.

**This Rider's Benefit.** We will pay an Accelerated Death Benefit in the amount requested by the owner, if the insured person is terminally ill, subject to the provisions of this rider. We will pay an Accelerated Death Benefit under this policy only once and in one lump sum.

The maximum Accelerated Death Benefit payment you may receive is the lesser of:

1. 75% of the death benefit payable under this policy, less any outstanding policy loan and accrued loan interest, and

2. $500,000.

The maximum aggregate amount of Accelerated Death Benefit payments that will be paid under all policies issued by us or our affiliated companies on the life of the insured person is $500,000.

For purposes of this benefit, the death benefit does not include any accidental death benefits, non-convertible term riders or convertible term riders with an expired conversion period, or any other benefits payable upon the death of any person other than the insured person under the base policy.

We reserve the right to deduct a processing charge of up to $250.00 per policy from the Accelerated Death Benefit payment.

We reserve the right to set a minimum of $5,000 on the amount you may receive under this rider.

To be eligible for this benefit you must provide satisfactory evidence to us that the insured person's life expectancy is twelve months or less. This evidence must include, but is not limited to, certification by a physician licensed to practice medicine in the United States or Canada and who is acting within the scope of such license. A physician does not include the owner, the insured person, or a member of either the owner's or insured person's family.

**How This Rider Relates To The Policy.** This rider is a part of the policy. Its benefits are subject to all terms of this rider and the policy. This rider has no cash or loan value. This rider is non-participating.

**Interest.** Interest will be charged on the amount of the Accelerated Death Benefit and on any unpaid premium we advance after an Accelerated Death Benefit payment. The interest rate at the time of the Accelerated Death Benefit payment is made will not exceed the greater of the following on such date:

1. the yield on a 90-day treasury bill; or

2. the maximum adjustable policy loan interest rate permitted in the state in which this policy is delivered.

**Effect Of Accelerated Death Benefit Payment On The Policy.** The Accelerated Death Benefit payment, plus any accrued interest, will be treated as a lien against the policy values. The amount of the lien will be pro-rated against the policy's net cash surrender value, if any, and the net amount at risk. If your policy is a variable or universal life policy, the net amount at risk is the death benefit minus the policy account, if any. If your policy is a term or whole life policy, the net amount at risk is the death benefit minus the cash surrender value, if any.

Additionally, if your policy is a variable life policy, the portion of the cash surrender value that is on lien and is allocated to investment funds of the Separate Account (SA) will be transferred to and maintained as part of the unloaned portion of the Guaranteed Interest Account (GIA). You may tell us how much of the accelerated payment is to be transferred from each investment fund. Units will be redeemed from each investment fund sufficient to cover the amount that is on lien and transferred to the unloaned portion of the GIA. If you do not tell us how to allocate the payment, we will allocate it based on our rules then in effect.

R06-70

EXHIBIT E
PAGE 00061

However, if your variable policy does not have a GIA, the portion of the cash surrender value that is on lien will be transferred to and maintained in the Money Market Fund of our SA. Such transfers will occur as of the date we approve an Accelerated Death Benefit payment; there will be no charge for such transfers. The amount payable at death under the policy will be reduced by the full amount of the lien and any other indebtedness outstanding under the policy. Your access to the policy's cash surrender value will be limited to the excess of the policy's cash surrender value over the amount of the lien secured against the cash surrender value and any other outstanding policy loans and accrued loan interest.

**Effect Of Accelerated Death Benefit Payment On Policy Premiums.** If your policy is a term, whole life or any other fixed premium policy, premiums will be required to be paid after an Accelerated Death Benefit payment. If any premium is not paid when due, we will advance the amount of the unpaid premium and add it to the lien.

If your policy is a flexible premium variable or universal life policy, and after an Accelerated Death Benefit payment the policy at the beginning of a policy month is in default, we will advance a premium sufficient to keep the policy in force and add it to the lien.

However, if a Disability Premium Waiver Rider or a Disability Waiver of Monthly Deductions Rider is in effect under the policy, this policy's premium or monthly deductions will be waived as of the date we approve an Accelerated Death Benefit payment.

**Rider Limitations.** Your right to an Accelerated Death Benefit payment is subject to the following conditions:

1. The policy must not be in the grace period.
2. The policy must be in force other than as extended term insurance.
3. For term insurance policies, there must be at least one year left before the final term expiry date.
4. You must submit a claim in writing to our Administrative Office in a form satisfactory to us.
5. Prior to the Accelerated Death Benefit payment, we will require from any assignee or irrevocable beneficiary a signed acknowledgment of agreement for such payment.
6. For joint last-to-die policies, a claim may be made under the rider only after the death of the first of the insured persons.
7. You may not be eligible for the Accelerated Death Benefit payment if we are notified that:
   a) you are required by law to elect this rider's benefit in order to meet the claims of creditors, whether in bankruptcy or otherwise; or
   b) you are required by a government agency to elect this rider's benefit in order to apply for, obtain, or keep a government benefit or entitlement.
8. You may request only one Accelerated Death Benefit payment per policy.
9. We may require examination of the insured person by our medical representatives at our expense as part of any proof to establish eligibility for benefits under this rider.

**When This Rider Terminates.** Prior to any Accelerated Death Benefit payment you may terminate this rider by providing written notice in a form satisfactory to us and returning the rider to our Administrative Office. The effective date of termination will be the date your request is received at our Administrative Office. Once this rider has been terminated, another Accelerated Death Benefit Rider cannot be attached to the policy.

This rider will terminate when the policy terminates. If at any time the amount of the lien equals the total death benefit, the policy will terminate. Termination will occur 31 days after we have mailed notice to the last known address of the owner, unless the full amount of the lien is repaid within 31 days of the notice.

## AXA Equitable Life Insurance Company

Karen Field Hazin, Vice President,
Secretary and Associate General Counsel

Christopher M. Condron,
Chairman and Chief Executive Officer

R06-70

# AMENDMENT TO APPLICATION

Name of
Proposed Insured ___RUTH L WILLIAMSON___                Application Dated ___NOV 15, 2006___
                    First         Middle Initial      Last

Policy No ___ ___156 229 495___

## TO AXA EQUITABLE LIFE INSURANCE COMPANY

The application is hereby amended by the undersigned in the following particulars:

ISSUE EXTRA PREMIUM CLASS POLICY.

MY ASSOCIATE HAS PROVIDED A PROPOSAL ILLUSTRATING THE VALUES OF THE CONTRACT AS ISSUED.

ISSUE WITH 3B TO BE OFFICER NAME GEORGE B WILLIAMSON, ADDRESS 12 CORPORATE PLAZA SUITE 105, NEWPORT BEACH, CA 92660

This amendment is to be taken as a part of said application, subject to the agreement therein contained; said application and this amendment thus taken as a whole are to be considered as the basis for and as a part of the policy. To the best of my knowledge and belief, in all other respects the statements and answers in the application continue to be, without material change, true and complete as of the date of this amendment.

Dated at ___Salt Lake City___ , ___Utah___            on ___12/1/06___
            (City)              (State)

_____                    _____
· Signature of Purchaser if other than Applicant                Signature of Applicant

Agent: _____

Agency: _____

EV 237-400 App. Amendment    (8)

EXHIBIT E
PAGE 00063

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Application For Life Insurance**
**Part I**
Form No. LIFEAPP-GV
(2005)

**❶ PROPOSED INSURED** (Print Name as it is to appear on the policy.) Please print in ink.

Proposed Insured

A. Full Name: First **Ruth** M.I. **L** Last **Williamson**          B. Gender: ☐ Male ☒ Female

C. Home Address: _____ No. and Street _____          Bldg/Apt/Suite

City/Municipality _____ nty/Parish _____ _CA_ Zip + 4 Code **90274**
(If address is a P.O. Box or not actual residence, proof of residence required.)

D. Home Phone No. _____ Best time to Call: _____ Best phone no. to be contacted: _____

E. Date of Birth: _____          F. Place of Birth: **Utah / Salt Lake**
(Month/Day/Year)                                              (State/County)

G. Marital Status: ☐ Single ☒ Married ☐ Widowed ☐ Divorced ☐ Separated     H. Soc. Sec. No. _____

I. Driver's Lic. No _____          State: **California**

J. U.S. Citizen? ☒ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S. ____

K. Currently employed? ☐ Yes ☐ No ☒ Retired

L. Current Occupation(s): (1) Title: **Homemaker** _____ (2) Duties _____ (3) How Long? _____
(If less than 1 year at current occupation, give previous in Remarks.)

M. Employer Name: _____

N. Employer Address: _____ No.& Street _____ City _____ State _____ Zip + 4 Code

O. Annual Earned Income (income from occupation) $ _____     P. Net Worth $ _____
 * If the Proposed Insured and/or policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a
   state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❷ COVERAGE INFORMATION**

A. Plan of Insurance **Athena UL**          Amount of Insurance $ **4 million**
(If survivorship policy, complete an application for each Proposed Insured.                              (If face amount is $2 million or larger complete Financial
If VUL, must also complete VUL Supplement.                                                                          Supplement.)
To select dividend options on EWL or Riders on all Non-VUL Plans
complete Optional Benefits Supplement.)

B. Complete for UL or VUL only (1) Death Benefit Option     ☒ Option A     ☐ Option B
                                  (2) Planned Periodic Premium $ **297,696.00**

C. Definition of Life Insurance Test  Complete for AUL 7, IL, IL COLI '04          ☐ Guideline Premium Test          ☒ Cash Value Accumulation Test

D. Premium Mode: ☒ Annual     ☐ Semi-Annual     ☐ Quarterly     ☐ Monthly
           Or
System-Matic (Complete S-M form and check applicable box)     ☐ Quarterly (only available for UL and VUL)     ☐ Monthly

E. Salary Allotment (1) Unit Name _____ (2) Unit/Sub Unit. No. _____ (3) Unit Register Date _____
(Salary Allotter name, if other than insured, in Remarks.)

F. Does Policy to save insured Age?     ☒ Yes     ☐ No

G. 1. Do you, the owner, intend to use or transfer the policy for any type of pre-death financial settlement, such as viatical settlement, senior settlement, life settlement, or
      for any other secondary market?     ☐ Yes     ☒ No
   2. Have you, the owner, or any Proposed Insured if other than the owner, in the past 5 years sold a policy in a life settlement, viatical, or other secondary market
      provider?     ☐ Yes     ☒ No

H. Any other life insurance now in effect or application now pending?     ☐ Yes     ☒ No
   (Give companies, amounts and policy numbers in Remarks.)

I. Will the coverage applied for replace or change any life insurance or annuities?     ☐ Yes     ☒ No     Is this a 1035 Exchange?     ☐ Yes     ☒ No
   If "Yes", complete: (If additional room is needed, please use Remarks Section.)
   Amount $ _____ Company _____ Issue Year ____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity
   Amount $ _____ Company _____ Issue Year ____ Policy Number _____ ☐ Life ☐ Group ☐ Annuity

J. Is this a Term Policy/Rider Conversion or Purchase Option?     ☐ Yes     ☒ No     If "Yes", complete Term Policy/Rider or Purchase Option Supplement.

K. Complete if Proposed Insured is under age 15:     a) State total amount of insurance in force on the life of applicant or child's
                                                             parent, if greater $ _____
                                                    b) Are any other children in the family insured for a lesser amount?     ☐ Yes     ☐ No

If "Yes" give details _____

AMIGV-2005          CAT# 133341          ES173_core (4/06) 1

**EXHIBIT E**
**PAGE 00064**

**❸ BENEFICIARY/OWNER**

A. Beneficiary (Total designation must be 100%. Use Remarks section for additional Beneficiary information.)

Beneficiary Full Name
Primary:   K W A X A   L L C     Relationship to Insured _____   Percentage 100%

Contingent: _____

B. Owner (The Owner of this policy is the Insured unless otherwise specified below. Enter name of successor owner in Remarks.)

Provide the Applicant's name, address and Taxpayer ID, if different from the Insured and Owner, in Remarks section.

If the Owner is the Trust provide the name of the Trust.

Owner's Name:   R W A X A   L L C     Social Security # or TIN # _____

Address: Street _____ City _____ State ____ Zip Code ____
(Policy issues will be sent to the Owner at this address unless otherwise directed in Remarks Section.)

U.S. Citizen? ☐ Yes ☐ No* If No, Country _____ U.S. Visa type _____ Passport # or U.S. Visa # _____ # of years in U.S. _____

Relationship to Insured _____ Date of Birth _____

Name of Trustee _____ Date of Trust Agreement _____

If the policy owner is not a U.S. Person (U.S. Citizen or U.S. Corporation, Partnership, or Trust established or organized under the laws of a state of the United States) then he, she or it may have to provide additional documentation, including IRS form W-8 BEN.

**❹ GENERAL INFORMATION (Proposed Insured)**

List details of all answers in the Remarks section.

A. Ever had a driver's license suspended or revoked, or within the last 5 years, been convicted of reckless or negligent driving or driving under the influence of alcohol or drugs?
(If "Yes", include dates, types of violations, and reason for suspension or revocation in Remarks.)

B. Any plans to travel or reside outside the United States?
(If "Yes", complete Foreign Residence and Travel Supplement.)

C. Have you been disabled for 2 or more weeks within the last 2 years?

D. In the last year been other than as a passenger or plan to do so?
(If "Yes", complete Aviation Supplement.)

E. Engaged within the last year or any plan to engage in motor racing on land or water, underwater diving, skydiving, ballooning, hang gliding, parachuting or flying ultra-light aircraft or other hazardous sports or hobbies?
(If "Yes", complete Avocation Supplement.)

F. Ever had an application for life or health insurance that was declined, required an extra premium or other modification?
(If "Yes", state companies and provide full details in Remarks.)

G. In the last 10 years, have you been convicted of, or pled "no contest" to _____?
(If "Yes" in "Remarks", state full details of offense and penalty, with date _____.)

H. Do you currently use any form of tobacco or nicotine product?  ☐ Yes ☐ No  Type _____ Avg. Quantity # packs _____ Frequency _____

I. Have you ever used any form of tobacco or nicotine product?  ☐ Yes ☐ No  Type _____ Date Ceased _____

**❺ MEDICAL INFORMATION (Proposed Insured) Please Note: Complete this section even if a paramedical or medical exam is being ordered**

A. Height 4 Ft. 11 In. Weight 110 lbs.

B. Personal Physician Name _____

C. Address _____

D. Date and Reason for Last Visit in the Last 5 Years _____

E. What treatment was given or recommended? (If none, so state) _____

Has Proposed Insured:

F. Ever had or been treated for heart trouble, stroke, high blood pressure, chest pain, diabetes, tumor, cancer, respiratory or neurological disorder?

G. In the last 5 years, consulted a physician, or been examined or treated at a hospital or other medical facility? (Also include medical checkups in the last 2 years. Do not include colds, minor injuries or normal pregnancy.)

H. In the last 10 years:
  1. Used, except as legally prescribed by a physician, tranquilizers, barbiturates or other sedatives; marijuana, cocaine, hallucinogens or other mood altering drugs; heroin, methadone or other narcotics; amphetamines or other stimulants; or any other illegal or controlled substances?
    (If "Yes", complete Substance Usage Supplement.)
  2. Received counseling or treatment regarding the use of alcohol or drugs including attendance at meetings or membership in any self-help group or program such as Alcoholics Anonymous or Narcotics Anonymous?
    (If "Yes", complete Substance Usage Supplement.)

I. In the last 10 years, been:
  Diagnosed with, or treated for, Acquired Immune Deficiency Syndrome (AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession?

J.

| Family History | Age If Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father | | | |
| Mother | | | |
| Sibling | | | |

ANKSV-2005     (4/06)  2

**EXHIBIT E**
**PAGE 00065**

**DETAILS OF ALL "YES" ANSWERS FOR MEDICAL INFORMATION**    (Attach additional sheet of paper if necessary;
and it must be signed and dated by the Proposed Insured, Owner, and financial professional.)

| Question No. | Illness, Treatment, and Number of Attacks (Include specific diagnosis and medication) | Onset Date | Recovery Date | If disabled, How long? | Doctor, Clinic, or Hospital Complete Address, and Phone Number |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**REMARKS**
Provide details for any of the questions, and any other additional remarks.    (Attach additional sheet of paper if necessary; and it must be
If the owner is a Qualified Plan, please indicate the qualified plan and type    signed and dated by the Proposed Insured, Owner, and financial
here.    professional.)

**COMPLETE IF MONEY IS PAID WITH THE POLICY:**

Amount paid with this Application: $ _____

Has the undersigned read, signed and received a copy of the Temporary Insurance Agreement, and do they agree to the conditions of the Temporary
Insurance Agreement, including:

(i)  the requirement that all of the conditions in that Agreement must be met before any temporary insurance takes effect, and

(ii)  the $1,000,000 insurance amount limitations, and

(iii)  that the Person Proposed for Insurance is at least 15 days of age and not older than 75 years of age?    ☐ Yes  ☐ No

If "No," or if any Person Proposed for Insurance has been diagnosed or treated for Acquired Immune Deficiency Syndrome
(AIDS) or AIDS-Related Complex (ARC) by a member of the medical profession within the last 10 years or
had cancer, a stroke, or a heart attack within the last year, a premium may not be paid before the policy is delivered.

**AGREEMENT.** Each signer of this application agrees that:

(1)  The statements and answers in all parts of this application are true and complete. We (the Company checked on page 1 of this application) may rely on them in
acting on this application.

(2)  The Temporary Insurance Agreement states the conditions that must be met before any insurance takes effect if money is paid before the policy is delivered.
Temporary Insurance is not provided for a policy or benefit applied for under the terms of a guaranteed insurability option or a conversion privilege.

(3)  Except as stated in the Temporary Insurance Agreement, no insurance shall take effect on this application: (a) until a policy is delivered and the full initial premium
for it is paid while the person(s) proposed for insurance is (are) living; (b) before any Registered Date specified in this application; and (c) unless to the best of my
(our) knowledge and belief the statements and answers in all parts of this application continue to be true and complete, without material change, as of the time the
full initial premium is paid.

(4)  No financial professional or medical examiner has authority to modify this Agreement or the Temporary Insurance Agreement. Or to waive any of our rights or
requirements. We shall not be bound by any information unless it is stated in Application Part 1 or Part 2 (Paramedical or Medical exam).

(5)  I acknowledge receipt of the Living Benefits Brochure (Accelerated Death Benefit Rider Brochure), where applicable.

AMIGV-2005    (4/06)   3

**EXHIBIT E**
**PAGE 00066**

☑ AXA Equitable Life Insurance Company          ☐ MONY Life Insurance Company of America

**ACKNOWLEDGEMENT OF UNDERWRITING PRACTICES**
I (we) acknowledge that I (we) have received a statement of the Underwriting Practices of the Company (ies) which describes from whom and why the Company (ies) obtains information on my (our) insurability, to whom such information may be reported and how I (we) may obtain it. The statement contains the notice required by the Fair Credit Reporting Act.

**AUTHORIZATIONS**
**TO OBTAIN HEALTH INFORMATION**
I (we) authorize any physician, hospital, clinic, medical practitioner, medical testing laboratory, pharmacy or other health care provider, health plan or insurance company (including our coverages, or other coverages), or any prescription drug or pharmacy benefit manager or administrator, and the Medical Information Bureau to disclose to the Company (ies) and its authorized representatives any and all information, whether fact or opinion, they may have about any diagnosis, treatment, prognosis, genetic test records, findings and/or results regarding my (our) past, present or future physical or mental condition.

**TO OBTAIN NON-HEALTH INFORMATION**
I (we) authorize any employer, business associate, government unit, financial institution, consumer reporting agency, the Medical Information Bureau, my (our) insurance agency and my (our) financial professional to disclose to the Company (ies) and its authorized representatives any information they may have about my (our) occupation, avocations, finances, driving record, character and general reputation. I (we) authorize the Company (ies) to obtain investigative consumer reports, as appropriate.

**PURPOSE OF AUTHORIZATIONS**
I (we) understand that the information obtained will be used by the Company (ies) to determine my (our) eligibility for life insurance coverage and such other uses specified in accordance with the Underwriting Practices attached to this application. In addition, information may be disclosed to the Medical Information Bureau (MIB) who, upon request, may disclose such information about you in its file to another member company with whom you apply for life or health insurance or to whom a claim for benefits may be submitted, when requested by a government agency, in connection with a legal or arbitration proceeding; or for other purposes as required or permitted by applicable law. If a policy is issued to me (us), this information may also be used in the future to administer my (our) policy and process claims made under the policy.

**COVERAGE CONDITIONS**
I (we) understand that the Company (ies) is conditioning the issuance of coverage on the provision of this authorization, and that, while I (we) may refuse to sign this authorization, my (our) refusal to do so could result in coverage not being issued.

**ADDITIONAL AUTHORIZATIONS**
You have advised me (us) that the Company (ies) may request additional authorizations in order to obtain the information the Company (ies) needs to complete its review of my (our) application and, if the policy is issued, in connection with any claim asserted under the policy, I (we) understand that I (we) am (are) not obligated to provide these additional authorizations but that, if I (we) choose not to provide them, this application and any claim made under the policy, if issued, may be rejected.

**DURATION**
Unless otherwise revoked, I (we) agree that this authorization will expire on the earlier of the date that the Company (ies) declines my application for coverage or, if a policy is issued, 24 months from the date of my (our) application. I (we) understand that I (we) may revoke my (our) authorizations at any time, except to the extent that the Company (ies) has taken action in reliance on this authorization, this application and any claim made under the policy, if issued, may be rejected. My (our) revocation must be submitted in writing to: Chief Underwriter of the Company checked above and on the front page of this application, 1290 Avenue of the Americas, New York, New York 10104.

**COPY OF AUTHORIZATIONS**
I (we) have a right to ask for and receive true copies of this Acknowledgement and Authorization Form and all other authorizations signed by me (us). I (we) agree that reproduced copies will be as valid as the original.

FOR THE APPLICANT'S PROTECTION, THE LAWS OF CERTAIN STATES REQUIRE THIS NOTICE: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE/SHE IS FACILITATING A FRAUD AGAINST AN INSURER, FILES AN APPLICATION OR CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT AS TO ANY MATERIAL FACT MAY BE GUILTY OF INSURANCE FRAUD, WHICH MAY RESULT IN LOSS OF COVERAGE UNDER THIS POLICY AND MAY SUBJECT THE APPLICANT/CLAIMANT TO CRIMINAL PROSECUTION.

SOCIAL SECURITY OR TAX I.D. NUMBER CERTIFICATION—UNDER THE PENALTIES OF PERJURY, I CERTIFY THAT (I) THE NUMBER SHOWING ON THIS FORM IS MY CORRECT TAXPAYER IDENTIFICATION NUMBER, AND (II) I AM NOT SUBJECT TO BACKUP WITHHOLDING BECAUSE (A) I AM EXEMPT FROM BACKUP WITHHOLDING OR (B) I HAVE NOT BEEN NOTIFIED BY THE INTERNAL REVENUE SERVICE (IRS) THAT I AM SUBJECT TO BACKUP WITHHOLDING AS A RESULT OF A FAILURE TO REPORT ALL INTEREST OR DIVIDENDS OR (C) THE IRS HAS NOTIFIED ME THAT I AM NO LONGER SUBJECT TO BACKUP WITHHOLDING, AND (III) I AM A U.S. PERSON (INCLUDING A U.S. RESIDENT ALIEN).
CERTIFICATION INSTRUCTIONS: You must cross out item (II) above if you have been notified by the Internal Revenue Service that you are currently subject to backup withholding because you have failed to report all interest or dividends on your tax return.
THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISIONS OF THIS DOCUMENT OTHER THAN THE CERTIFICATION REQUIRED TO AVOID BACKUP WITHHOLDING.

I (we), the undersigned, by my (our) signature(s) below understand that I (we) am (are) agreeing to all the terms and conditions of this application, including, but not limited to, the Acknowledgement and Authorization.

Dated at City ___Los Angeles___

State ___CA___

on ___11/15/06___

Signature of Proposed Insured, Applicant or person or guardian.
If Proposed Insured is a Child, then Parent/Guardian:

Signature of Owner Applicant if not Proposed Insured
(If corporation, print firm's name and signature of authorized officer.)
(If trust, signature of trustee.)

**Financial Professional to complete this section:**
Will any existing insurance be replaced or changed (or has it been) assuming the insurance applied for will be issued?   ☐ Yes  ☑ No
(If 'yes' give details)
I certify that I have asked and recorded completely and accurately the answers to all questions on the fully completed application Part 1, and I know of nothing affecting the risk that has not been recorded herein.
☐ I have witnessed the signature required on fully completed Part 1    ☐ I have not witnessed the signature required on fully completed Part 1. (Explain below)

Signature of Licensed Financial Professional/Insurance Broker ___
Print Licensed Financial Professional's Name ___

AMIGV-2005                                                                (4/06)

**EXHIBIT E**
**PAGE 00067**

AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

NGNY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

**Financial Supplement**
Form No. FM-GV (2006)

## Financial Supplement Forming Part of the Application for Life Insurance

☐ Proposed Insured
☐ Additional/Joint Insured

Name

### Personal Financial Statement (For Personal Insurance)

**1. Balance Sheet**

| Current Assets | Amount | Current Liabilities | Amount |
|---|---|---|---|
| Liquid | $ | Mortgages | $ |
| Other (specify) | $ | Other (specify) | $ |
| Total | $ | Total | $ |
| | | Net Worth | $ |

**2. Income**

| | Earned Income | Unearned Income | | | | |
|---|---|---|---|---|---|---|
| | | Div/Interest | Rental Income | Pension/Soc Sec | Other-specify | Total |
| Current Year | $ | $ | $ | $ | $ | $ |
| Last Year | $ | $ | $ | $ | $ | $ |

**3.** How was face amount determined?
State what formula was used (e.g., estimated fair market value, capitalization of earnings, etc.) If none, state none.

**4.** Do you expect any changes greater than 15% in income or net worth in the next 12 months?  YES ☐  NO ☐
If "yes", explain

**5.** Have you filed for bankruptcy in the past 5 years?  YES ☐  NO ☐
If "yes", chapter _____  Date Open _____  Date Closed _____

### Business Information (For Business Insurance)

**6.** Type of business  ☐ Sole Proprietorship  ☐ Partnership  ☐ Corporation  ☐ Limited Liability Corporation
**7.** Name of business _____  Nature of business _____
**8.** How long has business been in operation? _____ years
**9.** % of business owned _____ %
Are all members of firm being similarly insured?  ☐ Yes  ☐ No
a.  If "yes", provide details of business coverage issued or applied for on other members: (Use Separate Sheet If Necessary)

| Name | Position/Title | % Owned | Business Insurance in force/applied for |
|---|---|---|---|

b.  If "no", explain reason _____

**10.** Business finances for past 2 years:

| Year | Assets | Liabilities | Retained Earnings | Gross Sales | Net Profit |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |
| | $ | $ | $ | $ | $ |

**11.** Has the business filed for bankruptcy and/or reorganization in the past 5 years?  YES ☐  NO ☐
If "yes", explain _____

### Other Information (For Personal and/or Business)

**12.** Do you intend to finance any of the premium required to pay for this policy through a financing or loan agreement? (If Yes, submit a copy of the financing or loan agreement)  ☐ Yes  ☐ No

Check all of the following that apply and complete requested information:

☐ Loan _____ (% of premium) Identify Source of Loan _____
Loan Repayment Schedule _____
Describe the collateral used _____
☐ Cash _____ (% of premium)
☐ Existing life insurance policy or contract _____ (% of premium)
☐ Existing Investments _____ (% of premiums) Identify Investment Source _____

**13.** Are you, the Owner, Proposed Insured, or any person or entity, being paid (cash, services, etc.) as an inducement to enter into this transaction? (If Yes, describe the inducement) _____  ☐ Yes  ☐ No

**14.** Please state the reason you are purchasing this policy (e.g., estate planning, business insurance, etc.)

_____
_____
_____

180-6004 (2006)    Cat. # 134000    ES810_core

**EXHIBIT E**
**PAGE 00068**

☐ AXA Equitable Life Insurance Company
1290 Avenue of the Americas
New York, NY 10104

☐ MONY Life Insurance Company of America
1290 Avenue of the Americas
New York, NY 10104

Optional
Benefits
Supplement
Form No. OPTIONAL
BENE-GV (2005)

**Optional Benefits Supplement Forming a Part of The Application for Insurance**
**REFER TO VUL SUPPLEMENT FOR RIDER SELECTION ON ANY VARIABLE LIFE PLAN.**

**Whole Life¹**
☐ Accidental Death Benefit (Amount) $ _____
☐ Disability Premium Waiver
☐ Children's Term $ _____ Units ____
   (Complete Children's Term Supplement)
☐ Option to Purchase Add'l Ins.
   $ _____
☐ Paid-up Additions.
   (1) Single Premium $ _____
   (2) Recurring Premium $ _____
☐ Supplemental Insurance (SIR) $ _____
   Target Death Benefit $ _____
☐ Supplemental Protective Benefit
   (Complete Term Rider Supplement Information
   on Applicant)
☐ Yearly Renewable Term
   (1) On Insured $ _____
   (2) On Add'l Insured $ _____
   (Complete Term Rider Supplement)
☐ Other _____

**Term Life**
☐ Disability Premium Waiver
☐ Children's Term $ _____ Units ____
   (Complete Children's Term Supplement)
☐ Other _____

**Survivorship Universal Life**
☐ Estate Protector (insert percentage)
   ____ % (Maximum = 122%)
☐ Lapse Protection Rider (DB option A only)
☐ Cash Value Enhancement Rider
☐ Return of Premium Death Benefit Rider
☐ Other _____

**Universal Life**
☐ Disability Waiver of Monthly Deductions
☐ Children's Term $ _____ Units ____
   (Complete Children's Term Supplement)
☐ Option to Purchase Add'l Ins.
   $ _____
☐ Lapse Protection Rider (DB option A only)
☐ Cash Value Enhancement Rider
☐ Return of Premium Death Benefit Rider
☐ Other _____

**ISWL (WLOA)**
☐ Waiver of Premium
☐ Children's Term Rider
   (Complete Children's Term Supplement)
☐ Accidental Death and Dismemberment
☐ Purchase Option Rider
☐ Other Insured Term Rider (Complete
   Term Rider Supplement)
☐ Primary Insured Term Rider
☐ Other _____

**Whole Life Dividend Elections¹**
☐ Dividend Accumulation
☐ Dividend Additions
☐ Dividend to Reduce Premium
☐ Term Dividend — Provision ☐ Premiums, Balance to Additions or
                              ☐ Cash
¹Available only for inforce AXA Equitable Whole Life (EWL) contractual obligations with a face amount less than $50,800.

Signed at (City and State) _LOS ANGELES CA_ on _11-15-06_ (Date)

Signature of Proposed Insured _Rich Wittiman_

Signature of Additional/Joint Insured (if to be insured) _____

Signature of Owner (other than Proposed Insured) who agrees to be bound by the representations and agreements in this and any other part of
the application _____

Signature of Licensed Financial Professional/Insurance Broker _____     Date _____

130-5210                    Cat. #136078                    ET071_CORE

**EXHIBIT E**
**PAGE 00069**

# AXA EQUITABLE
### LIFE INSURANCE COMPANY

A Stock Life Insurance Company
Home Office: 1290 Avenue of the Americas, New York, New York 10104

This is a Flexible Premium Universal Life Insurance Policy. The Insurance Benefit is payable upon the death of the insured person while this policy is in force. You may pay premiums while the insured person is living and is not yet attained age 100. The values provided by this policy are based on declared interest rates. This is a non-participating policy.

No. 04-100CA

EXHIBIT E
PAGE 00070

# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | JURY TRIAL DEMANDED |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. _____ |
| ) | |
| LYDIA CAPITAL, LLC, ) | |
| GLENN MANTERFIELD, and ) | |
| EVAN ANDERSON, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission") alleges the following in this emergency enforcement action against defendants:

### PRELIMINARY STATEMENT

1.     This matter involves an ongoing fraudulent investment scheme carried out by Defendant Lydia Capital, LLC ("Lydia" or the "Adviser") and its two principals, Defendants Glenn Manterfield ("Manterfield") and Evan Anderson ("Anderson"), involving sales to investors in Taiwan of "limited partnership interests" in an unregistered fund, Lydia Capital Alternative Investment Fund LP (the "Fund"), based in Boston.

2.     As further detailed below, Defendants are offering and selling hedge fund interests to investors and potential investors and not disclosing material facts and/or omissions to the investors, including, but not limited to the fact, that the Fund's principal underlying assets – i.e., life insurance policies – may be either worthless or virtually worthless.

EXHIBIT F
PAGE 00071

3.    As further detailed below, the Commission is seeking emergency relief because it learned today that Defendants may be seeking to transfer investor assets out of its brokerage account.

4.    As a result of the above, Defendants engaged in: (i) fraudulent or deceptive conduct in connection with the purchase or sale of securities, in violation of Section 10(b) of the Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder; (ii) fraudulent or deceptive conduct in connection with the offer or sale of securities, in violation of Section 17(a) of the Securities Act of 1933 ("Securities Act") and (iii) fraudulent or deceptive conduct with respect to investment advisory clients, in violation of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act").

5.    Accordingly, the Commission seeks:  (I) permanent injunctions prohibiting defendants from further violations of the relevant provisions of the federal securities laws; (Ii) disgorgement of defendants' ill-gotten gains and unjust enrichment, plus pre-judgment interest; and (iii) the imposition of civil monetary penalties due to the egregious nature of defendants' violations.  In addition, because of the risk that defendants will continue violating the federal securities laws and the danger that any remaining investor funds will be dissipated or concealed before entry of a final judgment, the Commission seeks preliminary equitable relief to:  (i) prohibit defendants from continuing to violate the relevant provisions of the federal securities laws; (ii) freeze defendants' assets and otherwise maintain the status quo; (iii) require defendants to submit an accounting of investor funds and other assets in their possession; (iv) prevent defendants from destroying relevant documents; (v) prohibit defendants from continuing to

2

accept or deposit investor funds; and (vi) authorize the Commission to undertake expedited discovery.

<div align="center">**JURISDICTION**</div>

6.     The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)], and Section 209(d) of the Advisers Act [15 U.S.C. §80b-9(d)]. The Commission seeks the imposition of a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C.§77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)].

7.     This Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa], and Sections 209(3) and 214 of the Advisers Act [15 U.S.C. §80b-9(d), 80b-14]. Venue is proper in this District because much of defendants' wrongful conduct occurred here and at least some of the defendants' ill-gotten gains remain within the District.

8.     In connection with the conduct described in this Complaint, defendants directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

<div align="center">**DEFENDANTS**</div>

9.     **Lydia Capital, LLC** (SEC File Number 801-66292) is a Delaware limited liability company established in February 2006, and is headquartered in Boston, Massachusetts. Lydia Capital is a registered investment adviser to Lydia Capital Alternative Investment Fund

<div align="center">3</div>

**EXHIBIT F
PAGE 00073**

("Fund"), L.P., an unregistered fund located in Boston, Massachusetts. The Fund, a Delaware limited partnership, is engaged in buying and selling life settlements (or insurance policies).

10.    Glenn Manterfield, 44, is believed to be a resident of Sheffield, United Kingdom, and is one of Lydia's two principals.

11.    Evan Anderson, 25, is believed to be a resident of Boston, Massachusetts, and is one of Lydia's two principals.

## STATEMENT OF FACTS

12.    Lydia solicits investors for the Fund through a Private Placement Memorandum ("PPM"). The PPM states that the Fund purchases life insurance policies in the life settlement aftermarket on insured individuals aged 65 or older with a life expectancy of between two and ten years. Through finders and/or brokers in Asia, Lydia has raised approximately $33 million in investments in the Fund from at least 57 investors in Taiwan.

13.    Contrary to statements in the PPM, Lydia's agents, SLS and Stamford Group, solicit individual seniors to purchase life insurance policies by obtaining a medical underwriter's evaluation of the life expectancy of those individuals prior to the individual applying for a life insurance policy. On approximately half of the applications, the individuals falsely claimed that they had no intention to sell their policies, when in fact, they obtained policies intending to sell it to Lydia's agents (SLS or Stamford Group).

14.    Life insurance companies have a right to rescind the aforementioned policies based on false representations in the application. Recision would render the policies nearly worthless, and diminish or obliterate the value of the Fund. Lydia, Manterfield and Andersen knew of this material risk because they set into motion the process whereby individuals would

4

EXHIBIT F
PAGE 00074

obtain the policies by making false statements and then the Defendants took possession of the

policies and fraudulent applications upon the Fund's purchase of the policies from the

individuals. The Fund's PPM misleads investors by omitting this significant risk, and by failing

to disclose that the value of the Fund is dependent on numerous insurance policies that have been

obtained through false statements. Lydia, Manterfield and Andersen used the fraudulent PPM to

solicit actual and potential investors for the Fund.

15.    Further, Lydia's website contains false and misleading postings of the Fund's

"NAV" appreciation. First, Lydia has no legitimate basis for such valuations of the Fund because

the valuations it is posting are from non-independent sources - SLS and Stamford Group, the

entities that sell the insurance policies to the Fund. In addition, the website states that the NAV

appreciation for July 2006 was 1.69%, when in fact, the Fund held no assets until it purchased its

first policy in August 2006.   Lydia, Manterfield and Andersen knew that the July 2006 NAV

appreciation was incorrect because they knew that the Fund had no actual assets upon which to

obtain appreciation. Lydia, Manterfield and Andersen used the firm's website and the false

statements therein to solicit actual and potential investors.   The firms's website as of today still

contains this misrepresentation. Lydia, Manterfied and Anderson have misappropriated assets

from the Fund by drawing fees, compensation and expenses to which they were not entitled.

16.    The Fund's February 2007 newsletter to investors in the Fund, signed by Glenn

Manterfield, repeates the false July 2006 appreciation and states that it was the "best ever"

increase in NAV for the Fund.

5

17.    Approximately $8.8 million in investor funds have been wired to a Smith Barney account in the name of Lydia that is controlled by Andersen and Manterfield.  Apparent investors have wired money to this account as recently as April 11, 2007.

18.    The Commission staff learned today that Andersen wants to move the money out of the Smith Barney account.

19.    Further, investor funds are in accounts of an escrow agent for Lydia, including an account at National City Bank in Cleveland.

20.    As a result, the staff seeks the emergency relief sought below, including an ex parte temporary restraining order, preliminary injunction, and an asset freeze.

### FIRST CLAIM FOR RELIEF
#### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

21.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-20 of the Complaint as if set forth fully herein.

22.    Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or has omitted or is omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

6

EXHIBIT F
PAGE 00076



23.     As a result, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### SECOND CLAIM FOR RELIEF
#### (Violation of Section 17(a) of the Securities Act)

24.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-20 of the Complaint as if set forth fully herein.

25.     By reason of the foregoing, defendants, directly or indirectly, in the offer or sale of securities, by use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon the purchaser of securities in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

26.     As a result, Defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act.

### THIRD CLAIM FOR RELIEF
#### (Violation of Sections 206(1) and 206(2) of the Advisers Act)

27.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-20 of the Complaint as if set forth fully herein.

28.     Defendants were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §80b-2(a)(11)].

7

EXHIBIT F
PAGE 00077

29.   Defendants, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting intentionally, knowingly or recklessly: (i) have employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

30.   As a result, Defendants have violated and, unless enjoined, will continue to violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§80b-6(1), (2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.   Enter a temporary restraining order, order freezing assets and order for other equitable relief in the form submitted with the Commission's motion for such relief and, upon further motion, enter a comparable preliminary injunction, order freezing assets and order for other equitable relief;

B.   Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of:

1.   Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

2.   Section 17(a) of the Securities Act [15 U.S.C. § 17q(a)];

3.   Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §80b-6(1), (2)];

8

EXHIBIT F
PAGE 00078

C.    Require Defendants to disgorge their ill-gotten gains and unjust enrichment, plus

pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution

to be ordered by the Court;

D.    Order Defendants to pay an appropriate civil monetary penalty pursuant to Section

20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C.

§78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)];

E.    Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

F.    Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Silvestre A. Fontes (BBO #627971)
        fontess@sec.gov
Martin F. Healey (BBO #227550)
        healeym@sec.gov
R. Daniel O'Connor (BBO #634207)
        oconnord@sec.gov
Senior Trial Counsel

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street
Boston, MA  02110
(617) 573-8991 (Fontes)
(617) 573-8952 (Healey)
(617) 573-8979 (O'Connor)
(617) 573-4590  fax

April 12, 2007

9

# EXHIBIT G

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 07-cv-10712-RGS |
| | ) |
| LYDIA CAPITAL, LLC, | ) |
| GLENN MANTERFIELD, and | ) |
| EVAN ANDERSEN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

### AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### PRELIMINARY STATEMENT

1.    During the period from June 2006 through April 2007 (the "Relevant Period"),
Defendants Glenn Manterfield ("Manterfield"), a convicted felon, and his business partner Evan
Andersen ("Andersen"), acting through their investment advisory firm, Defendant Lydia Capital,
LLC ("Lydia"), engaged in a scheme to defraud investors in a hedge fund, Lydia Capital
Alternative Investment Fund LP (the "Fund"). During the Relevant Period, more than 60
investors purchased approximately $34 million in limited partnership interests in the Fund. The
Defendants told investors that they intended to use the Fund's assets to acquire a portfolio of life
insurance polices in the life settlement market. The Defendants materially misled investors
about their operations and misappropriated millions dollars of investors' funds.

2.    Manterfield, Andersen, and Lydia sold limited partnership interests and retained

1

investors in the Fund through a series of material misrepresentations and omissions, including but not limited to: (1) materially overstating, and in some instances completly fabricating the Fund's performance; (2) inventing business partners, offices, and investors in an attempt to legitimatize the firm and concealing the truth as to why key vendors and banks ceased relationships with the Defendants; (3) lying about Manterfield's significant criminal history, and failing to disclose a February 2007 criminal asset freeze in England; (4) lying about how the Fund planned to address certain material risks and failing to disclose others; and (5), misstating the nature of the Fund's assets and its investment process.

3.      In addition to making serious material misrepresentations and omissions, Defendants misappropriated millions of dollars of investors' funds. Defendants, because of the serious nature of their fraud, were not entitled to draw either performance or maintenance fees, and admit they drew none. Defendants, however, withdrew $8.16 million of investor funds, supposedly maintained in "safe" escrow accounts beyond Defendants' reach. The money was supposedly obtained as payment for mark-ups applied to assets sold to the Fund and reimbursement for other unidentified expenses. Even assuming that the Defendants' fraud had not negated their right to receive any compensation, which it did, the Defendants were, at best, entitled to receive a mark-up of approximately $1.58 million to $2.64 million plus some smaller amount for reimbursement of expenses. Moreover, because the withdrawal of the $8.16 million from escrow was in no way actually tied to the sale of assets to the Fund, Defendants' mark-up explanation on internal records was nothing more than an attempt to cover up their misappropriation of investors' cash.

4.      By engaging in the conduct alleged in this Complaint, Defendants Manterfield,

2

EXHIBIT G
PAGE 00081

Andersen, and Lydia violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5], and Sections 206(1) and

206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6 (1) and

80b-6 (2)].

     5.     Unless restrained and enjoined, Defendants are likely to commit further violations

in the future.  Accordingly, the Commission seeks:  (i) entry of a permanent injunction

prohibiting Defendants from further violations of the relevant provisions of the federal securities

laws; (ii) disgorgement of Defendants' ill-gotten gains and unjust enrichment, plus pre-judgment

interest; and (iii) the imposition of civil monetary penalties due to the egregious nature of

Defendants' violations.  In addition, because of the risk that Defendants will continue violating

the federal securities laws and the danger that any remaining investor funds will be dissipated or

concealed before entry of a final judgment, the Commission seeks preliminary equitable relief to:

 (i) prohibit Defendants from continuing to violate the relevant provisions of the federal

securities laws; (ii) freeze Defendants' assets and otherwise maintain the status quo; (iii) require

Defendants to submit an accounting of investor funds and other assets in their possession; (iv)

prevent Defendants from destroying relevant documents; (v) require the repatriation of any and

all assets abroad that were obtained or derived from the violative securities transactions; (vi)

prohibit Defendants from continuing to accept or deposit investor funds; and (vii) other equitable

relief as necessary to prevent additional harm.

     6.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C.

3

§§ 78u and 78aa], and Section 209 of the Advisers Act [15 U.S.C. § 80b-9]. The Commission

seeks the imposition of a civil monetary penalty pursuant to Section 20(d) of the Securities Act

[15 U.S.C.§77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section

209(e) of the Advisers Act [15 U.S.C. §80b-9(e)]. Many of the acts and transactions constituting

violations occurred primarily within the District of Massachusetts and at least some of the

Defendants' ill-gotten gains remain within the District.

## DEFENDANTS

7.      Lydia was a Delaware limited liability company established in February 2006,

with an office in Boston, Massachusetts. Lydia was registered as an investment adviser with the

Commission. Lydia was an investment adviser to and general partner of the Fund. The Fund, a

Delaware limited partnership, was a pooled investment vehicle set up to purchase and sell all

types of securities, with a focus on investing in interests in life insurance policies. Lydia's sole

employees, Manterfield and Andersen, are also its owners.

8.      Manterfield, age 44, is a resident of Sheffield, England and was one of Lydia's

two principals and a 50% owner of the firm. During the Relevant Period, Manterfield acted as

an investment adviser, and as such, Manterfield had a fiduciary duty to his advisory clients.

Manterfield traveled to the United States on several occasions in furtherance of the fraud alleged

herein and held himself out as a director of the Boston-based Lydia. Manterfield has an

extensive criminal record with arrests and convictions for fraud and theft felonies. He is under

investigation in England for acquiring criminal property, a potential felony charge, and on

February 1, 2007, an English court froze all assets that Manterfield controlled directly or

indirectly, but allowed Manterfield, to the extent that the was not imprison, to spend up to £300 a

4

EXHIBIT G
PAGE 00083

week towards his ordinary living expenses.

9.    Andersen, age 25, is a resident of Boston and is one of Lydia's two principals and a 50% owner of the firm.  During the Relevant Period, Andersen acted as an investment adviser, and as such, Andersen had a fiduciary duty to his advisory clients.  Andersen held himself out as a director and chief compliance officer of Lydia, and worked primarily out of Boston.

## DETAILED ALLEGATIONS

### Defendants Misappropriated Investors' Funds

10.    In addition to the making serious material misrepresentations and omissions, Defendants misappropriated millions of dollars of investors' funds.  Defendants, because of the serious nature of their fraud, were not entitled to draw either performance or maintenance fees, and admit they drew none.  Defendants, however, withdrew investor funds supposedly maintained in "safe" escrow accounts beyond Defendants reach.  Defendants withdrew $8.16 million of the Fund's assets from various escrow accounts as supposed payment for mark-ups applied to assets sold to the fund and reimbursement for expenses.

11.    The June 2006 private placement memorandum provides that Lydia "intends to purchase life insurance policies through its contacts and resell such policies to the [Fund] to become a part of the [Fund's] portfolio.  Lydia intends to sell policies to the [Fund] for at a minimum mark-up of 3% to 5% of the face value of the policy." Although the 3% to 5% is described as a minimum fee, the Defendants never calculated a mark-up fee using a higher amount, and to the extent they actually calculated a fee, they used 4%. In early January 2007, Defendants announced to investors that Lydia would no longer charge a mark-up fee on the sale of assets to the Fund, and modified the existing private placement memorandum to reflect the

5

change.

12.    Defendants kept few if any records to show exactly when the Fund, or one of its indirect agents, acquired interests in insurance policies. At best, however, before announcing the change in early January 2007, the Fund acquired interests in thirteen insurance polices with a combined face value of $52,750,000. Using the 3% to 5% mark-up, Lydia would have been entitled to a fee of approximately $1.58 million to $2.64 million, not the $8.16 million that Defendants took out of the Fund's various escrow accounts. Moreover, Lydia's first two withdrawals from escrow accounts, totaling approximately $1.6 million, were made before the Fund or any agent had actually bought an interest in a single life insurance policy. Subsequent withdrawals also were not timed to match asset purchases by the Fund.

13.    Under the Limited Partnership Agreement and as stated in the various private placement memoranda, Lydia was entitled to receive reimbursement for certain expenses. Once again, however, Lydia's bookkeeping was deficient and not in keeping with its fiduciary duty or requirements imposed by the Advisers Act. Lydia did not incur reimbursable expenses that justify the $8.16 million withdrawn from the Fund, even if Lydia was entitled, and it was not, to receive a mark-up on certain assets acquired by the Fund.

14.    Of the $8.16 million wrongfully withdrawn from the Fund's escrow accounts, approximately $2.35 million was transferred to Manterfield's personal account and approximately $2.35 million was transferred to an account controlled by Andersen.

15.    Defendants' poor or nonexistent record keeping makes it impossible at this point in time to determine to the penny the amount of the misappropriations. The total outflows from Lydia's accounts, other than transfers to accounts controlled by Manterfield or Andersen, totaled

6

EXHIBIT G
PAGE 00085

to approximately $3.43 million. Even if all of these payments were for legitimate reimbursable expenses, which they were not, and Lydia was entitled to receive the maximum mark-up on assets sold to the Fund by early January 2007, which it was not, Lydia should have taken no more than $6.07 million, not $8.16 million. Thus, at a minimum, the Defendants have misappropriated at least $2.09 million of investor funds.

**Defendants' Misrepresentations and Omissions**

16.     In order to induce investors to purchase interests in the Fund, Defendants described the Fund's planned investment activities and supposed associated risks in a Confidential Private Placement Memorandum, dated June 2006 (the "June 2006 PPM"). Defendants stated in the June 2006 PPM that Lydia intended to use the Fund's assets to "purchase life insurance policies in the life settlement after-market on numerous insured individuals of sixty-five (65) years of age or older . . . who have a life expectancy of between two to ten years." The June 2006 PPM also provides that "[u]pon purchasing a policy in a life settlement after-market the [Fund] will be re-assigned all legal rights and responsibilities contained in the policy contract. Therefore, the [Fund] will legally assume all ownership rights to the policy and the death benefit, [and] the responsibility for future premium payments . . . ." The June 2006 PPM provides that the Fund's revenues would be derived from the death benefit of the underlying life insurance policy or gains from the sale of a policy in the secondary life market.

17.     In early August 2006, the Defendants amended the June 2006 PPM and under cover letter signed by Manterfield in early August 2006, reissued a revised private placement memorandum (the "August 2006 PPM") to all existing investors. For the remainder of 2006, the

7

EXHIBIT G
PAGE 00086

Defendants used the August 2006 PPM to describe the investment activities and risks of the Fund to actual and potential investors. In early January 2007, the Defendants amended the August 2006 PPM and reissued a new private placement memorandum (the "January 2007 PPM"). Except as explicitly stated herein, the June 2006 PPM, the August 2006 PPM, and the January 2007 PPM are virtually identical, and the misrepresentations and omissions found in June 2006 PPM, are also present in the subsequent versions.

18.    In addition to the private placement memorandum, Defendants communicated with investors in a variety of modes. For example, Lydia maintained a password protected website, www.lydiacapital.com, and provided login credentials to all 60+ investors. Lydia also sent login credentials to numerous other potential investors who provided simple background information indicating whether they would be qualified to invest in Lydia. Additionally, Andersen directly provided credentials to potential investors. The website, which was up and running from at least August 2006 through April 13, 2007, contained information related to Lydia, the Fund, Manterfield, and Andersen, and parts of it were updated frequently. The website included a chart showing the Fund's net asset valuation ("NAV") appreciation on a monthly basis starting in July 2006 and continuing through to March 2007. The site also displayed a twenty page Microsoft PowerPoint presentation entitled "Lydia Capital Investment Fund 2006" (the "2006 PowerPoint"), which provided background on the Fund, biographies of Andersen and Manterfield, and directs inquiries to Andersen, listing his phone number and email address.

19.    In addition to the website, Andersen and Lydia provided other Microsoft PowerPoint presentations to investors during the Relevant Period and used those presentations as

8

EXHIBIT
PAGE 00087

a guide for oral conversations about the Fund, including one presentation entitled "Lydia Capital Investment Fund 2006/7 – Institutional Partnerships" (the "2006/7 PowerPoint"), and another one entitled "Lydia Capital Investment Fund 2007 – Institutional Partnerships" (the "2007 PowerPoint"). Andersen used the 2006/7 PowerPoint in at least thirty to forty meetings in person with potential investors in the United States, as well as additional meetings, via telephone, with Asian investors during the Relevant Period.

20.    Manterfield and Andersen also produced a newsletter that was sent to investors on a monthly basis by mail and/or email starting with a July 2006 edition and continuing through to March 2007. The newsletter was written by Manterfield and Andersen, with Manterfield doing most of the writing and with Andersen reviewing the material and approving it as chief compliance officer before its publication. Beginning in the fall of 2006, the newsletter was mailed from Singapore to investors in Asia after signoff by Manterfield and Andersen. Manterfield's name appears on the first page of all but one newsletter. The newsletters were sent to investors in the first few weeks of the following month (e.g., the September newsletter was sent out in mid-October).

21.    In addition to the private placement memorandum, PowerPoint presentations, and newsletters described above, Andersen and Manterfield engaged in frequent communications with potential and existing investors, as well as their representatives, via the telephone, email and written letters.

22.    From June 2006 through to February 2007, more than sixty investors purchased limited partnership interests totaling approximately $34 million. The subscriptions continued through the Relevant Period. In March and early April, several investors sent in another $8.7

9

EXHIBIT G
PAGE 00088



million but it is unclear whether this money was formally accepted for subscription.

23.    During the Relevant Period, Defendants used the previously described modes of communications, as well as others, to sell new partnership interests in the Fund and to maintain and to grow the size of the existing investors' accounts.  This securities sales activity, as well as Defendants' role as fiduciary investment advisers, gave rise to a duty on the part of Defendants to disclose to the investors all material information related to the Fund's investment objectives and risks.  As described more fully below, however, many of Defendants' communications to investors during the Relevant Period contained material misrepresentation and omissions.

**Fabrication & Material Overstatement of NAV Appreciation**

24.    The June 2006 PPM states that Lydia will calculate the Fund's indicative NAV on the last day of each calendar month and it will be "the value as of such date of all the assets of the [Fund] . . . less all of the liabilities of the [Fund] . . . ."  Defendants told investors that the indicative NAV was subject to biannual audit and confirmation by an actuarial firm ("Actuary A") and the Fund's auditors ("Auditor A"), and that Lydia produced the monthly indicative NAV using portfolio valuation software based on that employed by Actuary A.

25.    In mid-August 2006, Manterfield calculated the Fund's NAV and published the percentage change in the Fund's indicative NAV that purportedly occurred in July 2006.  The Defendants falsely reported that the Fund's NAV increased by 1.69% in the month of July.  Defendants touted the false information to investors and potential investors by posting it on the Lydia website and included it in the July and later newsletters and other communications.  The Defendants knew or recklessly disregarded the misleading nature of the reported July NAV increase because, as described below, they knew that it was based on valuing assets that the Fund

10

EXHIBIT G
PAGE 00089

did not own.

26.     The reported 1.69% increase in NAV during July 2006 was false and misleading. The Defendants knew that the Fund had not actually purchased any interests in the life insurance policies that were used to calculate July's NAV. Thus, at the end of July, the Fund's assets only included the cash it had received from investors, less expenses. Rather than calculate the Fund's NAV using its actual assets, Defendants improperly included the value of interests in life insurance policies that it hoped to purchase at some future date.

27.     In July 2006, the Defendants were using a broker in California to find interests in life insurance policies ("Broker A"), but by the end of July 2006, no interests had been purchased. Defendants, however, requested that Broker A prepare an analysis of the value of the interests in insurance policies for which Broker A, on behalf of Lydia, had made an oral offer to purchase. Andersen and Manterfield knew that no assets had been purchased by the Fund because they had not signed any agreements or authorized release of funds. The July 31, 2006 report from Broker A shows:

| | |
|---|---|
| Cash at Escrow | $5,063104.78 |
| Cumulative Policy Market Value | $2,813,833.00 |
| Cumulative Policy Face Value | $10,000,000.00 |
| Asset Value for NAV Calculation | $7,876,937.78 |

28.     The Cumulative Policy Market Value in Broker A's July 31, 2006 report purports to be the market value of the interests in the insurance policies with $10,000,000 total face value, taking into account a number of actuarial variables such as the life expectancy of the insureds and the premium payment schedule. The Asset Value for NAV Calculation in Broker A's report

11

was the sum of the Cash at Escrow (the money that will eventually be used to buy interests in policies) and the Cumulative Policy Market Value. The report was inaccurate, however, because neither the Fund nor its indirect agent, Broker A, owned any interests in insurance polices as of July 31, 2006. Manterfield knowingly or reckless used the inaccurate asset valuation from Broker A's July 31, 2006 report to calculate the Fund's NAV and its percentage increase, 1.69%, which the Defendants then published to existing and prospective investors. The 1.69% increase in NAV for July equates to a 20.28% annual return, a number that helped spur additional investment.

29. Over the next several months, the Defendants followed a similar course of action and had Broker A complete a month-end report that purported to show the asset value of the interests in insurance policies that Broker A had acquired for the Fund. Like the July 31, 2006 report, Broker A's August and September reports, and possibly the October report, counted interests in policies that had not yet been purchased by the Fund or its indirect agent, and thus, the resulting asset values were substantially higher than they actually should have been.

30. Broker A's August 31, 2006 report shows interests in insurance policies with a face value of $36,500,000, when at most, the Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values totaling no more than $32,500,000 (and likely less). Using this false report, Manterfield calculated an increase in NAV for August of 1.44%, which the Defendants then published to investors on Lydia's website and newsletter. Similarly, Broker A's September 30, 2006 report shows interests in insurance policies with a face value of $36,500,000, when at most, the Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values totaling no more than $35,250,000 (and likely less). Using

12

this false report, Manterfield calculated an increase in NAV for September of 1.53%, which the Defendants then published to investors on Lydia's website and newsletter.

31.    In October 2006, the Defendants entered into a relationship with a new broker based in Indiana ("Broker B"). Broker B took over the role of Broker A and went about finding interests in insurance policies for the Fund. The Defendants continued the practice they had established with Broker A, and had Broker B prepare a month end report starting in at least December 2006 that purported to calculate the asset value associated with interests in insurance policies that Broker B had acquired on behalf of the Fund. As was the situations with Broker A, the monthly reports from Broker B were incorrect in that they valued interests in insurance polices that had not yet been purchased.

32.    Broker B's December 31, 2006 report shows interests in insurance policies with a face value of $77,000,000, when at most, Broker B had used the Fund's assets to obtain interests in policies with face values totaling no more than $12,500,000. Using this false report, Manterfield calculated an increase in NAV for December 2006 of 1.66%, which the Defendants then published to investors on Lydia's website and newsletter. Broker B's January 31, 2007 report shows interests in insurance policies with a face value of $102,000,000, when at most, the Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values totaling no more than $49,150,000 (and likely less). Using this false report, Manterfield calculated an increase in NAV for January of 1.48% and then the Defendants published this information to investors on Lydia's website and newsletter. Broker B's February 28, 2007 report shows interests in insurance policies with a face value of $142,000,000, when at most, the Fund's indirect agent had used the Fund's assets to obtain interests in policies with face values

13

EXHIBIT G
PAGE 00092

totaling no more than $89,150,000 (and likely less), through the end of the month of February, 2007. Using this false report, Manterfield calculated an increase in NAV for February of 1.68%, which the Defendants then published to investors on Lydia's website and newsletter.

**False Business Activities, Phantom Investors and Terminated Relationships**

33.     Defendants published materially false information about Lydia's business activities, the existence of investors from countries other than Taiwan, and other matters so as to falsely legitimize themselves to the Fund's investors.

34.     Lydia's July 2006 newsletter, prepared by Manterfield and reviewed prior to publication by Andersen, falsely stated that "[n]ew investors from Mexico, Austria, Israel, and the USA are expected to boost our purchasing power and increase our profit margin." Defendants knew, however, that that the only investors in the Fund were from Taiwan.

35.     Lydia's September 2006 newsletter, also prepared by Manterfield and reviewed by Andersen prior to publication, falsely stated that Lydia was opening new offices in Mexico and Singapore, when in fact the Defendants knew that the firm had no such offices. The September newsletter also falsely stated that Lydia was "already welcoming new investors from South America, together from institutional investments from Funds-of-Funds in Europe . . . ." In fact, Defendants knew that throughout the Fund's existence, all of its investors were from Taiwan.

36.     On October 24, 2006, Manterfield emailed a broker selling Fund interests in Taiwan and falsely stated that Lydia has been approached by a "Swedish Financial Institution" with a request to help package a structured note for their clients. Later that day, Manterfield emailed the same broker to say that a "private Banking Organization in Sweden has agreed to

14

'brand' a note linked 100% to Lydia Fund. Nordic." Manterfield identified the firm as Nordic Mutual. *As described below, however, Nordic Mutual was not a real or separate entity, but rather a creation of Manterfield and Andersen with a website and no real business.*

37.    Lydia's November 2006 newsletter contained further falsehoods about Nordic Mutual, in that it stated that Lydia had "established links with a small Private Institution based in Scandinavia. Nordic Mutual is similar in structure to the US "Savings & Loan or Credit Union. . . . Offering a range of financial services to its private members . . . Nordic Mutual has expressed a desire to offer a 5 year Structure Note" tied to the Fund. Manterfield and Andersen knew that Nordic Mutual had no separate existence and they knew this because they bought the shell.

38.    Lydia's December 2006 newsletter made many other false and misleading statements about the relationship between Lydia and Nordic Mutual, noting in particular that the purported structured note deal has been launched.

39.    Nordic Mutual, however, was invented out of whole cloth by Manterfield and Andersen. On or about October 24, 2006, Lydia purchased the shell of a Swedish credit union from a company in Panama, Overseas Clearing Corporation, that specialized in creating overseas financial institutions. Andersen and Manterfield bought "Nordic Mutual Savings and Loan" for $38,000 in a package that included a credit union registration, certificates and bylaws in Swedish and English, and other bits and pieces of veneer designed to make it look like a real and substantial company. In order to complete the fraudulent scheme, a website was created for Nordic Mutual that purported to show a functioning financial institution offering banking products to private clients, including a structured note tied to a hedge fund in the life settlement industry. In fact, Nordic Mutual was and remains nothing but a virtual company with no staff or

15

physical location.

40.     On October 26, 2006, Manterfield wrote a letter and sent it via email to a Taiwanese corporate investor that had already made a $2 million investment in the Fund. Manterfield wrote to the investor to address a concern about redemption liquidity. Manterfield misled the investor by stating that Lydia had "negotiated credit-line collateralized financing with our colleagues at KBC Bank amongst others, and this will allow us to raise 90% of the market value of policies at 48 hours notice." In fact, Manterfield knew that Lydia had no such relationship with KBC Bank. Manterfield also knew that Lydia had no such relationship with any other institution which was willing to extend Lydia credit based on the value of the Fund's interests in insurance polices. After receiving Manterfield's misrepresentations, the corporate investor made and additional $1 million investment on November 2, 2006.

41.     In addition to lying about nonexistent business relationships, the Defendants knowingly or recklessly omitted telling investors about key vendor relationships that were terminated under less than favorable terms. In early February, Actuary A, a firm that had been hired by Lydia to audit its valuation of the Fund's assets, declined to continue engagement upon learning of Manterfield's criminal troubles in England. The Defendants did not disclose to investors the reason why the relationship was terminated, and instead noted in the February 2007 newsletter, published in early March 2007, that there had been several delays with Actuary A's work and serious failures to perform that led to the end of the relationship. This omission was material because the Defendants, basically since it first started soliciting funds, had been touting the relationship with the Actuary A, as well as the use of software based on its methodology to support its own calculations of NAV.

16

42.    Shortly after Manterfield's January 2007 arrest, a number of financial institutions at which Lydia and the Fund had accounts terminated their relationships based on suspicious money flows and knowledge of Manterfield's arrest and/or criminal record. This forced the Defendants to seek out new banking relationships. Manterfield, Andersen and Lydia did not disclose to the Fund's investors the reason why the relationships were ended nor did they disclose the asset freeze, which had the potential to bring activities at the Fund to a halt. Defendants chose instead in their February 2007 newsletter to misrepresent the nature of the banking changes as a decision undertaken to improve and streamline the firms' processes.

43.    In late February and/or early March 2007, the Fund's auditors, Auditor A, met with Andersen and told him that, based on their review of the Fund's activities and the assets it held, that it could only provide a report with a disclaimer, which Auditor A forwarded to Andersen. The disclaimer said that the Fund was not "audited" and no "opinion" was provided by Auditor A. Mr. Andersen told Auditor A that the report was not acceptable. Auditor A responded by saying that he (Lydia) needed to find another auditor. Manterfield sent an e-mail to Auditor A afterwards noting his disappointment. Once again, Defendants decided not to disclose this material information to investors.

**Defendants hid Manterfield's Criminal History and Asset Freeze**

44.    Defendants' failure to disclose Manterfield's significant criminal history, as well as the February 2007 order freezing all of Manterfield's assets that he controlled directly and indirectly, which was issued by an English court in connection with a money laundering inquiry, was a material omission and a breach of their fiduciary duty to investors. Likewise, Lydia's Form ADV, which was publicly available to investors online, contained material

17

EXHIBIT G
PAGE 00096

misrepresentations in Item 11. In response to questions in Item 11 of the Form ADV about whether any advisory affiliate, which includes Manterfield, had been convicted or charged with any felony, or convicted or charged with a misdemeanor involving fraud, wrongful taking of property or conspiracy to commit the same, Andersen checked the "no" boxes. Manterfield, Andersen, and Lydia, likewise failed to amend and modify Item 11 as new information developed.

45.     On or about June 12, 1992, Manterfield was convicted at the Sheffield Crown Court in South Yorkshire, England on one charge of obtaining property by deception, a felony for which he could have been sentenced to at least one year imprisonment, and was sentenced to 180 hours of community service.

46.     On or about March 25, 1996, Manterfield was convicted in the Leeds Crown Court in West Yorkshire, England on four charges of conspiracy to defraud, a felony for which he could have been sentenced to at least one year imprisonment, and was given a sentence of incarceration for twelve months that was suspended for two years.

47.     On or about November 29, 1999, Manterfield was convicted in the Sheffield Magistrates Court in South Yorkshire, England on three charges of shoplifting and was given a twelve month conditional discharge.

48.     On or about December 5, 2006, Manterfield was convicted in the South East Suffolk Magistrates Court in Ipswich, England on one charge of handling stolen goods, a felony for which he could have been sentenced to at least one year imprisonment, and was fined £200. Manterfield was initially arrested on May 16, 2000 and was charged in November 2000 with three charges of theft and one charge of handling stolen goods. Manterfield was released on bail

18

pending his court date. However, before the court date, Manterfield fled England and did not return for several years, thus violating his conditions of bail.

49.     On or about January 26, 2007, Manterfield was arrested in England on suspicion of acquiring criminal property, a potential felony charge. On February 5, 2007, in connection with this inquiry, an English court froze all assets that Manterfield controlled directly or indirectly, but allowed Manterfield, to the extent that the was not imprison, to spend up to £300 a week towards his ordinary living expenses. Because of his ownership of Lydia, the English freeze order covers all accounts for Lydia and the Fund. On March 26, the English court continued the February 5, 2007 order leaving the asset freeze in place.

50.     Throughout January, February and March 2007, the Defendants failed to make any substantive disclosure to investors as to the many negative events suffered by the firm and its principal. Instead the Defendants continued through the use of newsletters and other communications to portray the firm and the Fund as prosperous and growing, all the while taking in substantial new and additional subscriptions from investors in Taiwan.

**Defendants Failed to Disclose Real and Serious Risks**

**False Bonding & Reinsurance Claims**

51.     The June 2006 PPM states that the "longevity risk" – the risk that the underlying insured will outlive his or her life expectancy – was one of the most important determiners as to the return that the Fund can expect on any given policy. The problem caused by an insured living past his or her life expectancy date is that receipt of the death benefit is delayed and additional premiums may be needed to keep the policy in force – meaning that the Fund needs to expend additional capital resulting in a lower return on its investment.

19

EXHIBIT G
PAGE 00098

52.     The Defendants falsely told investors in the June 2006 PPM that they intended to manage the longevity risk through, among other things, the use of bonding, and reinsurance. "Bonding" is a practice whereby the Fund pays a third party for a bond such that if the insured lives a specified period beyond his or her life expectancy, the bonding company purchases the bonded policy from the Fund at face value. "Reinsurance" is a practice whereby the Fund pays a third party and the third party agrees that if the insured lives a specified time past his or her life expectancy, the third party will pay all premiums to keep the policy in force. The Defendants knowingly or recklessly omitted to tell actual and prospective investors, however, that the Fund never purchased bonding or reinsurance, and in fact never discovered any company offering such products.

53.     The 2006 PowerPoint, which was posted on Lydia's website and made available to the hundreds of investors and potential investors that received website login credentials from Andersen and Manterfield, went further than the June 2006 PPM in misrepresenting how the Defendants intend to deal with the longevity risk. Page 3 of the 2006 PowerPoint stated that the Fund had obtained an "AAA-Rated Re-Insurance Package," and on page 12, investors are told, "[o]ur bonding solution carries a back-up guarantee from an AAA-Rated European Government." Those statements are simple falsehoods – the Fund had not purchased any reinsurance or bonds. Page 10 of the 2006 PowerPoint also fraudulently states:

> Our primary concern is longevity risk and we manage that risk in four ways [including]:
> 1. Bonding. By purchasing a Settlement Bond we can effectively build-in a guaranteed maturity date. If the insured remains alive after this date the Bond issuer pays out the full value of the policy. . . .
> 3. Re-insurance. . This addition covers the payment of future premiums for the life of the insured, after the Life Expectancy date passes.

20

EXHIBIT G
PAGE 00099

54.    A fact sheet prepared by Lydia and distributed to investors in Taiwan during the Relevant Period contained similar falsehoods: "Margins are created by the deep initial discounts . . . creating an inherent growth rate, and the bulk of that rate is locked in by the purchase of Extended Longevity Risk Mitigation Insurance, which gives us a guaranteed worst-case maturity payout. [O]ur Extended Longevity Risk Mitigation Insurance with an AAA-Rated European Government Guarantee, cannot be matched anywhere."

Suicide Exclusion Risk

55.    The June 2006 PPM states that one of the "[k]eys to assuring the integrity and value of a life settlement transaction include[s] . . . assuring there is no suicide exclusion" in the insurance policies in which the Fund acquires an interest. "Suicide exclusions" are provisions in life insurance policies which state that if the insured commits suicide within two years of the issuance of the policy (the "contestable period"), the insurance company will not pay any death benefit and instead will only return any premiums paid. Such an occurrence, because of the Fund's substantial cost to acquire an interest in an insurance policy over and above the premiums it must also pay, would be a material negative event.

56.    Defendants, however, knowingly or recklessly omitted to tell investors that such provisions exist in every life insurance policy in which the Fund acquired an interest and in fact that no insurance companies sell life insurance without suicide exclusion clauses. Thus, Defendants knowingly or recklessly misled investors into thinking that they had a strategy to limit the risk posed by a suicide. The suicide risk was especially relevant to the investors in the Fund because all of the insurance policies in which the Fund owned an interest were still in the contestable period, and thus susceptible to losing the death benefit if suicide occurred.

21

EXHIBIT G
PAGE 00100

**Premium Payment Risk**

57.     In order to maintain the value of the Fund's interests in various life insurance policies, the premiums on the polices needed to continue to be paid or the policies will lapse and become worthless. The 2006/07 PowerPoint, falsely stated that the Defendants "avoid this risk by pre-paying premium payments up to and beyond the point at which we intend to package and re-sell a given portfolio." This misrepresentation was repeated on page 10 of the 2007 PowerPoint. The June 2006 PPM also falsely stated that "[f]uture premiums will be escrowed . . ." to avoid the premium payment risk.

58.     Contrary to the above, however, the Defendants had not prepaid premiums on all insurance policies beyond the point at which they intend re-sell (i.e. beyond the end of the contestable period); in fact, the premiums on some policies were being paid on a monthly or quarterly basis. Defendants' knew that the above statements were false because they tracked and authorized premium payments as they became due. Defendants also did not undertake any systematic attempt at escrowing necessary premiums, which will cost several million dollars on an annual basis. It appears as if Defendants were counting on new subscriptions for cash to pay the debt, rather than planning to pay for premiums in advance.

**Contestability Risk**

59.     Defendants focused the Fund on purchasing interests derivative of insurance polices that were still in the contestable period. The Defendants, however, knowingly or recklessly failed to adequately describe the special risks inherent in such an investment strategy. The Defendants instead tailored their disclosures on what they saw as the positive aspects that may come from the heightened returns associated with the deep discounts that the market

22

EXHIBIT G
PAGE 00101

imposed on the sale price of interests in contestable policies. The market imposes these discounts, however, because of the additional material risks that the Defendants failed to disclose to the Fund's investors.

60.    The significance of buying interests in policies that are still in the contestable period was that if an insured dies during this timeframe, the insurance company can investigate the matter and if it finds fraud in connection with the purchase of the policy, refuse to pay any death benefit. Rescission was a possibility if the insured makes misrepresentations or omissions on his or her insurance application related to, among other things, the insured's health, financial status, the existence of pending or granted insurance policies, or the intent to sell an interest in the policy. Depending on the nature of the fraud, an insurance company has two options. First it can seek rescission of the policy, at which point all that the Fund would be entitled to receive would be a return of premiums paid, with some small amount of interest. If the fraud is more severe, the insurance company can seek to have the policy declared void, at which point the insurer can obtain a setoff against paid premiums for damages. Either way, given the substantial acquisition costs that the Fund incured in obtaining an interest in an insurance policy, a simple return of premiums, even with interest, would result in a net loss for the Fund. Moreover, any delay and expense incurred in addressing concerns raised during an insurance company's review would also lower the Fund's return. The Defendants knew of these risks but failed to fully disclose them to investors, simply stating in the June 2006 PPM, without an explanation, that selling interests in contestable policies was a "riskier practice" than trading in non-contestable policies.

61.    Defendants also understood that the issue of contestability was not a remote one

23

for the Fund. In the 2007 PowerPoint, the Defendants stated that "within the two year

contestable period a percentage of the polices (around 27%) will actually mature," (i.e. the

insured will die). The Defendants painted this as a positive fact for the Fund because the early

maturity generates a stronger return. Defendants failed to disclose to investors, however, that

motivated insurance companies will work to try and avoid paying death benefits on contestable

polices because they represent a significant loss for the insurance companies.

  62.  The Defendants noted in the June 2006 PPM that there has been fraud in the life

settlement industry, and stated that there have been a "number of companies [in the life

settlement industry] considered less than reputable." One of fraudulent practices described by

the Defendants in the June 2006 PPM was "clean sheeting," a colloquial term in the life

settlement industry related to the practice of an insured withholding negative information about

his or her health from an insurance company. Defendants failed to disclose to investors,

however, how the Fund could suffer if it found itself dealing with a non-reputable firm or

insurance broker that was supplying "clean sheet" policies.

  63.  It is clear from the variety of purchase-related contracts that the Defendants and

their agents used during the Relevant Period to memorialize the Fund's interests in the insurance

policies that the Defendants' knew of the risks inherent in contestable policies. The contracts

required representations that were aimed at helping to avoid issues that could lead to rescission

during the contestable period. For example, the Assignment of Beneficial Interest Agreements

used in most if not all of these transactions, contained the following representation:

> [N]o statement, representation, warranty or information made or provided by
> Assignor or the Insured in any application, worksheet or supplemental document
> made or provided to the Insurer for the Policy, or otherwise made or provided by
> Assignor or the Insured to the Insurer, contained any untrue statement of fact, or

<div align="center">24</div>

EXHIBIT G
PAGE 00103

omitted to state any fact necessary to make such statement, representation or warranty not misleading, true and complete in all respects;

[A]ll personal, medical and financial information provided with respect to the Insured in connection with acquisition of the Policy and in connection with the sale of the Interest by Assignor to Assignee (including, without limitation, all medical records and other information provided to the medical or life expectancy underwriters) are true, correct and complete and do not fail to state a fact necessary to make such information not misleading.

64.    Defendants knew or recklessly disregarded the fact that rescission by reason of fraud in the procurement of insurance was a live issue for the Fund. In at least five instances, described in detail in paragraphs 65 and 66, the insurance applications and related documents of five insureds, all of which were in the possession of the Defendants, presented a strong possibility of fraud that could lead to rescission. The five insurance policies in question had a face value of $16.5 million, or just over ten percent of the total face value of all of the policies underlying the assets of the Fund.

65.    In four instances (a $1.5 million policy issued on CV, a $5 million policy issued on HG, a $2 million policy issued on RW, and a $3 million policy issued on RB) the insureds all answered "no" to the question on their applications asking whether they ever discussed the possible sale or assignment of their policy in a life settlement transaction. The Defendants possessed strong circumstantial evidence in documents that would or should have been reviewed as part of Defendants' deal diligence, indicating that the insureds' representations were incorrect. First, all of the insureds obtained independent life expectancy evaluations prior to applying for insurance – CV, HG, and RB did so within two to five weeks of submitting their applications. An independent life expectancy analysis was a critical piece of data that Defendants relied upon in pricing a life settlement transaction. On information and belief, such analyses were not

25

EXHIBIT G
PAGE 00104

typically obtained by individuals just seeking insurance coverage who were not also evaluating selling their policy in the secondary market. Moreover, CV, HG, RW and RB sold interests in their policies to the Fund's indirect agents within approximately one to five weeks after applying for coverage. Obtaining a life expectancy analysis before applying for insurance and then selling an interest in the policy within weeks of issuance together offer strong evidence that CV, HG, RW, and RB lied on their insurance applications in saying that they had not discussed such an eventuality.

66.     The fifth policy at risk of rescission was a $5 million policy issued on AL. AL responded in the negative to a question on the application for the $5 million policy asking whether he had any other life insurance in force or applied for. The Fund purchased interests in two life insurance polices issued on AL, the $5 million policy that he applied for on March 2, 2007, and a $9 million policy from another insurance company that he applied for on February 27, 2007. Thus, it appears as if AL misrepresented the truth in his application for the $5 million policy. Defendants possessed both of AL's applications and knew that the two polices were issued close in time.

67.     Based on straightforward information which Defendants possessed, and which they had a reason to review as part of their deal diligence and in fulfillment of the their fiduciary duties to evaluate the assets that the Fund purchased, if CV, HG, RW, RB, or AL were to die during the contestability period, the insurance company's inquiry could have lead to rescission efforts. Defendants, however, knowingly or recklessly failed to make any disclosure to investors associated with these material risks.

68.     The unique risks posed by buy interests in contestable polices involve exposure to

26

EXHIBIT G
PAGE 00105

another illicit practice called "wet inking." "Wet inking" involves the purchase of an insurance policy purely for the purpose of selling it in a life settlement transaction immediately after issuance, or while the ink on the policy is still "wet." Insurance companies will not sell insurance policies to individuals for purposes of resale to strangers, nor will courts, for long standing public policy reasons, allow such insurance contracts to be validly enforced. Such situations run afoul of a concept in insurance law know as "insurable interest" which requires that, at the time a policy is issued, the owner of the policy (i.e. the beneficiary) have an interest in seeing the insured survive rather than immediately die.

69.    Defendants, by focusing on contestable policies issued on high net worth individuals over the age of seventy-five, participated in a process whereby it was probable that individuals would be obtaining life insurance for the purpose of immediate sale into the secondary market, and thereby giving rise to a risk that the policies would be subject to a challenge on insurable interest grounds. Defendants were aware of the "wet ink" issue. For example, the Defendants' agents often required insureds to sign consents and undertakings that included the following language:

> I certify that no formal or informal agreement, arrangement, understanding to sell or assign ownership of any beneficial interest in the Policies was arranged prior to the Policies being placed in force.

70.    While Defendants were aware of the risk posed by "wet ink" policies, they knowingly or recklessly omitted to describe the risk to investors. Moreover, a review of the timing of key events related to policies underlying the Fund pointed to a strong possibility that many of the policies may in fact have been procured by "wet inking," and thus, subject to a possible insurable interest challenge if the insured died during the contestable period. For

27

EXHIBIT G
PAGE 00106

example, interests in fourteen of the thirty-three polices in the Fund, with a total face value of

$68.4 million, were transferred to Lydia's agent less than four weeks after the policies were

issued. Eight of these fourteen transfers happened less than ten days after issuance. Once again,

Defendants knowingly or recklessly failed to make any disclosure to investors associated with

these material risks.

**Defendants Misstated the Nature of Its Investment Process and the Underlying Assets**

71.    Throughout the June 2006 PPM and of the various PowerPoint presentations,

newsletters, and other communications, Defendants represented that they utilized the services of

various escrow agents in order to provide false assurance to investors that the Defendants will

would not have an opportunity to misappropriate investors' funds. For example, the 2006

PowerPoint, specifically states:

> All investments are wired directly to the Fund's US-Onshore Bank Account at JP
> Morgan. The sole signatories to this account are our administrators, [DL]. They
> in turn wire the deposit to escrow with Morgan Stanley, and only when policies
> have been received by them with details amended to reflect the [Fund] as the new
> and sole beneficiary, is any capital released by Morgan Stanley. This structure
> has been devised to deliver peace of mind and allay any fears regarding potential
> misappropriation of funds.

72.    While investors' funds were initially placed into an account over which the

Fund's administrator had sole signatory power, Manterfield and Andersen then had the funds

moved to other accounts over which they had direct or indirect control. For example,

Manterfield and Andersen were signatories on the Morgan Stanley escrow account described in

the 2006 PowerPoint. Thus, once the investors' money was transferred into the Morgan Stanley

account, Manterfield simply withdrew funds as he saw fit. Moreover, in addition to the Morgan

Stanley account, Defendants used several other "escrow" accounts, to which they likewise

28.

**EXHIBIT G**
**PAGE 00107**

enjoyed easy access though direct or indirect control of the various escrow agents. Through this process, Defendants were able to misappropriate millions of investors' funds.

73.    Defendants also made knowing or reckless material misrepresentations during the Relevant Period about the assets that they were buying for the Fund. For example, a one page fact sheet that Lydia distributed to investors in Asia during the Relevant Period indicated that the Fund owned interests in life insurance policies issued by highly rated and commonly known insurance companies, New York Life, Metropolitan Life, and Mass Mutual, when in fact, the Fund never owned any interests in policies issued by these companies. Defendants knew that the fact sheet was false and misleading because they approved or at least ratified all of the transactions in which interests in insurance polices were purchased, and thus, knew the names of the companies involved.

74.    Defendants also knowingly or recklessly provided materially false information to investors with respect to the manner in which they selected life insurance interests for the Fund. The June 2006 PPM, the 2006/7 PowerPoint, as well as the July and August 2006 newsletters, contain representations about the Fund's purported "Policy Selection Criteria," including the following requirements: (1) expectancy reports from at least two firms completed within ninety days of closing; (2) annual premium rates set at no more than 5% of face value; and, (3) life expectancies of between five and ten years with a preference towards expectancies of between five to nine years.

75.    Defendants knowingly or recklessly disregarded the fact that these selection guidelines were rarely used. In fact, material variations from the published parameters were tolerated without disclosure to investors. For example, less than half of the insureds had two life

EXHIBIT G
PAGE 00108

expectancy analyses completed prior to closing and, in most instances, the reports were completed more than ninety days before closing (i.e. they were stale). Defendants also knowingly or recklessly disregarded the fact that more than twenty of the thirty-three policies in which the Fund held interests have annual premiums that are greater than 5% of face value. Similarly, there were more than nine policies, with a combined face value of greater than $40 million, where the insured's life expectance was estimated at greater than 10 years. Both of these issues, higher premiums and longer life expectancies, created a risk of lower than projected returns, and should have been disclosed to investors.

### FIRST CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

76.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-75 of the Amended Complaint as if set forth fully herein.

77.     Defendants, directly or indirectly, acting intentionally, knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) have employed or are employing devices, schemes or artifices to defraud; (b) have made or are making untrue statements of material fact or have omitted or are omitting to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) have engaged or are engaging in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

78.     As a result, Defendants have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

30

EXHIBIT G
PAGE 00109

## SECOND CLAIM FOR RELIEF
### (Violation of Section 17(a) of the Securities Act)

79.    The Commission repeats and incorporates by reference the above allegations in of

the Amended Complaint as if set forth fully herein.

80.    By reason of the foregoing, Defendants, directly or indirectly, in the offer or sale

of securities, by use of means or instruments of transportation or communication in interstate

commerce or by the use of the mails, in the offer or sale of securities: (a) employed devices,

schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of

material fact or omissions to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or (c) engaged in

transactions, practices or courses of business which operated as a fraud or deceit upon the

purchaser of securities in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

81.    As a result, Defendants have violated and, unless enjoined, will continue to

violate Section 17(a) of the Securities Act.

## THIRD CLAIM FOR RELIEF
### (Violation of Sections 206(1) and 206(2) of the Advisers Act)

82.    The Commission repeats and incorporates by reference the above allegations in of

the Amended Complaint as if set forth fully herein.

83.    Defendants were investment advisers within the meaning of Section 202(a)(11) of

the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

84.    Defendants, by use of the mails or any means or instrumentality of interstate

commerce, directly or indirectly, acting intentionally, knowingly or recklessly: (I) have

31

EXHIBIT G
PAGE 00110

employed or are employing devices, schemes, or artifices to defraud; or (b) have engaged or are

engaging in transactions, practices, or courses of business which operate as a fraud or deceit

upon a client or prospective client.

85.     As a result, Defendants have violated and, unless enjoined, will continue to

violate Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a preliminary injunction, order freezing assets and order for other equitable

relief in the form submitted with the Commission's motion;

B.     Enter a permanent injunction restraining Defendants and each of their agents,

servants, employees and attorneys and those persons in active concert or participation with them

who receive actual notice of the injunction by personal service or otherwise, including facsimile

transmission or overnight delivery service, from directly or indirectly engaging in the conduct

described above, or in conduct of similar purport and effect, in violation of:

1.     Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. '240.10b-5];

2.     Section 17(a) of the Securities Act [15 U.S.C. § 17q(a)];

3.     Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1), (2)];

C.     Require Defendants to disgorge their ill-gotten gains and unjust enrichment, plus

pre-judgment interest, with said monies to be distributed in accordance with a plan of

distribution to be ordered by the Court;

32

EXHIBIT G
PAGE 00111

D.      Order Defendants to pay an appropriate civil monetary penalty pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act

[15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

E.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

F.      Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Plaintiff hereby requests that this matter be tried before a jury.

                              /s/ R. Daniel O'Connor
                              R. Daniel O'Connor (BBO #634207)
                                   oconnord@sec.gov
                              Silvestre A. Fontes (BBO #627971)
                                   fontess@sec.gov
                              Martin F. Healey (BBO #227550)
                                   healeym@sec.gov
                              Attorney for Plaintiff
                              SECURITIES AND EXCHANGE COMMISSION
                              33 Arch Street
                              Boston, MA  02110
                              (617) 573-8991 (Fontes)
                              (617) 573-8952 (Healey)
                              (617) 573-8979 (O'Connor)
                              (617) 573-4590  fax

May 1, 2007

33

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 148846    – SH**

**March 18, 2008
09:33:21**

**Civ Fil Non-Pris**
USAO #.: 08CV0498
Judge..: MARILYN L HUFF
Amount.:
Check#.: BC67382                    $350.00 CK


**Total–>    $350.00**


FROM: XA EQUITABLE LIFE INS CO. V.
MORAN ET AL

ßJS 44 (Rev. 11/04)                        **CIVIL COVER SHEET**                        FAXED

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)  PLAINTIFFS**

XA EQUITABLE LIFE INSURANCE COMPANY

**(b)** County of Residence of First Listed Plaintiff   New York, NY
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
RINKER BIDDLE & REATH LLP, 50 Fremont St., 20th Floor, San Francisco, CA 94105, 415-591-7500

**DEFENDANTS**

H. THOMAS MORAN, II, Ct-Apptd Rcvr of LYDIA CAPITAL LLC & GEORGE WILLIAMSON, Trustee RW AXA LLC

County of Residence of First Listed Defendant   Oklahoma
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

FILED
MAR 17 2008
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

'08 CV 498  H LSP

**II. BASIS OF JURISDICTION**  (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability |  | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liabiliy | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability |  |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other |  |  | ☐ 900 Appeal of Fee Determinatio Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition |  |  |  |

**V. ORIGIN**  (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC § 2201
Brief description of cause:
Declaratory Judgment

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**  (See instructions)   JUDGE _____   DOCKET NUMBER _____

DATE   03/17/2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 148846   AMOUNT $350   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____

SL 3/18/08



JS 44 Reverse (Rev. 11/04)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.     Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.     Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.**          Example:          U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.     Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.     Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.